IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

DEC - 2 2011

David J. Bradley, Clerk of Court

THERESA ALLEN, §
INDIVIDUALLY, and as NEXT §
FRIEND to E██████ T██████ ██ §
█ A█████ and §
K██████ T██████ A█████ █ §
Plaintiffs §
§ CIVIL ACTION NO. _4:11CV4170_
§ JURY TRIAL REQUESTED
§
§
§
§
v. §
§
TEXAS DEPARTMENT OF §
FAMILY AND PROTECTIVE §
SERVICES, HOWARD BALDWIN, §
YOLANDA ALPOUGH, ADRIAN §
HOMER, STEPHANIE HAMMON, §
IVY CHAMBERS, and UNKNOWN §
COMMISSIONERS, SUPERVISORS §
OR DIRECTORS OF §
YOLANDA ALPOUGH, ADRIAN §
HOMER AND STEPHANIE HAMMON §
Defendants §

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE AND JURY OF SAID COURT:

### Parties

1.    Plaintiffs are individuals that are citizens of the Unites States and residents of the State of Texas.

2.    Defendant, Texas Department of Family and Protective Services, Child Protective Services (hereinafter "TDFPS" or "CPS"), a Texas State governmental

1

entity, may be served with process by serving its Commissioner, Howard Baldwin, at 701 West 51st Street, Austin, Texas 78751.

3.      Defendant, Howard Baldwin, an individual, may be served with process at 701 West 51st Street, Austin, Texas 78751.

4.      Defendant, Yolanda Alpough, an individual, may be served with process at 2500 Bolsover, Houston, Texas 77005.

5.      Defendant, Adrian Homer, an individual, may be served with process at 9333 Bryant, Houston, Texas 77075.

6.      Defendant, Stephanie Hammon, an individual, may be served with process at 2500 Bolsover, Houston, Texas 77005.

7.      Defendant, Ivy Chambers, an individual, may be served with process at 2500 Bolsover, Houston, Texas 77005.

8.      Defendants, Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon, individuals, may be served with process once identities are established.

## Capacity

9.      Plaintiffs sue Howard Baldwin in his official and individual capacities.

10.     At the time of the occurrences at issue in this suit, Defendants Yolanda Alpough, Adrian Homer, Stephanie Hammon, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon were officers of cps, were acting in such capacity as agents, servants, and employees of CPS, were acting under the direction and control of CPS, were acting under the direction and control of CPS, and were acting

2

pursuant to either official policy, or the custom, practice, and usage of CPS.

11.     Defendant CPS is a department of the State of Texas organized and existing under the laws of the State of Texas. In this cause, CPS acted through its agents, employees, and servants, who were the policymakers for CPS and for the conduct of the persons employed by CPS and through Defendants Yolanda Alpough, Adrian Homer, Stephanie Hammon, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon.

12.     Plaintiffs sue Defendants Yolanda Alpough, Adrian Homer, Stephanie Hammon, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon each in their individual and official capacities.

13.     At all times referred to herein, Defendants Yolanda Alpough, Adrian Homer, Stephanie Hammon, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Texas and/or CPS and/or Harris County and pursuant to their authority as officers of CPS.

### Jurisdiction

14.     This Court has jurisdiction to hear and determine this action based upon violations of the Fourth and Fourteenth Amendments to the United States Constitution, federal civil rights law pursuant to 42 U.S.C. §§ 1983 and 1988, federal statutes, and Texas statutory and/or common law. The court has

jurisdiction of this action under 42 U.S.C. § 1983, 28 U.S.C. § 1343, and 28 U.S.C. §1331.

## Conditions Precedent

15.     All conditions precedent have been performed or have occurred.

## Facts

16.     This is an action for money damages and for prospective relief against the Defendants named above, for violations of the Fourth and Fourteenth Amendments to the United States Constitution, federal civil rights law pursuant to 42 U.S.C. §§ 1983 and 1988, the Texas Constitution, and Texas statutory and/or common law.

17.     Plaintiff Theresa Allen ("Ms. Allen") is the maternal grandmother and is now the Sole Managing Conservator of ~~Elliott Tyler Allen~~ and ~~Katelynn Tyler Allen~~.

18.     In 2007, Renesha Allen, the birth mother of Plaintiffs ~~Elliott Allen~~ and ~~Katelynn Allen~~, placed the children with Ms. Allen and "disappeared" for a time. Later, CPS became involved with Renesha and placed her and the children in a residential drug rehabilitation program.

19.     Renesha later obtained her own apartment, but again left the children with Ms. Allen.

20.     Around August 23, 2009, Renesha asked for a visit with the children. Ms. Allen brought the children to Renesha's apartment for about an hour while Ms. Allen attended a church meeting. When Ms. Allen arrived back at Renesha's

apartment, she smelled marijuana. Renesha refused to return the children and demanded money from Ms. Allen.

21.     Ms. Allen contacted Houston police, but was told by the officer who came out that it was a CPS matter. Ms. Allen then called CPS and informed them of the incident. Renesha called Ms. Allen the next morning and informed her that she could pick up the children, which she promptly did.

22.     CPS took no action.

23.     About November 12, 2009, Defendant Yolanda Alpough left a message on Ms. Allen's voicemail stating that she was a CPS investigator and was trying to contact Renesha Allen. Ms. Allen returned Alpough's call immediately and informed Alpough that Renesha was at work. Alpough stated she was in fear of losing her job for missing the deadline to investigate the matter alleged by Ms. Allen, and would need to pick up the children and place them in foster care.

24.     Ms. Allen went to Renesha's workplace and informed her of the conversation. She and Renesha borrowed a friend's cell phone and left a message for Alpough, asking her to return the call.

25.     About November 16, 2009, Ms. Allen made telephone contact with Defendant Stephanie Hammon, Alpough's supervisor. Hammon stated that she was on her way into court, and that she would call Ms. Allen back later. Hammon never returned the call.

26.     Later that same day, Alpough called Ms. Allen, who voiced her concern about Alpough's threat to remove the children from Ms. Allen and place them in foster care. Alpough told Ms. Allen that foster care was necessary because Ms.

Allen was "hiding the children." Ms. Allen stated to Alpough that the assertion was untrue, and reminded her that it was Ms. Allen who had called CPS in the first place, and that she and Renesha had attempted to contact her numerous times. She also reminded Alpough of Alpough's statement that she wanted to remove the children because she feared for her job. Alpough became angry and hung up the phone.

27.    About November 23, 2009, Ms. Allen had not heard from either Alpough or Hammon, so she sought out and left a message for Ivy Chambers, the Program Director over Alpough and Hammon.

28.    Chambers returned Ms. Allen's call. Ms. Allen informed Chambers of the threats Alpough had made to remove the children from Ms. Allen's care, and voiced her concerns about how the case was being handled. Chambers promised to call Ms. Allen back. She never did.

29.    About December 3, 2009, Ms. Allen again attempted to contact Chambers. Later that same day, Hammon called Ms. Allen and was very angry with her for calling Chambers. Hammon informed Ms. Allen that she would be sorry for going over Hammon's head. Ms. Allen apologized to Hammon, explaining that she did not intend to harm or embarrass anyone. She was simply trying to do what was best for her grandchildren. Hammon stated that Alpough would be coming to Ms. Allen's home the following morning, but would not tell her why.

30.    About December 4, 2009, Alpough and a co-worker arrived at Ms. Allen's home. Alpough informed her that she was there to take Ms. Allen's

grandchildren. Ms. Allen begged her not to do so, but Alpough stated that "you

never should have gone over my head."

31.    The following explanation of the day's events came from Alpough's own

Investigation Report (*See* Exhibit A):

> 12104/2009 FTF at the home of the maternal grandmother. Ms.
> Theresa Allen was aware that I would be arriving at 10:00 AM and
> permission was given to enter the home. When I arrived that
> children were on the floor playing I watching TV in their pajamas. It
> was snowing outside and our offices were closing. I explained to
> the grandmother instead of meeting to discuss a plan the
> supervisor Stephanie Hammon had advised me to remove the
> children and return to our office so that we could get them placed
> before the weather got too bad. Ms. Theresa Allen said she wanted
> the main number to my office so that she could speak with my
> supervisor. I provided the number and she called it but asked for
> Scott Dixon and was told he was not in that office. I explained that
> she would not find him in that office but she said she wanted the
> number for my supervisor not Mr. Dixon. She said she had her own
> way of doing things and she needed to talk to Mr. Dixon. I told her
> that he was at Murworth and provided her with the number.
>
> After 20 minutes I called my supervisor and explained that Ms.
> Allen still had not made any progress getting the children dressed
> and that she was being passive aggressive. I was instructed to go
> ahead and call out the police so we could get the children and
> leave.
>
> Ms. Allen spoke on the phone with supervisor Stephanie Hammon
> on a coworker's cell phone and it was explained to her that the
> decision was made to take custody of the children and the process
> was explained to her.
>
> The police arrived at 10;40 AM and after being there 10 minutes the
> grandmother still had not put any clothes on the children and the
> officers were losing their patience. She was very vocal with them
> and they told her to be quiet and get the children ready, she said if
> you want to put your jacket around them and take them then go
> right ahead. The officer said you have a suitcase full of clothes right
> there just put some clothes on the children so these people can
> take the children and get out this weather. She said she did not
> want the children to have to see the police the fact that they were
> called was unnecessary and traumatizing for the children. The

officer said if you dld not want the children to see the police you
had ample-time to get them ready before we .arrived. He said the
police are not traumatizing for the children unless you make it that
way for them. You should not teach your children that the police are
bad or to fear the police. Ms. Allen continued to talk to the police as
she was trying to get someone on the phone and try to iron a T-
shirt In the kitchen. We were finally able to leave the home at

11: 15/11 :20 AM as the police escorted us to the car.

Ms. Theresa Allen called a friend Faye on the cell phone and tried
to get Mr. Dixon on the home phone. She said she wanted her on
the phone as a witness because they were there to take her
grandbabies. An older white male came by named Joe who said he
was friend of Ms. Allen he said he was also a minister.

32.    Alpough took plaintiffs E███ and K██████ Allen into state custody without

consent from Ms. Allen, without a court order, and without an emergency

situation. Alpough, at the direction of Hammon, used armed police officers to

support her forced removal of the children.

33.    During the removal, Pastor Jim MacKennon came to Ms. Allen's home to

deliver some documents. Alpough shouted "Who is this?" and ordered him to

leave Ms. Allen's home. This visibly upset the children, so in order to keep them

calm MacKennon went and sat in his truck until Alpough and the police left.

34.    Also during the removal, Ms. Allen repeatedly tried to call Hammon but got

no response. However, Ms. Allen noticed at one point that Alpough's co-worker

had Hammon on the phone. Ms. Allen begged the co-worker to allow her to

speak to Hammon, and she did. Ms. Allen asked Hammon why they were doing

this to her grandchildren. Hammon stated that "it's because you went over my

head."

35.     Alpough's co-worker informed Ms. Allen that an emergency hearing was to take place, but did not tell her what an emergency hearing was, or where or when it would take place. Ms. Allen attempted to get the information from Alpough, but a police officer told her not to talk, but to just get the children ready to leave. Alpough left without giving the information to Ms. Allen.

36.     Fortunately, Ms. Allen knew a former CPS employee who was able to find out for her when and where the emergency hearing was to be held.

37.     At 7:30 a.m. on December 7, 2009, Ms. Allen and several supporters arrived in the 315th Juvenile District Court of Judge John Phillips. Renesha Allen was not in attendance, as she was undergoing a drug rehabilitation program. She had, however, provided a letter stating that she wanted her children to be placed with Ms. Allen.

38.     After waiting a long while, Ms. Allen observed Alpough enter the courtroom and speak with the court clerk. Judge Phillips then announced that court was in recess until December 17 and left the bench. Ms. Allen, confused, approached the clerk and asked to speak to Judge Phillips. The clerk stated that there was nothing she could do, and that Ms. Allen would need to speak to CPS.

39.     Immediately after the hearing, Ms. Allen went to the CPS office at 2525 Murworth in Houston, Texas. She asked to speak to Regional Director Scott Dixon. After almost two hours, she was approached by James Castille, the Regional Deputy Director. She explained to him what had happened in this case, and asked to speak to Mr. Dixon. Castille stated that Dixon was in a meeting, but that he, Castille, would investigate her complaint. Approximately fifteen minutes

later, Dixon did meet with her and Castille. She repeated her story to Dixon. He stated that he would investigate and call her back.

40.     As far as Ms. Allen knows, no such investigation took place. Neither Dixon nor Castille ever contacted her again.

41.     On December 8, 2009, Ms. Allen was allowed to visit E███ and K███████ at the CPS office. It was K███████ third birthday. The children were dirty and smelled of stale urine. K███████ hair did not appear to have been combed in quite some time. Both children looked shocked and confused. Ms. Allen voiced her concern at the children's condition to Hammon, who merely smiled and reminded Allen that she had gone over the woman's head.

42.     At the visit, Hammon stated to Ms. Allen that she would never see the children again.

43.     On December 17, 2009, Ms. Allen arrived for the Show Cause hearing. At the hearing, Ms. Allen discovered that the Emergency Hearing on December 7 had taken place in Associate Judge Aneeta Jamal's court across the hall from Judge Phillips' court. Ms. Allen also discovered that Alpough had apparently fabricated the tale that that Ms. Allen was not present at the Emergency Hearing because Judge Phillips had thrown her out of his courtroom! (*See* Exhibit B, Transcript of Show Cause Hearing, page 5 line 21 – page 6 line 4, and page 14 line 16 – page 15 line 16.)

44.     Alpough made other outrageous and untrue statements at the hearing. She stated that Ms. Allen took the children and Alpough couldn't find them for a period of time, that Ms. Allen lied to her, and that she had "concerns" about Ms.

Allen's emotional stability. *Id.* at page 5, lines 8 – 20. As shown above, the CPS defendants knew that Ms. Allen had not taken the children but was in fact the children's primary caregiver. The CPS defendants knew exactly where the children were.

45.     Alpough gave no examples of how Ms. Allen had lied. Alpough later stated that her concerns about emotional stability were that Ms. Allen was bipolar and not taking her medication. She provided no evidence to support this allegation, and could not had the judge required her to do so. Id at page 9, lines 9 – 22.

46.     Alpough then proceeded to state to the Court that Ms. Allen had actually attempted to hide the children from her. *Id.* at page 9 line 23 – page 10 line 18. As shown above, however, Ms. Allen had made the call that got CPS involved in the first place, and had repeatedly tried to get the CPS defendants to do their jobs.

47.     Alpough also told the judge that Ms. Allen lived with her son, who has an "extensive criminal history." *Id.* at page 9 line 3 – 10. This was also blatantly false.

48.     The end result of Alpough's false statements was that Judge Jamal approved of CPS' warrantless taking of the children and keeping them in foster care. *Id.* at page 11 lines 11 – 18.

49.     The judge ordered CPS to conduct a home study on Sonya Balenton, a family friend. Ms. Allen, although not a party at the time, was ordered to take a drug test and a "Four C's" (Children's Crisis Care Center) assessment and follow its recommendations. *Id.* at page 19 line 13 – page 20 line 18. 44. Ms. Balenton

11

passed the Home Study, but CPS never placed the children with her. As a result, the children spent ten months in foster care

50.     The Four C's assessment is an interview process where the adult's resources and risk factors are explored, so that resources can be identified that the adult may need to access in order to regain possession of the child. This assessment *might* lead to a recommendation for further testing, such as psychological testing, if the information gathered at the assessment warranted such a recommendation.

51.     CPS never conducted this assessment. Rather, CPS employee Adrian Homer stated to Ms. Allen about December 23, 2009 that he was informed by his supervisor that the Court had ordered a full psychological examination. He further stated that the Court had ordered no visits between her and the children. Both statements were blatantly false, as no such orders were given by Judge Jamal. See Exhibit B.

52.     About December 30, 2009, Ms. Allen was invited by her daughter to attend a permanency conference, a meeting designed to review the permanency plan for a child or to remove barriers to finding a permanent placement for the child.  CPS' own online handbook states that family and extended family are welcome to attend. However, Hammon barred Ms. Allen from the meeting.

53.     After complaining to others, Ms. Allen was finally allowed entry into the meeting. However, it was almost concluded.

54.     After the meeting, CPS supervisor Beverly Morris told Ms. Allen that she was not being considered for placement of the children. Morris read to her what

she held out to a Court order requiring a psychological examination and barring visitation between Ms. Allen and her grandchildren. Plaintiffs do not at this time have a copy of the alleged order, if it exists.

55.    If such an order does exist, it does not comport with statements by the judge at the show cause hearing and Plaintiffs question its veracity. What the judge did order was this: "I want a drug test on grandma too if she is going to be visiting." *Id.* at page 17 lines 12 – 15.

56.    Ms. Allen took the drug test that same day, and passed it. However, she never found out the results until she discovered them in the CPS case file, which the Court ordered CPS to hand over in September 2010 after Ms. Allen's motion to compel discovery, fully nine months after the drug test cleared her to visit her grandchildren.

57.    On January 19, 2010, Ms. Allen met with Defendant Ivy Chambers, the Program Director over Alpough and Hammon. Chambers admitted that the case had been mishandled, and took "the majority of the blame" on herself because she was acting on what she was being told by her staff. Ms. Allen asked Chambers if this admission meant that she was going to set things right. Chambers, unconcerned, stated that it was out of her hands now.

58.    On September 30, 2010, the Court held a Permanency Hearing. At the hearing, CPS announced that their goal in the case was unrelated adoption, meaning that the desire was to allow strangers to adopt the children, forever severing their family relationship with their grandmother. See Exhibit C, September 30, 2010 transcript of Permanency Hearing, page 7 lines16 – 18.

The representative for Child Advocate on the case, as usual, was "with CPS on this matter on adopting the children." When asked by the Court what the problem with Ms. Allen was, the Child Advocate responded that "I have attempted several times with [the current CPS caseworker] to find out what the exact problem is." *Id.* at page 9 line 20 – page 10 line 2.

59.     At the hearing, the Court asked why a home study done on Ms. Allen had been denied by CPS. The answer was that "[t]he concerns were that she doesn't have contact with any of her siblings. She could not provide information regarding the whereabouts, ages or occupations, which led the person that did the home study to think that she might be hiding something." Id at page 11 lines 15 – 19. Ms. Allen categorically denies this allegation. Further, the CPS defendants had been in contact with family members of Ms. Allen and knew these allegations to be false.

60.     At the hearing, it became clear that the Court was unaware of any order barring Ms. Allen from visiting her grandchildren, and wanted to know why she was not. The fiction that there was a court order in place was dropped, and instead the reason for denial of visitation was now because CPS "didn't recommend it because she didn't think the children would be placed there." *Id.* at page 14 line 13 – page 16 line 18.

61.     At an October 7, 2010 hearing regarding visitation with Ms. Allen, the conspiracy to keep Ms. Allen away from her grandchildren, furthered by current CPS caseworker Adrian Homer, finally began to unravel. The Court finally realized that there was no order against visitation. *See* Exhibit D, Transcript of

October 7, 2010 hearing regarding visitation, page 13 line 16 – page 17, line 4.

The Court saw through the obfuscation and untrue statements and ordered

visitation between Ms. Allen her grandchildren. *Id.* at page 23 lines 18 – 20.

62.     Despite the Court's order, CPS refused visitation. Defendant Homer

ignored repeated attempts by Ms. Allen to set up visitation with her

grandchildren.

63.     On November 9, 2010, the Court ordered the grandchildren back home

with Ms. Allen.

64.     On March 8, 2011, the Court made Ms. Allen Sole Managing Conservator

of Elisha Allen and Katelynn Allen.

## Causes of Action

65.     For all causes of action, Plaintiffs incorporate by reference paragraphs 9 -

64 as though fully set forth at length herein.

## Count # 1 - Unlawful Retaliation Cognizable Under 42 U.S.C. § 1983

66.     The conduct of Defendants Yolanda Alpough and Stephanie Hammon,

acting individually and in conspiracy, as set forth above, was a direct result of

their personal animus toward Plaintiff Theresa Allen and/or as retaliation for Ms.

Allen's "going over the head" of Defendants Alpough and Hammon and speaking

with Defendant Chambers. As such, Defendants' actions were an unlawful and

malicious attempt, under color of law, to harass, intimidate, and punish Plaintiff

Allen.

67. The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

68. If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count # 2– Unlawful Search and Seizure Without Probable Cause by CPS Agents

69. Defendants Yolanda Alpough, Stephanie Hammon, and Ivy Chambers acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant or order, and in failing to take any steps to confirm the validity of information provided them by informants when they had reason to doubt the validity of such information, based on information in their own files. They further fabricated "evidence" such as Ms. Allen was hiding the children from CPS agents, knowing that the "evidence" was untrue.

70. As a result of Defendants' acts as described above, Defendants deprived Plaintiffs of their right to be free from unlawful searches and seizures, in violation of the Fourth Amendment to the Constitution of the United States.

71. As a direct and proximate result of the Defendants' actions as described above, Plaintiffs suffered damages and will suffer additional damages in the future in an amount that cannot yet be determined.

72. The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

73.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

74.    Prior to the incidents at issue in this case, Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon knew of previous incidents involving Defendants or other CPS agents, wherein those CPS agents acted unreasonably and in reckless disregard for the truth in failing to seek or secure a proper warrant or order, and in failing to take any steps to confirm the validity of information provided them by an informant when they had reason to doubt the validity of such information. They took no action to discipline Defendants or other CPS agents, or to order them not to repeat such incidents, thus tacitly authorizing such conduct. If they had taken such remedial action, the unlawful procedures would not have occurred.

75.    CPS is vested by state law with the authority to make policy on the practice of child abuse investigations. CPS was aware of a pattern of unlawful investigations and seizure of children without due process, when due process was available, by workers employed by CPS; they were aware that the policies regarding the discipline of workers accused of such unlawful practices was so inadequate that it was obvious that a failure to correct them would result in further incidents of unlawful searches; and the failure to correct said policies caused the unlawful procedures to be forced upon Plaintiffs as set forth above. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

76.     At all times relevant to this complaint, Defendants, as CPS employees, were acting under the direction and control of Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and of CPS, and were acting pursuant to the official policy, practice, or custom of CPS.

77.     Acting under color of law and pursuant to official policy, practice, or custom, Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and CPS intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, Defendants in their duties to refrain from unlawfully and maliciously conducting an illegal search and seizure against Plaintiffs.

78.     Acting under color of law and pursuant to official policy, practice, or custom, Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and CPS intentionally, knowingly, and recklessly failed to instruct, train, and supervise Defendants on a continuing basis in the correct procedure for conducting a lawful investigation of alleged child abuse.

79.   Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and CPS had knowledge, or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about

to be committed. Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and CPS had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly, or recklessly failed or refused to do so. The allegations in this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

80.    CPS directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants as set forth above.

81.    As a direct and proximate result of the acts or omissions of Yolanda Alpough, Stephanie Hammon, Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon and CPS as set forth herein, Plaintiffs suffered mental anguish in connection with the deprivation of their constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and protected by 42 U.S.C. § 1983.

82.    The acts of Yolanda Alpough, Stephanie Hammon, Howard Baldwin, Ivy Chambers and Unknown Commissioners, Supervisors or Directors of Yolanda Alpough, Adrian Homer and Stephanie Hammon as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacity.

## Count #3 –Interference with Family Relationships

83.     As a direct and proximate result of the unlawful, deliberately indifferent, and malicious acts of Defendants CPS, Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon, as set forth above, and as a direct and proximate result of established policies and customs of CPS as set forth above, Plaintiffs were deprived of their right to the services, consortium, companionship, comfort, and support of their grandchildren/grandparents without due process of law, in violation of their rights under the Fourteenth Amendment to the United States Constitution to live together as a family.

84.     If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Count #4 - Removing Children from Family Custody Without Hearing

85.     As a direct and proximate result of the unlawful, deliberately indifferent, and malicious acts and omissions of Defendants CPS, Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon, Plaintiffs were deprived of their liberty without due process of law in contravention of the Fourteenth Amendment of the United States Constitution as a result of the failure of the Defendants to afford Plaintiffs a hearing regarding the decision to remove the Plaintiff children from Plaintiff Allen's custody.

86.     If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Count #5 - Intentional Infliction of Emotional Distress

87.    The conduct of Defendants Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon was extreme and outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious and intolerable in a civilized community. In particular, the conduct was outrageous because Defendants, despite possessing no evidence to support allegations of child abuse or neglect, and despite possessing evidence to refute allegations of child abuse or neglect, nonetheless forcibly removed the Plaintiff children from their home with their grandmother and attempted through legal action to terminate the family relationship. The Plaintiff children were subjected to extreme fear and anxiety, in addition to unsafe conditions.

88.    The Defendants' conduct proximately caused Plaintiffs damage in that it caused Plaintiffs to suffer severe emotional distress. In particular, the Defendants' conduct was the direct and proximate cause of severe disappointment, indignation, wounded pride, shame, despair, and public humiliation in that Plaintiff Allen was deprived of her grandchildren, threatened with the permanent loss of same, and falsely portrayed as a perpetrator of child abuse/neglect, and/or harboring children on behalf of an abusive or neglectful parent to the community.

89.    In addition to emotional distress, Plaintiffs have suffered and will continue to suffer additional damages as a proximate result of the Defendants' conduct in that, in all reasonable probability, Plaintiffs will continue to suffer this mental pain and anguish for a long time into the future. Plaintiff Theresa Allen has also incurred damages in the form of attorney's fees and court costs to defend against Defendants' conduct and to try to clear her name.

90.    Defendants' conduct as set forth above was malicious and fraudulent so as to entitle Plaintiffs to recover exemplary damages. In this connection, Plaintiffs will show that as a result of Defendants' conduct, Plaintiffs have suffered losses of time and other expenses, including attorney's fees incurred in the investigation and prosecution of this action. Accordingly, Plaintiffs ask that exemplary damages be awarded against the Defendants in a sum within the jurisdictional limits of this Court.

### Count #6 - Invasion of Privacy (Intrusion on Seclusion) and § 1983 Violation of Zone of Privacy Protected by the United States Constitution Committed by Governmental Agent

91.    As a direct and proximate result of Defendants CPS, Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon's unjustified and unlawful invasion of Plaintiffs' privacy, Plaintiffs suffered loss of privacy as well as the private use of their residence. Furthermore, Plaintiffs have suffered humiliation, embarrassment, fear, frustration, and general mental anguish, and in all reasonable likelihood they will continue to do so for a long time in the future.

92.    Plaintiffs have suffered actual losses and actual damages as a direct and proximate result of the Defendants' cruel and wrongful invasion of their privacy described above in a sum within the jurisdictional limits of the Court and for which Plaintiffs sue.

93.    Defendants' conduct constituted a fraudulent and malicious violation of Plaintiffs' right to privacy. Plaintiffs, therefore, are entitled to recover exemplary damages. Accordingly, Plaintiffs sue for exemplary damages in a sum within the jurisdictional limits of this Court.

94.     If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Count #7 - Negligence

95.     Defendant CPS was negligent in the manner in which it placed the Plaintiff children with foster caregivers. CPS had a duty to insure that the children were placed into comfortable, appropriate, safe environments. The children were not so placed.

96.     CPS' breach of their duty to Plaintiffs was the proximate cause of extreme trauma, emotional distress and mental anguish. Damages will be determined by a jury. Because this action by CPS showed reckless indifference by CPS, Plaintiffs seek punitive damages for this negligence.

### Count #8 - Abuse of Civil Process Under 42 U.S.C. § 1983

97.     Defendants Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon, acting individually or together and in conspiracy, caused the litigation against Plaintiff Theresa Allen as set forth above to issue against her and assisted in the prosecution of said litigation.

98.     Defendants were motivated in the pursuit of civil charges against Plaintiff Theresa Allen not by a belief that the charges had any factual or legal merit or that probable cause for their issuance existed, but for improper, illegal and unconstitutional purposes, to wit:

    a.      Defendants sought to protect themselves from civil and/or criminal liability for the unlawful treatment of Plaintiffs as set forth above, by litigating against Plaintiff Theresa Allen which, if proven, would

arguably have demonstrated the justification for the treatment of Plaintiffs; and/or

b.     Defendants sought to collect monies from Texas State and/or federal agencies in relation to the taking of the Plaintiff children, placing said children in foster care, and later placing said children for adoption; and/or

c.     Defendants strongly resented the fact that Plaintiff Theresa Allen stood up to them on behalf of her grandchildren; and/or

d.     Defendants were consumed with their own power agenda.

99.     Defendants falsified their official reports and offered perjured testimony at hearings of causes of action against Plaintiffs in an attempt to secure rulings against Plaintiffs. Further, Defendants routinely disregard statutory requirements for gathering evidence.

100.     The conduct of Defendants as set forth above clearly violated Plaintiffs' fundamental right to be free of unreasonable and unlawful seizure, secured by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

101.     The acts of Defendants as set forth above were intentional, wanton, malicious, and oppressive, thus entitling Plaintiffs to an award of punitive damages against said Defendants in their individual capacities.

102.     If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Count #9 – Conspiracy

103.   Defendants CPS, Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon, acting in their individual and official capacities and under color of law, having conspired together and with others, reached a mutual understanding and acted to undertake a course of conduct that violated Plaintiffs' civil rights, to wit:

a.    Defendants Alpough, Hammon and Chambers agreed and acted intentionally to illegally remove the Plaintiff children and place them in foster care without due process of law or probable cause, thereby unreasonably depriving them of their liberty without due process of law.

b..    Defendants Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon agreed and acted intentionally to forcibly remove children from their home without any probable cause, warrants, orders, or other due process of law. This was an unreasonable search and seizure and improper deprivation of liberty.

c.    Defendants Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon agreed and acted intentionally to litigate to prevent Plaintiff Theresa Allen from getting her grandchildren returned to her after they were snatched by CPS. No reasonable basis in fact existed for this extraordinary action, or the months of litigation that followed as Defendants tried to terminate Ms. Allen's family relationship to her grandchildren.

d.    Defendants Baldwin, Alpough, Homer, Hammon, Chambers, and Unknown Commissioners, Supervisors or Directors of Alpough, Homer and Hammon agreed and acted intentionally to keep the Plaintiff children

from being returned to their grandmother. This was a violation of due process.

104.   The above conspiracies are the proximate cause of mental anguish, emotional distress, and legal expenses for Plaintiffs.

105.   If Plaintiffs prevail, they are entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Count #10 - Violation of State Constitution

106.   By their actions described above, Defendants violated Article 1, Sections 9 and 19 of the Texas Constitution.

## Jury Requested

107.   A jury trial is requested on all issues.

## Damages

108.   As a direct and proximate result of Defendants' conduct, Plaintiffs suffered the following injuries and damages:

   a.   Lost earnings.

   b.   Damage to reputation in the past and in the future.

   c.   Mental anguish in the past and in the future.

   d.   Emotional distress.

   e.   Exemplary damages.

   f.   Costs and fees related to litigation by the State of Texas in its interference with the family relationship between Plaintiffs.

## Attorney's Fees

109.   Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to reasonable and necessary attorney's fees for the preparation and trial of this case and various

stages of appeal, if any, including additional attorney's fees in the event it is necessary to pursue the collection of any judgments.

### Prayer for Relief

110.    For these reasons, Plaintiffs ask for judgment against Defendants for the following:

      a.     Actual damages,

      b.     Exemplary damages,

      c.     Reasonable and necessary attorney's fees,

      d.     Prejudgment and Postjudgment interest,

      e.     Costs of suit,

      f.     Costs of defending appeal,

      g.     Such other and further relief that this Court may deem appropriate and just.

111.    Plaintiffs further ask the Court for the following relief against the Texas Department of Protective and Regulatory Services in addition to the requested relief hereinabove against said Defendants:

      a.     A declaratory judgment that the policies, practices, and acts complained of herein are illegal and unconstitutional.

      b.     A permanent injunction enjoining said Defendants from engaging in the practices complained of.

      c.     Such other and further relief that this Court may deem appropriate and just.

      d.

Respectfully Submitted,

By: _____
CHRIS BRANSON
Texas Bar No.: 24009914
Southern Dist. of Texas Bar No.: 24128
5380 West 34th Street #221
Houston, Texas 77092
Tel: (832) 794-3338
Fax: (713) 290-1717
ATTORNEY IN CHARGE FOR
PLAINTIFF THERESA ALLEN


By: _____
STEVEN D. POOCK      by Permission
Texas Bar No.: 00794473
Southern Dist. of Texas Bar No.: 20774
P. O. Box 984
Sugar Land, Texas 77487
Tel: (281) 2777678
Fax: (281) 277-7679
ATTORNEY IN CHARGE FOR
PLAINTIFF ELISHA TYRELL ALLEN


By: _____
TOM SANDERS      by Permission
Texas Bar No.: 17609900
Southern Dist. of Texas Bar No.: 9735
P. O. Box 1860
Sugar Land, Texas 77478
Tel: (281) 242-9700
Fax: (281) 242-8340
ATTORNEY IN CHARGE FOR
PLAINTIFF KATELYNN ALLEN