Theresa Allen, the grandmother is finally located by Alpough, and she provides Alpough with information concerning the whereabouts of the children and her daughter, (IR, p.16). Over one hundred days after the initial report had been filed, on December 4, 2009, Defendants Alpough, Hammond and Chamber decide to remove the children from the home of the grandmother while the mother is in rehabilitation, (IR, p. 18). TDFPS was aware that Renesha Allen had committed herself to rehabilitation on December 1, 2009. This decision is executed by Defendant Alpough on the morning of December 4, 2009. The "Notice of Removal of Children" form indicates that the children are being removed because of "risk of sexual abuse". A copy of the form is attached as Exhibit "F".

It is the Plaintiffs' contention, that TDFPS removed the children without consent, a court order, or exigent circumstances.

### *Consent*

There is no evidence that Renesha Allen, nor the grandmother gave TDFPS consent to remove the children. "Silence or passivity cannot form the basis for consent to enter." Roe, 299 F.3d at 402. Further, "it is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996). Theresa Allen did not affirmatively consent to let Defendant Alpough and her assistant, Casey Kane into her home to remove the children.

### *Court Order*

Yolanda Alpough, the TDFPS investigator admits in her deposition testimony that they came to the grandmother's home at 10:00 in the morning without a court order on December 4, 2009, (*See* Exhibit A, p.33 line 4-6). The Plaintiffs claim that there was

sufficient time to retrieve a court order prior to the removal. The Defendants offer no explanation as to why a court order was not sought, especially since 102 days had passed since the initial report was made to TDFPS. It had been two weeks since the positive drug test results were received from the mother. Additionally, the court system was open from 9:00 a.m. until 5:00 p.m., and a court order could have been retrieved on the morning prior to removal.

### *Exigent Circumstances*

During Alpough's initial visit with the children and mother, she states that she did not see any signs of abuse or neglect, (*See* Exhibit A, p. 15, lines 14-16.) She also states that the children did not make a disclosure, but indicated that Renesha would need to take a drug test, (*See* Exhibit A, p.16 line 14). After the test results came back positive in October of 2009, Alpough met with her supervisor, Defendant Hammond, but no determinations were made as to how to proceed, (*See* Exhibit A, p.18, line 4). Alpough clearly indicates that her supervisors determine whether an emergency exists, (*See* Exhibit A, p.18, lines 21-25). Apparently, Hammond "can't staff anything, the nature of a removal, without Ivy who is the program director," (*See* Exhibit A, p.19, lines 2-4). When Alpough is asked does she "know what an emergency situation looks like?" She initially states that "It wasn't about Ms. Allen, Theresa Allen, at that point. It was about Renesha Allen." Then she readily admitted that Renesha Allen was not in the apartment, but in rehab, (*See* Exhibit A, p. 42, lines 12-19). Seemingly, no emergency existed that placed the children at risk because the alleged perpetrator was not in the home on the day of the removal. Then Alpough was asked a second time, "What was the emergency?" This time Alpough changed her story, and stated, "I should say that it was about Theresa

13

Allen's--- the allegations of bipolar, the allegations of her not protecting her daughter when she told her she was sexually abused." Her comments are referencing Renesha Allen's child abuse claim that she was sexually abused by her stepfather when she was a child. This allegation had never been reported to CPS and had never been raised before. The matter being investigated involved Theresa Allen and her grandchildren. There was no evidence to support that Theresa Allen abused anyone. Theresa Allen lived alone in 2009, and is no longer married. These facts were known by the TDFPS workers. There was no risk of the children being abused by their grandfather in 2009. Alpough was asked a third time, "What is your definition of an emergency?" Alpough finally states, "In this case we had a parent that was not able to parent her child. So that is an emergency situation," (See Exhibit A, p.43 lines 12-25). Alpough's varying answers concerning her determination of what is an emergency is a clear indication that she was insufficiently trained and lacked the knowledge and ability to properly make that determination. Alpough's reasoning is insufficient to meet the exigent circumstances requirement for removal of the children pursuant to Fourth Amendment standards. Her supervisors, Defendants Hammond and Chambers apparently were no more equipped than Alpough to make such a determination because according to TDFPS records, a staff meeting was held on the morning of December 4, 2009, and it was determined by Alpough, Hammond and Chambers that removal was necessary, (IR, Exhibit "D", p. 18). The Defendants can not show that there was a reasonable cause to believe that the children were in imminent danger of physical or sexual abuse at the time of removal. In fact, Alpough admits that the children were not in danger of being sexually or physically abused, (See Exhibit A, p. 52, lines 2-7). She also knew about the grandmother being

14

allegedly bipolar and not on medication for at least 2 weeks but she made no effort to obtain a court order, (*See* Exhibit A, p. 52 lines 10-25). The mother's positive drug test results were received by TDFPS in October. Two month old information was used as the basis for the emergency removal, (*See* Exhibit A, p. 57, lines 5-22). In conclusion, Alpough admits that the children were not being abused, and that she "did not see an emergency happening while I was there," but yet after making such observations, she proceeded to remove the children from the home, (*See* Exhibit A, p. 63, lines 1-13).

Defendant Hammond completed the forms which indicated that the reason for removal was "sexual abuse". Hammond knew that the mother was in rehabilitation and that the children were not in immediate danger, but yet she gives authority to Alpough to move forward with the removal in violation of the Plaintiffs' rights. Chambers approved both Hammond and Alpough's actions. Alpough, Hammond and Chambers had adequate opportunity to intervene and prevent the violation from occurring. It is fair to say that TDFPS policy is that the social workers are to follow their supervisors' orders even if such orders violate the constitutional rights of others.

In summary, the children were residing with their grandmother, Theresa Allen, at the time of their removal. Renesha Allen, the mother of the children, had voluntarily placed herself in a rehabilitation center for drug abuse. TDFPS was aware of this fact. Prior to committing herself, Renesha Allen gave her mother full authority to have possession of the children and to provide for their welfare. According to TDFPS records, the "alleged perpetrators" of the abuse is the mother, Renesha Allen, and/or her boyfriend Chester Moore, not the Plaintiff, Theresa Allen. Renesha Allen, nor Chester Moore, the alleged perpetrators, were present in the home at the time of the removal and the children

15

were not at risk. There was no evidence of any danger to the children that would enable the state to act without a warrant. Id. There was nothing particularly unusual about the children's condition at the time they were removed. When reviewing the facts of this case, there were no exigent circumstances present at the time of the Defendants' initial entry into the grandmother's home that would have permitted the warrantless intrusion. The facts of this case do not give rise to an "immediate danger" supporting a warrantless entry. It was unreasonable for the TDFPS employees to conclude that the children needed to be removed from their grandmother's home on December 4, 2009. In conclusion, TDFPS's seizure was unreasonable under the exigent circumstances standard.

The Defendants received minimal information and training concerning the new Fourth Amendment standards imposed by the Gates case. It is acknowledged by Defendants Alpough, Hammond, and Chambers through discovery that they took a course entitled "What Every Caseworker Needs to Know about the 4th Amendment" which was offered in the late 2008/early 2009 timeframe. No other training is mentioned in their responses. (Defendants' Responses to Plaintiff's Interrogatory #9 are attached as Exhibits "G", "H", and "I", respectively).

Specifically, when Alpough was questioned concerning any training received involving the legal aspects of her job, she responds "I think the Fourth Amendment, things like that were mandatory training." She further states, "I remember I had it. But you know, the particulars we get briefed on as we need it." When asked "how long ago was that Fourth Amendment training? She responds, "I want to say it was in 2008," (See Alpough Deposition, page 7 lines 5-17). The dialogue and the discovery answers implicate that she took training almost 5 years ago, and she does not readily recall the

contents of what she learned. Her ability to carry out her duties as a social worker investigator was and continues to be compromised because she lacks the knowledge required to implement action that complies with the standards provided in the Gates decision for proper removals and required hearings that do not violate the constitutional rights of others. All the employees of TDFPS lack in training and education. The one time training in 2008 was insufficient to assure proper removal of children in compliance with the Fourth Amendment requirements and applicable standards promoted by the Gates case. The circumstances involving this case happened a year later. The evidence shows that the employees had already forgotten the importance of protecting the constitutional rights of others when exercising their duties as TDFPS social workers.

A failure to train or supervise the employees amount to a deliberate indifference in this case resulting in a warrantless entry into the grandmother's home without consent, court order or exigent circumstances.

### *Designated Caregiver or Relative Caregiver*

The Plaintiffs claim that it is the objective and customary practice of TDFPS to prohibit visitation by a family member when he/she is not a "designated or relative caregiver" approved by TDFPS.

No efforts were made by TDFPS to voluntary assign the grandmother, Theresa Allen as the "designated or relative caregiver" to prevent removal, as required by the Tex. Fam. Code, Ann. § 262.107(a)(3). The Defendants show no action taken to prevent removal from the date of the initial reporting, August 23, 2009 to the date of removal, December 4, 2009. Theresa Allen had always been the safe haven for the children, and had been taking care of the children since they were born. TDFPS was aware of the

grandmother's involvement with the children since 2006. In fact, the evidence will show that Theresa Allen is the individual who filed the TDFPS claim in 2007 and 2009 in an effort to protect the children from their mother's abusive environment. In 2007, Theresa Allen was "relative caregiver" for the children authorized by TDFPS. Renesha and the children were permitted to live with Theresa Allen with the restriction that Renesha was not to be left alone with the children. The children were returned to their mother in the latter part of 2007 when the mother and children were moved to the Bonita House TDFPS facility. Theresa Allen filed a second report with TDFPS in 2009 concerning her grandchildren being in danger. This lawsuit is the basis of that report. The obvious choice for TDFPS was to voluntarily designate Theresa Allen as the relative caregiver, especially since the mother had requested that her mother be given the children (See the Kinship Caregiver Request form attached as Exhibit "J"), and since the children were already residing with her at the time. Under 42 U.S.C. § 671 (a) (15) reasonable efforts shall be made to preserve and reunify families – prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home and to make it possible for a child to safely return to the child's home. 42 U.S.C. § 671 (a)(19), further provides that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards. No valid reason was given as to why Theresa Allen was not designated as a relative caregiver prior to removal, especially since TDFPS had previously given the children to her in 2007.

Theresa Allen became the victim. She was able to visit her grandchildren 1 time on December 8, 2009, thereafter, Defendant Hammond provided verbal and written

18

information to Alpough, the investigator, and eventually the subcare workers, Defendant Homer and his supervisor, stating that there was a Court Order prohibiting Theresa Allen from visiting the children, (Homer's Deposition is attached as Exhibit "K", p. 15 line 20-25). No such order existed. When asked "Did you see the order," Homer replies "No", (Exhibit K, p. 52, lines 4-5). Even when Plaintiff attempted to inform them that no such order existed, there was no effort made to substantiate the information that was relied upon. The CPS workers continued to enforce the false order without question or confirmation that such an order existed. Defendants Alpough and Homer readily admit that visitation was restricted because Theresa was not going to be designated as the caregiver of the children. Homer had testified in court on October 7, 2010 that it was his desire that Ms. Allen and her grandchildren not see each other again, (See TXSD, Document 22-4, p. 8, line 18). Homer further states that he did not want them to have visits because he was not looking to place them permanently with the grandmother, (Exhibit "K", p. 16 lines 6-10 and p. 17 lines 20 through p. 18, lines 1-6). Homer states that "I didn't have any personal biases or anything, you know, going towards Ms. Theresa Allen. I just solely went upon what the Agency was telling me to do, (Exhibit "K", p. 19, lines 18-21). It became clear in the Alpough and Homer depositions, that each employee blindly follows the recommendations of the supervisor, even when the instructions given can and did violate the constitutional rights of the Plaintiffs. Both employees claim that they merely follow supervisory directives. When the Defendants are asked whether or not they felt anything was done wrong in this case, they quickly reply "No". Their acts show a lack of training on behalf of TDFPS employees on how to review a case for accuracy, and they lack knowledge and are unaware of the nature of

acts within their duties that is a direct violation of a person's constitutional rights. Investigator Alpough followed the orders of Hammond blindly. Hammond followed the orders of Chambers blindly. When the case was transferred to the subcare unit Supervisor Whalenniel Grant-Billy, the same instructions of no visitation without an order was enforced by her and Defendant Homer.

The Plaintiffs had a right to intimate family association and family integrity pursuant to the First and Fourteenth Amendments to the U.S. Constitution. A copy of the "Rights of Children and Youth in Foster Care" is attached as Exhibit "L", which provides under paragraph 18 that the children are entitled "to visit and have regular contact with my family, including my brothers and sisters (unless a court order or case plan doesn't allow it) and to have my worker explain any restrictions to me and write them in my record." There was no court order or case plan that restricted the visitation of Plaintiff Theresa Allen. In fact, TDFPS state that their initial purpose was to reunite the children with their family. A copy of the "Post-Removal Staffing Form" is attached as Exhibit "M". Yet, every employee simply followed the orders of their supervisor without question, and without confirmation that the "no visitation order" was credible. The Gates decision makes each individual liable for his actions, and responsible for the decisions made. Blindly following orders is no longer permissible, especially when the acts violate the constitutional rights of others.

The cases found in Exhibit "C" have claims by the parents and/or caretakers that TDFPS has denied them visitation as well. They involve circumstances whereby TDFPS has made an internal decision to not return the children to their parents or a family member, but rather place them in foster care and ultimately have the children adopted. It

20

is important to note, that TDFPS makes such decisions without a court order. A process known as "wheening" is implemented to separate the child from the family when the ultimate goal is total separation between the children and any family member. This process takes place before the Court makes a final determination concerning the termination of parents' rights or final placement of the children by the State Court Judge. The parties acknowledge that TDFPS is required to draft a permanency plan, (with the help of parents and family according to TDFPS policy) but argue that such plan is not to be implemented before court approval. Ultimately, it has become customary for TDFPS to usurp the power of the Court. The cases listed in Exhibit "C" will provide sufficient evidence to show that TDFPS has a custom or policy of preventing visitation by family members when there is no relative caretaker appointed, and the children are placed in foster care.

## CONCLUSION

Plaintiffs claim that TDFPS conspired with its attorney and the State Judge to effectively deprive the Plaintiffs and other minorities with similar economic background of their constitutional right to a hearing, thereby depriving such persons of their due process rights. Further TDFPS violated Sections 1985, and 1986 of the Constitution, when it failed to take action that was obviously necessary to prevent or stop the violations from occurring, and such failure caused a constitutional injury to the Plaintiffs and others similarly situated. TDFPS, its attorney, and the State Court unfairly denied Plaintiff, Theresa Allen the right to be heard at the emergency hearing, and visitation with the children. This prohibitive action was taken despite Theresa Allen's presence when the

children were removed from her home, and her substantial involvement in the children's life. The children's welfare including their physical health and emotional well being was significantly impaired resulting in abandonment issues requiring the use of heavy medication to allegedly stabilize the children while in foster care. In conclusion, TDFPS has intentionally selected or affirmed a particular course of action knowing its adverse effects.

## PRAYER

For the reasons stated above, Plaintiffs request that the Court grant its Motion to Amend or Supplement its Second Amended Complaint and set aside its Order of Dismissal granted to the Texas Department of Family and Protective Services.

Respectfully submitted,

Wallace & Watson, P.C.

/s/ Sonya Wallace
Sonya O. Wallace
Attorney for Petitioners
TBN: 20776455
2626 S. Loop W., Ste. 400
Houston, Texas 77054
Tele: 713-661-3231
Fax: 713-661-8212
swallace4627@yahoo.com

## CERTIFICATE OF CONFERENCE

The undersigned attorney hereby certifies that she conferred with Gunnar P. Seaquist, counsel for Defendants, and he is opposed to the relief sought herein.

/s/ Sonya Wallace
Sonya Wallace

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2013, a true and correct copy of Plaintiffs' Motion for Reconsideration and Motion for Leave to Amend or Supplement its Second Amended Complaint was forwarded via CM/ECF with the Court Clerk to Gunnar P. Seaquist, Assistant Attorney General, attorney for the Defendants.

/s/ Sonya Wallace
Sonya Wallace