IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

THERESA ALLEN, :
INDIVIDUALLY, E.T.A. by :
and through Theresa :
Allen, and K.T.A. by and :
through Theresa Allen :
 :
    Plaintiffs :
 :
VS. : CIVIL ACTION NO. 4:11-CV-04170
 :
TEXAS DEPARTMENT OF :
FAMILY AND PROTECTIVE :
SERVICES, HOWARD :
BALDWIN, YOLANDA :
ALPOUGH, ADRIAN HOMER, :
STEPHANIE HAMMON, IVY :
CHAMBERS, and UNKNOWN :
COMMISSIONERS, :
SUPERVISORS OR DIRECTORS :
OF YOLANDA ALPOUGH, :
ADRIAN HOMER AND :
STEPHANIE HAMMON :
 :
    Defendants :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
YOLANDA ALPOUGH
FEBRUARY 21, 2013
VOLUME 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION OF YOLANDA ALPOUGH, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 21st of February, 2013, from 12:55 p.m. to 4:28 p.m., before Beth L. Sheen, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Children's Advocacy Center, 2500 Bolsover, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
 1
                      A P P E A R A N C E S
 2
 3      FOR PLAINTIFF THERESA ALLEN:
 4           Mr. Chris Branson
             ATTORNEY AT LAW
 5           5380 West 34th Street, #221
             Houston, Texas 77092
 6
 7      FOR PLAINTIFF E.T.A:
 8           Mr. Steven Poock
             LAW OFFICE OF STEVEN D. POOCK
 9           1911 Redbud
             Sugar Land, Texas 77479
10
11      FOR PLAINTIFF K.T.A.:
12           Mr. Thomas C. Sanders
             TOM SANDERS, P.C.
13           P.O. Box 1860
             Sugar Land, Texas 77487
14
15      FOR THE DEFENDANTS:
16           Mr. Gunnar Seaquist
             Assistant Attorney General
17           General Litigation Division
             ATTORNEY GENERAL OF TEXAS
18           P.O. Box 12548
             Austin, Texas 78711-2548
19
20           Ms. Rosa L. Rohr
             Litigation Counsel
21           TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES
             Department Mail Code E-611
22           Austin, Texas 78714-9030
23
        ALSO PRESENT:
24
             Theresa Allen
25
```

1  we could possibly run into. It's not just for
2  investigators. We have to take training as it relates to
3  FBSS and sub care and the other parts of the Agency as
4  well.
5      Q.  Okay. Any training on the legal aspects of
6  your job?
7      A.  We've had some over the years.
8      Q.  Okay. What type of training is that?
9      A.  Well, like, I think the Fourth Amendment,
10 things like that that were mandatory training.
11     Q.  Okay. And what do you remember about your
12 Fourth Amendment training?
13     A.  I remember I had it. But, you know, the
14 particulars we get briefed on as we need it.
15     Q.  Okay. How long ago was that Fourth Amendment
16 training?
17     A.  I want to say it was in 2008.
18     Q.  Okay. Was that prior to the incidents
19 involved in this case?
20     A.  Yes.
21     Q.  Okay. And what kind of experience do you have
22 in your current position? How long have you been with
23 the Agency?
24     A.  I have been with the Agency since 1997. I
25 have been in the sexual abuse unit since 2000.

1  Ms. Renesha Allen get in touch with me. Ms. Allen
2  eventually did call me. And I went by and spoke with
3  her.
4      Q.   Okay. And what did Renesha Allen have to say
5  in that conversation?
6      A.   Well, she said her children were not being
7  abused. She said that her mother was behind this. That
8  she said, If you look at the history you'll see my mother
9  has called four times. She said her mother was trying to
10 take her children.
11     Q.   How did she know that her mother had called
12 four times?
13     A.   I have no idea.
14     Q.   Did you see any signs of abuse or neglect on
15 the kids at this point?
16     A.   No, I did not.
17     Q.   So what did you do next then?
18     A.   After speaking, like I said, with the
19 children, I called my supervisor who advised me we needed
20 to do a drug test because of the prior history and the
21 age of the children.
22     Q.   Okay. And did you ask Renesha Allen to take a
23 drug test?
24     A.   I told her we would be asking her to take a
25 drug test, yes.

```
 1        Q.   Okay.  And what was her reaction to that?
 2        A.   Initially she said she would.  But then I got
 3   a call and said that she wanted to wait until, like, the
 4   next week because she couldn't take off from work.
 5        Q.   Was that a problem for you?
 6        A.   It was.  I told her -- that was on Wednesday.
 7   I told her I needed her to take the test by Friday.
 8        Q.   And why is that?
 9        A.   Because drugs stay in your system three to
10   five days; some drugs, some longer.  But I needed -- for
11   the test to be accurate, I wanted to get it done sooner
12   than later.  I advised her if there was no drugs in her
13   system most likely her case would be closed because the
14   children did not make a disclosure.
15        Q.   Okay.  And did you interview the children?
16        A.   I did.  Well, not K.T.A.
17        Q.   All right.  Okay.  But you did examine K.T.A.?
18        A.   Yes.  Some.
19        Q.   All right.  So if somebody wants to wait to
20   take a -- a week to take a drug test, is that a red flag
21   for you?
22        A.   It can be.
23        Q.   And why is that?
24        A.   As I previously stated, we want to make sure
25   that we get an accurate test.
```

1    A.    Ivy Chambers.
2    Q.    All right. So what was the result of that
3    staffing?
4    A.    There was no determination at that time. They
5    wanted to see her and talk to her and see what her plans
6    were. And I couldn't find her after I met with her. And
7    I couldn't find the children.
8    Q.    Okay. So mother ends up testing positive for
9    crack cocaine, and there was a question as to whether the
10   children stay with her or not?
11   A.    No. We were trying -- what we try to do
12   initially is, if we can, see if there is alternative
13   placement or something of that nature. And we -- it was
14   going back and forth with the supervisors. I don't know.
15   Q.    Okay. So is it fair to say this was not a
16   situation that you considered an emergency?
17   A.    After she tested positive, I felt it was, yes.
18   Q.    Okay. Okay. You felt it was. You, Yolanda
19   Alpough, felt it was?
20   A.    Yes.
21   Q.    Was it your decision to make as to whether it
22   was an emergency situation?
23   A.    No.
24   Q.    Okay. And whose decision was that?
25   A.    The supervisors.

```
 1        Q.   Okay.  Both of them?
 2        A.   Well, Stephanie can't staff anything, the
 3   nature of a removal, without Ivy who is the program
 4   director.
 5        Q.   Okay.  So tell the jury how that chain of
 6   command works.  Does Ms. Hammon make a recommendation to
 7   Ivy Chambers and Ivy Chambers has the final say?  Is it a
 8   group consensus?  How does that work?
 9        A.   It's not a group consensus.  It is -- we all
10   sit down.  Generally I'll tell my supervisor what I have
11   found in the course of the investigation.  And she can
12   speak with Ivy about it or Ivy may speak with her and
13   someone else about it.
14             So I don't know what happens after that.
15   I tell my supervisor.  And then from there on I get
16   directives from them.
17        Q.   Okay.  So do you have any -- so you do an
18   investigation and make a report to Stephanie Hammon?
19        A.   That's correct.
20        Q.   Okay.  From there on do you have any input
21   into the decision as to whether to remove or not?
22        A.   No.
23        Q.   Okay.  It simply comes back down to you as to
24   what your supervisors have decided?
25        A.   Yes.
```

```
 1   mother.
 2       Q.   Okay.  And did she tell you how the children
 3   had gotten there?
 4       A.   No.
 5       Q.   I mean, did she say, I sent my kids with my
 6   mother?
 7       A.   No.  She just said, The children have been
 8   with my mother.
 9       Q.   Okay.  So she didn't indicate that Mom had
10   come and snatched them by force?  Just a straight
11   statement of fact that the kids were with Theresa
12   Allen?
13       A.   Yes.
14       Q.   Okay.  And when was this that she informed you
15   of that?
16       A.   That was probably mid to late November.
17   Because I spoke with her before I went out.  I was out
18   sick.
19       Q.   Uh-huh.  Okay.  All right.  So what happened
20   next?
21       A.   Well, while I was out sick -- I was home sick
22   on December 3rd when I received a call that they had
23   received -- my supervisor had received a call from
24   Ms. Theresa Allen and that I needed to go and meet with
25   her and talk about what was going to happen with the
```

```
 1        Q.   Okay.  All right.  Did you smell any drugs in
 2    the air?  Did Ms. Allen look like she was incapacitated
 3    in any way?
 4        A.   No.
 5        Q.   Okay.  Anything that raised a red flag?
 6        A.   No.
 7        Q.   Okay.  So is it fair to say that you did not
 8    see an emergency situation?
 9        A.   I can't answer that.
10        Q.   So you don't know what an emergency situation
11    looks like?
12        A.   Yes.  It wasn't about Ms. Allen, Theresa
13    Allen, at all at that point.  It was about Renesha Allen.
14        Q.   Okay.  So Renesha Allen was in the
15    apartment?
16        A.   No.
17        Q.   Okay.  Where was Renesha Allen?
18        A.   I didn't -- I didn't -- I did find out during
19    the phone call that she was in rehab.
20        Q.   So Renesha Allen was not with the kids?
21        A.   Correct.
22        Q.   She was not with Theresa Allen?
23        A.   Correct.
24        Q.   She was not in -- she was not in Theresa
25    Allen's apartment?
```

A. No.

Q. Okay. So, again, the question is: What was the emergency?

A. Well, I should say that it was about Theresa Allen's -- the allegations of the bipolar, the allegations of her not protecting her daughter when she told her she was sexually abused. And the mother at that point was, I guess, in rehab. But she had relapsed and had confirmed that she had relapsed.

So we had to make a decision regarding the children.

Q. Uh-huh. Okay. Now, you are aware that you took the -- well, let me ask you this: Did you have a court order to remove the kids?

A. No, we did not.

Q. Okay. What is your understanding of your ability to take children away from family without a court order?

A. The ability to take children away from a parent without a court order is that we can if we feel it is an emergency situation.

Q. Okay. And what is your definition of an emergency?

A. In this case we had a parent that was not able to parent her child. So that is an emergency situation.

please?

A. Imminent danger means there is an immediate threat to the physical health or safety of the child or that the sexual abuse is about to occur to the child.

Q. Okay. Was there sexual abuse about to occur to either of those kids?

A. Not to my knowledge.

Q. Okay. And what was the immediate threat to the physical health or safety of those children?

A. That they were in the care of their grandmother who had been -- we had been told was not protective of their mother when she alleged sexual abuse and who was bipolar and not on medication.

Q. Okay. We've already established that you had information for two weeks, correct?

A. Correct.

Q. My question to you is: What was the immediate threat to these children?

A. The immediate threat is that they were in the care of the grandmother.

Q. Okay. In that two-week period that you knew that the grandmother had been allegedly bipolar and not on medication, in that two-week period was there time to obtain a court order?

A. I'm sure that there was.

1    relapsed prior to December 4th, 2009?
2        A.   Yes.
3        Q.   Okay. And when did you know that the mother
4    had relapsed?
5        A.   Sometime in October.
6        Q.   So a month and a half to two months prior to
7    that?
8        A.   Yes.
9        Q.   Okay. How does the fact that the mother --
10   your knowledge that the mother had relapsed constitute an
11   emergency situation?
12       A.   She was not available to parent her children
13   and I now know where the children are.
14       Q.   Are you testifying to the Court today under
15   oath that two-month-old information constitutes an
16   emergency situation?
17       A.   If I just found the children, I need to do
18   what is necessary at that time.
19       Q.   Do you understand that an emergency situation
20   is a snapshot of the situation as you find it that is so
21   immediate that you do not have time to go seek a court
22   order?
23            MR. SEAQUIST: I'm going to object to
24   counsel testifying.
25       Q.   (BY MR. BRANSON) You can answer.

1    MR. SEAQUIST: I'm going to object. Calls
2    for a legal conclusion, but she can answer.
3        A.    I don't know.
4        Q.    (BY MR. BRANSON) You've testified that you
5    know what an emergency situation is.
6        A.    Yes.
7        Q.    And you've testified that nothing was going on
8    at that apartment, correct?
9        A.    Correct.
10       Q.    And yet you will not answer a simple yes or no
11   question, was there an emergency?
12       A.    I did not see an emergency happening while I
13   was there.
14       Q.    Okay. So the question is: Was there an
15   emergency situation?
16       A.    Based on information I have, yes, it was a
17   removal.
18           MR. BRANSON: Objection; nonresponsive.
19       Q.    (BY MR. BRANSON) I understand it was a
20   removal. Was there an emergency situation December 4th,
21   2009, 10:00 a.m. when you removed those kids?
22       A.    I don't know.
23       Q.    Okay. Can you explain to the jury why they
24   should not think you were dodging this question?
25       A.    No.

1    A.    Yes.
2    Q.    Was Theresa Allen at the emergency hearing?
3    A.    Yes.
4    Q.    Who was the emergency hearing in front of?
5    A.    Actually, there wasn't an emergency hearing
6  that actually took place.
7    Q.    Well, then how could you have been at the
8  emergency hearing?
9    A.    There was a setting for an emergency hearing.
10 When I arrived there, the paperwork was handed to me and
11 I was done.
12   Q.    There was no emergency hearing?
13   A.    There was an emergency setting.  In other
14 words, yes, we show up for but there was not one held.
15   Q.    So there was no emergency hearing held?
16   A.    Held.
17         MR. SEAQUIST:  I object to the extent that
18 calls for a legal conclusion.  I mean, the Judge has his
19 particular procedures for that court.  So I don't want to
20 get caught up in whether or not it's a hearing or not.
21 But that's how the Judge in that court does it.
22   Q.    (BY MR. POOCK)  But you were there observing,
23 correct, at the hearing setting, correct?
24   A.    Go ahead.
25   Q.    You were there at the time that was set for