IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| THERESA ALLEN, INDIVIDUALLY, AND AS NEXT FRIEND TO ELISHA TYRELL ALLEN AND KATELYNN TYREAL ALLEN <br>     PLAINTIFFS, <br><br> V. <br><br> TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, HOWARD BALDWIN YOLANDA ALPOUGH, ADRIAN HOMER, STEPHANIE HAMMON, IVY CHAMBERS, AND UNKNOWN COMMISSIONERS, SUPERVISORS OR DIRECTORS OF YOLANDA ALPOUGH, ADRIAN HOMERAND STEPHANIE HAMMON <br>     DEFENDANTS. | § § § § § § § § § § § § § § § § § § § § § CIVIL ACTION NO.4:11 CV-04170 |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW Plaintiffs, Theresa Allen, Individually, and as next friend to Elisha Tyrell Allen and Katelynn Tyreal Allen, and files this Response to Defendants' Motion for Summary Judgment, and will show the Court the following:

### SUMMARY JUDGMENT EVIDENCE

    The Plaintiffs request that the Court take judicial notice of the entire record of the state file, including hearing transcripts, under Cause No. 2009-08650J, In the Interest of Elisha Tyrell Allen and Katelynn Tyreal Allen, Children, In the 314th Judicial District of Harris County, Texas. The Plaintiffs also rely upon the summary judgment evidence

1

attached to this Response; Plaintiffs' Motion for Reconsideration, (TXSD, Doc. 41) and all exhibits attached; Plaintiffs' Second Amended Complaint, (TXSD, Doc. 22) and all exhibits attached; Deposition Excerpts of Yolanda Alpough, Adrian Homer and Theresa Allen; and Discovery.

## STATEMENT OF FACTS

The facts will show that the initial report to TDFPS was made on August 23, 2009, by Theresa Allen, the plaintiff and grandmother of the children a part of this action. The case was categorized as Priority 1. (*See* TXSD, Doc. 41-5). In accordance with 40 TAC Section 700.505, Priority 1 cases are to be investigated within 24 hours. The records of TDFPS indicate that Dorothy Oakes of the Children's Youth Center visited the home of the mother on the same day making a finding that the children were safe at the time. (See TXSD, Doc. 41-8, p.13). TDFPS records further indicate that Defendant Alpough, the social worker investigator did not perform an investigation within the 24 hour timeline. Three days later, she states that there is no one home. (*See* TXSD, Doc. 41-8, p. 13) On September 24, 2009, thirty days later, Alpough allegedly interviews the children at their home, but not the mother. (*See* TXSD, Doc. 41-8), p. 14) Alpough claims that she was unable to locate the mother despite the fact that the report by Ms. Oakes specifically provided that Renesha Allen continued to work at the daycare of the Bonita Facility known as Kids Are People Too (a TDFPS facility), (*See* TXSD, Doc. 41-8, p. 13). Her employment there was from 2007 to November 30, 2009. Alpough never contacted her job. Allegedly on November 5, 2009, Theresa Allen, the grandmother is finally located by Alpough, and she provides Alpough with information concerning the whereabouts of the children and her daughter, (*See,* TXSD Doc. 41-9, p.16). Alpough

2

states that she is in fear of losing her job for missing the deadline to investigate the matter, and she would need to pick up the children and place them in foster care. Theresa went to her daughter's workplace and informed her of the conversation. They immediately called Alpough and left a message for her to call them. On or about November 16, 2009, Theresa called Defendant Stephanie Hammon, the supervisor of Yolanda Alpough. Ms. Hammon indicated that she was on her way to court and stated that she would call Theresa later. Theresa never heard from Hammon. On or about November 23, 2009, she contacted Defendant Ivy Chambers, the Program Director, and left a message for her to return the call. The following day, Chambers returned the call, and Theresa explained the situation, and her fears regarding the way the case was being handled. Defendant Chambers was to investigate Theresa's concerns. On November 30, 2009, after trying to reach Chambers with no success, Theresa contacted Scott Dixon, the Director of TDFPS. He was also not available, and did not return the call. On December 3, 2009, Theresa received a call from Defendant Hammon, who was very upset. She asked Theresa why had she called her Program Director, and finally stated that Theresa would be sorry for making the call and for going over her head. Defendant Hammon indicated that Defendant Alpough would be at the home of Theresa the following morning, but didn't explain why she was coming. Over one hundred days after the initial report had been filed, on December 4, 2009, Defendants Alpough, Hammond and Chambers decide to remove the children from the home of the grandmother while the mother is in rehabilitation, (*See*, TXSD Doc. 41-9, p. 18). TDFPS was aware that Renesha Allen had committed herself to rehabilitation on December 1, 2009. This decision is executed by Defendant Alpough on the morning of December 4, 2009. The

3

"Notice of Removal of Children" form indicates that the children are being removed because of "risk of sexual abuse". (*See* TXSD Doc. 41-10) allegedly by the mother's boyfriend. The boyfriend did not live with the grandmother where the children resided. The children are removed from Theresa's home without her consent, without a court order and without exigent circumstances. On December 7, 2009, Theresa Allen and several of her friends appear in court for the hearing, but no hearing took place. Defendant Alpough admits that she entered the courtroom, retrieved the signed Order from the clerk, and then left. The "emergency hearing" never took place. Judge Phillips announced that court was in recess until December 17 and left the bench. Theresa was denied the right to present evidence to show the court that no "emergency" existed and to request that the children be returned to her. The Adversary hearing was set on December 17, 2009. Theresa attended the hearing, and she was ordered to take a drug test and a "Four C's" (Children's Crisis Care Center) assessment. The drug test was taken the same day, and the results were negative. A home study was ordered on Sonya Balenton and Theresa. Again, at the adversary hearing, Theresa was denied the right to speak and provide necessary testimony concerning the removal of her grandchildren. TDFPS received temporary managing conservatorship over the children. The Four C's Assessment was never done. On or about December 23, 2009, the subcare social worker, Adrian Homer informed Theresa that the Court had ordered a full psychological examination and further stated that the Court had ordered no visitation between her and the children. The Judge had not restricted visitation but stated "I want a drug test on grandma too if she is going to be visiting." Once the test was passed, Theresa was to receive visitation rights with the children. A nonexistent court order of no visitation was

4

created by the Defendants, not the Court. Theresa was prevented from visiting her grandchildren for over ten months. On December 30, 2009, Jennifer Dalby, an unlicensed clinician performed a home study on Theresa Allen, which denied her for placement due to the fact that she did not have a relationship with her siblings. Theresa never knew the results of the home study until September 30, 2010. On or about January 27, 2010, Bernard McAfee performed a home study on a family friend, Sonya Balenton, which was approved. Ms. Balenton was never notified of her approval. The children remained in foster care despite the approval.

On January 13, 2010, the permanency conference was held by Defendant Hammon. Hammon barred Theresa from the meeting, despite TDFPS policy that family and extended family were welcome to attend.

On January 19, 2010, Theresa and her friend, Ms. Guillory meets with Ivy Chambers, who admits that the case was mishandled, but refused to rectify the situation.

On May 28, 2010, Theresa filed a Motion to Intervene, which was accepted by the court on June 3, 2010.

On October 7, 2010, the Judge realizes that the grandmother had been denied visitation by TDFPS, and orders them to allow visitation. Despite the Court's order, Defendant Homer refused visitation.

On November 9, 2010, the Court ordered the grandchildren back home with Theresa Allen.

On March 8, 2011, the Court made Theresa the Sole Managing Conservator of the children. The entry date was set for March 30, 2011, but reset without notice to Theresa

to April 7, 2011. The Decree in Suit Affecting the Parent-Child Relationship was executed by the Judge on April 7, 2011.

### ARGUMENT AND AUTHORITIES

Qualified immunity protects governmental employees who are acting within their discretionary authority if their actions do not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

When a plaintiff sues a state official for civil rights violations, the plaintiff must plead that each government official, though his or her own individual actions, violated the Constitution or a clearly-established statutory right. These claims must be supported by enough facts to show "more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Although the complaint need not contain detailed factual allegations, it must include more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). To meet this standard, the plaintiff must allege sufficient facts to state a claim for relief that is plausible on its face. *Iqbal*, 129 S. Ct. at 1949. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Plaintiffs have plead sufficient facts in its Second Amended Complaint, (TXSD, Doc. 22) Motion for Reconsideration (TXSD, Doc. 48) and Motion to Amend

6

(TXSD, Doc. 49) that will allow this Court to draw a reasonable inference that the Defendants' are liable for the alleged constitutional and statutory violations.

### A. Defendants are not entitled to qualified immunity on Plaintiffs' Claims against them in their Individual Capacity.

The individual Defendants are not entitled to qualified immunity. Their conduct has clearly violated established statutory or constitutional law of which a reasonable person would have known.

### COUNT 1 -FOURTH AMENDMENT CONSTITUTIONAL VIOLATION

In 2008, the United States Court of Appeals, 5th Circuit, provided applicable standards, guidelines and criteria for proving liability based on constitutional violations by CPS social workers. *Gates v. Texas Department of Protective and Regulatory Services*, et. al, 537 F3d 404 (Fifth Cir. 2008). The court held that it is well established that the Fourth Amendment regulates social workers' civil investigations, (quoting, *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002)). Pursuant to Fourth Amendment law, "warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search," (quoting *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). The 5th Circuit provides an extensive analysis of the applicable standard that will be used to assess personal liability on the individual worker.

It is the Plaintiffs' contention, that Defendants Alpough, Hammon and Chambers removed the children without consent, a court order, or exigent circumstances.

7

*Consent*

There is no evidence that Renesha Allen, nor the grandmother, Plaintiff Theresa Allen gave TDFPS agents consent to enter to remove the children. "Silence or passivity cannot form the basis for consent to enter." Roe, 299 F.3d at 402. Theresa Allen did not affirmatively consent to let Defendant Alpough and her assistant, Casey Kane into her home to remove the children. Theresa indicates in her testimony that the "kids were trying to see who was at the door. And when I move the kids like this, she (Alpough) came in – her and whoever she had with her (Cane)... She walked in my home. She was fierce. She was angry and I was intimidated by her persona. A copy of the Excerpts from Theresa Allen's Deposition is attached as Exhibit "A", (*See* p. 253 lines 1 – 9). Alpough and Cane never asked whether or not they could enter the home. Defendant Alpough stuck her foot in the door and entered without consent, (*See* Exhibit A, p. 263 lines 1-18).

The facts show that Defendant Alpough had received the documents to remove the children from her supervisor, Defendant Hammon the morning of December 4, 2009. Despite having the documents in her possession, Alpough claims that she was not aware that she was to remove the children. Based upon her deposition testimony, her initial intent was to meet with Plaintiff Theresa Allen and speak to her about the children, not to remove the children. A copy of the Excerpts from Yolanda Alpough's Deposition is attached as Exhibit "B", (*See* pp.67 - 70. The decision to remove took place after she entered the home and received a telephone call from her supervisor, Defendant Hammon. For purposes of analysis, even if Theresa Allen gave consent for the initial entering as alleged in Defendants' Motion for Summary Judgment, it does not prevent the Plaintiff

8

from withdrawing her consent at any point during the Defendants visit. The Defendants in their training had been instructed that "consent" could be withdrawn at anytime. Each Defendant admits to training by the Texas Department of Family Protective Services (TDFPS) and each received a copy of the Memorandum entitled *"Urgent Legal Advisory for Investigations, dated August 22, 2008"*. A copy is attached as Exhibit C, *See* p. 11.

It is clear, that when Alpough made known her intentions to remove the children, Theresa became "a little uncomfortable" with her (See Exhibit B, p. 98, line 1-3). Defendant Theresa Allen asked Alpough for her supervisor's name and number. Theresa states "When I realized that Ms. Alpough was – mind was made up, that she was there to take the children, no matter what I did, then I tried to get on my cell phone to call Scott Dixon who I'd spoken to and Ivy Chambers, (*See* Exhibit A, p. 257 lines 13 – 20). At that point, Defendant Alpough realized that Theresa was no longer going to cooperate and release the children to her. Alpough called the supervisor (Hammond) and asked if she needed to get some assistance. (*See* Exhibit B, page 98, lines 14-15). Alpough then called the police, (*See* Exhibit B, page 98, lines 14-15). Defendant Alpough tried to get Theresa to sign a form to release the children to her, (*See* Exhibit A, p.257, line 25 and p. 258, line1-9), which Theresa refused to sign. When Alpough went outside, the police came in, (*See* Exhibit A, p. 258, lines 8-9). At that time, the Plaintiffs argue that consent, if ever given was withdrawn. It becomes apparent, that a reasonable person would believe that a necessity to call the police indicates that Theresa is not cooperating and has not given consent to the removal of the children. Refusal to sign the "release form" is further evidence of the fact. The only purpose for the police was to force Theresa to release the children. Consent must be voluntary. "It is well established that a

9