defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996). In this case, Defendant Alpough, Hammond and Chambers knew through their training that consent may be revoked for any reason at any time by whoever gave it, or it may subsequently be revoked by another resident of the home. If consent is revoked, CPS must leave, (*See* Exhibit C, p. 11), and *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed. 2d 208 (2006). The entry and seizure of the children were under involuntary circumstances and a violation of the Plaintiffs' constitutional rights.

### Court Order

Yolanda Alpough, the TDFPS investigator admits in her deposition testimony that they came to the grandmother's home at 10:00 in the morning without a court order on December 4, 2009, (*See* TXSD 41-2, p.33 line 4-6). The Plaintiffs claim that there was sufficient time to retrieve a court order prior to the removal. The investigation had been ongoing for 102 days. Additionally, the court system was open from 9:00 a.m. until 5:00 p.m., and a court order could have been retrieved on the morning prior to removal. The Defendants actions did not dictate an emergency. The Defendants in their Motion for Summary Judgment failed to state why a court order was not retrieved.

### Exigent Circumstances

Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he/she remains in the home. *Gates,* 537 F.3d at 433

The Defendants are incorrect, when they state that the "standard of exigency was limited to a custodial parent in the family homestead," (*See* Defendant's Motion for

Summary, p. 10)   In *Georgia v. Randolph*, 547 U.S. at 106, the court recognized that another resident of the home could revoke consent.  As occurred in this case, the grandmother was well within her rights, since it was her home, to either not consent to the removal of her grandchildren, and/or revoke consent after Alpough entered her residence.

The facts indicate that there was no court order, and consent if given, was withdrawn and involuntary, therefore the Defendants must establish "exigent circumstances" to justify removal of the children.  In an effort to meet their burden, the Defendants claim that "exigency existed to render DFPS's removal of E.T.A. and K.T.A. reasonable.  Balancing DFPS's interest in protecting E.T.A. and K.T.A. from exposure to a parent in the depths of crack addiction, against a child's interest in being left in the possession of a non-custodial third party (even a grandmother) where there is a history of that third-party returning the children to the impaired parent without notifying the authorities, weighs decisively in favor of protection, not intrusion.... One significant, although not dispositive factor in identifying the presence of exigency is the risk that a parent will flee with the child... and the record is replete with references to Theresa Allen having an untreated mental disorder." (*See* Defendant's Motion for Summary Judgment, p. 11).

The facts presented by the Defendants are insufficient to meet the "exigent circumstance" standard.  They can not show that the children were in immediate danger, and it was that danger that prompted removal. TDFPS records indicate that during a 2007 interview with Renesha, she claims that her stepfather sexually abused her, and that her mother did not believe that the abuse occurred.  Excerpts from the 2007 investigative

11

report is attached as Exhibit D, (*See p. 2*). Nothing was done by TDFPS concerning the allegations. The result of the 2007 investigation led to Theresa Allen receiving a voluntary placement of the children with her, (*See* Exhibit D, p. 3). A reiteration of the same facts in 2009 does not create an emergency situation.

The 2009 complaint was filed on August 23, 2009. One hundred and two (102) days had passed since the initial report was made to TDFPS. The mere fact that the investigation was ongoing for this length of time shows a lack of immediacy and circumstances that dictated an emergency removal. On October 21, 2009, 44 days prior to removal, Renesha had alleged that her mother, Theresa had a mental disorder, (*See* TXSD 41-8, p. 15*)*. The Defendants knew about the allegations, yet no action was taken. No psychological evaluation was ordered in an effort to determine the truth of the allegations. The children remained with Theresa. The only action taken by Defendant Alpough was to require Renesha to take a drug test. On October 23, 2009, the drug test results were received on the mother, showing positive for cocaine. A copy of the drug test results is attached as Exhibit E. Over the next 42 days, the Defendants showed no concern about the safety of the children, and no efforts were made to: 1) assure that the grandmother did not release the children to the mother, or 2) assure that the grandmother alleged "mental disorders" would prohibit her from properly taking care of the children. The facts and TDFPS records show that the Defendants were aware that Theresa's home was a safehaven for the children, and they realized that Renesha had given her mother the children voluntarily so that TDFPS would not have to remove them and take them into custody.

During Alpough's initial visit with the children and mother, she states that she did not see any signs of abuse or neglect, (*See* TXSD Doc. 41-2, p. 15, lines 14-16.) She also states that the children did not make a disclosure, but indicated that Renesha would need to take a drug test, (*See* TXSD Doc. 41-2, p.16 line 14). After the test results came back positive in October of 2009, Alpough met with her supervisor, Defendant Hammond, but no determinations were made as to how to proceed, (*See* TXSD Doc. 41-2, p.18, line 4). The situation was not being handled by TDFPS employees as if there was an emergency.

Alpough's affidavit included in TDFPS's Original Petition provides with detail why and under what circumstances the children were removed on December 4, 2009. A copy is attached as Exhibit "F". In her deposition testimony, she reiterates certain facts that are also found in the affidavit to substantiate her actions.

When Alpough is asked does she "know what an emergency situation looks like?" She initially states that "It wasn't about Ms. Allen, Theresa Allen, at that point. It was about Renesha Allen." Then she readily admitted that Renesha Allen was not in the apartment, but in rehab, (*See* TXSD Doc. 41-2, p. 42, lines 12-19). Seemingly, no emergency existed that placed the children at risk because the alleged perpetrator was not in the home on the day of the removal. Then Alpough was asked a second time, "What was the emergency?" This time Alpough changed her story, and stated, "I should say that it was about Theresa Allen's--- the allegations of bipolar, the allegations of her not protecting her daughter when she told her she was sexually abused. The sexual abuse allegations had originated in 2007. There was no risk of the children being abused by their grandfather in 2009. Theresa lived alone in 2009, and was no longer married. There was no evidence indicating that Theresa abused anyone.    Alpough also knew

about the grandmother being allegedly bipolar and not on medication for at least 6 weeks but she made no effort to obtain a court order, or remove the children the day she received the information (*See* TXSD Doc. 41-2, p. 52 lines 10-25). Alpough merely continued to investigate the case day by day indicating that there were no emergency circumstances.

Alpough was asked a third time, "What is your definition of an emergency?" Alpough finally states, "In this case we had a parent that was not able to parent her child. So that is an emergency situation," (*See* TXSD Doc. 41-2, p.43 lines 12-25). The mother's positive drug test results were received by TDFPS in October. Two month old information can not be used as the basis for the emergency removal, (*See* TXSD Doc. 41-2, p. 57, lines 5-22). The Defendants knew that Renesha had entered into a rehabilitation on December 1, 2009 and had voluntarily turned the children over to her mother. The children were not at risk.

Finally, after extensive questioning, Alpough admits that the children were not being abused on December 4, 2009, and that she "did not see an emergency happening while I was there," but yet after making such observations, she proceeded to remove the children from the home, (*See* TXSD Doc. 41-2, p. 63, lines 1-13).

The facts stated by Alpough in her affidavit and during her deposition testimony do not give rise to an "immediate danger" supporting a warrantless entry into Theresa's home.

The Defendants argue that even if Alpough's entry were not reasonable, the remaining Defendants are entitled to summary judgment as to allegations relating to the December 4, 2009.

14

## SUPERVISORS' LIABILITY

a.    **Affirmative Action**

Alpough indicates that her supervisors determine whether an emergency exists, (*See* TXSD Doc. 41-2, p.18, lines 21-25). She states "Hammond can't staff anything, the nature of a removal, without Ivy who is the program director," (*See* TXSD Doc. 41-2, p.19, lines 2-4). A staff meeting was held on the morning of December 4, 2009, and it was determined by Alpough, Hammond and Chambers that removal was necessary, (*See* TXSD Doc. 41-5, p. 18). It is clear from Defendant Alpough's testimony that she can not seize the children without the consent and approval of her supervisor Hammond, and Hammond can not authorize seizure without consent and approval of Chambers. Each individual employee was apprised of the facts in order to make a personal determination as to whether a seizure should take place. Their individual analysis coupled with a consensus by all to proceed with the removal without consent, a court order or exigent circumstances constitutes affirmative action by each and makes each one personally liable for the constitutional violations alleged by Plaintiffs . The Defendants consent and approval to seize the children constitute sufficient evidence to show a causal connection between the supervisors' conduct and the constitutional violations. No entry, nor seizure would have taken place without the consent of Defendant Chambers and Hammond, and the resulting execution by Defendant Alpough.

The Defendants Hammon and Chambers provide no reason why a court order was not sought prior to the removal of the children. Hammond gives Alpough consent to remain on the property and force removal by calling the police, which constitutes a clear violation of the Plaintiffs' constitutional rights. Further, they can not show that there was

a reasonable cause to believe that the children were in imminent danger of physical or sexual abuse at the time of removal. In fact, Alpough admits that the children were not in danger of being sexually or physically abused, (*See* TXSD Doc. 41-2, p. 52, lines 2-7).

Defendant Hammond completed the forms which indicated that the reason for removal was "sexual abuse". Hammond knew that the mother was in rehabilitation and that the children were not in immediate danger of being sexually abused, but yet she gives authority to Alpough to move forward with the removal without good cause. Chambers approved both Hammond and Alpough's actions. Theresa had contacted Alpough, Hammond and Chambers several times in an effort to prevent the removal. She was willing to provide a safe place for the children to live while their mother was in rehabilitation. Alpough, Hammond and Chambers had adequate opportunity to intervene and prevent the violations from occurring, but each Defendant chose to pursue removal in light of the circumstances.

In summary, the children were residing with their grandmother, Theresa Allen, at the time of their removal. Renesha Allen, the mother of the children, had voluntarily placed herself in a rehabilitation center for drug abuse. Defendants Hammon and Chambers were aware of this fact. Prior to committing herself, Renesha Allen gave her mother full authority to have possession of the children and to provide for their welfare. According to TDFPS records, the "alleged perpetrators" of the abuse is the mother, Renesha Allen, and/or her boyfriend Chester Moore, not the Plaintiff, Theresa Allen. Renesha Allen, nor Chester Moore, the alleged perpetrators, were present in the home at the time of the removal and the children were not at risk. There was no evidence of any danger to the children that would enable the Defendants to act without a warrant. There

16

was nothing particularly unusual about the children's condition at the time they were removed. When reviewing the facts of this case, there were no exigent circumstances present at the time of the Alpough's initial entry into the grandmother's home that would have permitted the warrantless intrusion. The facts of this case do not give rise to an "immediate danger" supporting a warrantless entry. It was unreasonable for Defendant Alpough, Hammon, and Chambers to conclude that the children needed to be removed from their grandmother's home on December 4, 2009. In conclusion, the entry and seizure were unreasonable under the exigent circumstances standard.

### b. Deliberate Indifference and Malice

The Defendants argue that supervisors may only be liable for constitutional violations committed by subordinate employees when supervisors act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates. In establishing deliberate indifference, the correct standard is whether the supervisors' had gained actual knowledge of the substantial risk of harm, but consciously disregarded it.

The Plaintiffs' argue that Defendants Alpough, Homer, Hammon and Chambers' actions show a deliberate indifference to the Plaintiffs' rights, and these defendants had actual knowledge through training that violation of certain constitutional rights would lead them to personal liability for their actions. Defendants Alpough, Hammon and Chambers had actual knowledge that their decision to remove and seize the children would cause substantial harm to the children and their grandmother, but consciously disregarded it.

17

The Defendants' have offered no plausible reason or explanation for the challenged actions. No facts have been presented that would show that their actions were reasonable or lawful under the circumstances.

The following acts will show that the Defendants had actual knowledge of certain events and facts that would cause substantial harm to the Plaintiffs, but they consciously disregarded the outcome that would be a direct result of the action taken:

1.    The initial TDFPS report was made by Theresa Allen on August 23, 2009. The investigation report shows that Alpough's first data entry was done on October 27, 2009, two months after the initial report. The entry alleges that she made her initial contact 2 months earlier. The next entry was November 19, 2009 alleging acts that took place from August through November 20, 2009. (*See* 41-8 and 41-9, pp. 14-18*)*.    The delayed entries coincide with the allegations of Theresa stating that Alpough had made no contact with her prior to November of 2009.   When Alpough realizes that she has failed to investigate the case, she starts to input false data to provide an illusion that she had been doing her job. All the contacts allude to the fact that she had attempted face to face (AFTF) contact with Renesha and the children, providing various excuses as to why contact wasn't made.   To explain the delay in her actions, she includes a false allegation that Theresa were hiding the children. The information is manipulated and falsified. The dates are erroneous. Thirteen entries are all made on the same day, November 19, 2009. In fact, one entry has been manipulated to show that the information was imputed on November 19, 2009 before the visit even occurred (November 20, 2009).   The investigative report states that she met with ETA on September 24, 2009 (*See* 41-8, p. 14*)*, but her notes indicate that her first contact with ETA was November 6, 2009.   A

18

copy of Alpough's handwritten note is attached as Exhibit "G".   It is obvious that the

computer system will not allow the user to change the entry date, but the date of contact

and the narrative can be altered and manipulated, as it has in this case.  Alpough's actions

are intentional and deliberate without concern about the misleading information provided.

Her only intent was to save her job at the expense of innocent children and their

grandmother.

     2.   Prior to removal of the children, Plaintiff Theresa Allen informed  Defendant

Hammon and Chambers that Defendant Alpough had contacted her on or about

November 5, 2009, claiming that she was in fear of losing her job for missing the

deadline to investigate the matter, and would need to pick up the children and place them

in foster care.  On December the 3rd, Theresa received a phone call from Stephanie

Hammon indicating that she was upset at the fact that Theresa had went over her head

and spoke to her boss, Ivy Chambers,. (*See* Exhibit A, p.251, line 13-24).  Faye Guillory

heard the threat by Hammon, (*See* Exhibit A, p. 255, lines 15-25 and 256 lines 1-10).

Defendant Hammon stated that she would be sorry (*See* Exhibit A, p. 254, lines17 – 25

and p. 255, lines 1 - 5) and Defendant Alpough also told her that "she would never see

those kids again" (*See* Exhibit A, p. 249, lines 5-10).  A plan was devised by the

Defendants to keep Theresa away from her grandchildren by using their authority as

TDFPS workers inappropriately, illegally and with deliberate indifference to the rights of

the children and Theresa.

     3.   Hammon proceeded to carry out her threat of never allowing Theresa to

see her grandchildren on December 16, 2009, when she completed the "Region 6

Removal Staffing Form" indicating that "Renesha Allen has alleged physical abuse by