**her mother** Teresa Allen over the years." The statement is entirely false. A copy of the staffing form is attached as Exhibit "H", *See* p. TDFPS 565. Chambers approved and executed the document on the same date. There has been no information provided by the Defendants to substantiate that Theresa has ever abused Renesha or her grandchildren. The statement is deliberately placed on this form to mislead the reader. The information is in direct conflict with the affidavit submitted to the Court by Defendant Alpough, which states that Renesha Allen indicated that Teresa Allen's **ex-husband** tried to touch her, not the Plaintiff, Theresa Allen. (*See* Exhibit "F" ", p. 3).

The Defendants might claim that the information was merely an error, but the Plaintiffs allege that the conduct is intentional, and is a part of a series of actions that constitute malice, and a deliberate indifference to the rights of the Plaintiffs. The conflict in the information gives credence to the fact that the Defendants' motives were personal, vindictive, unsubstantiated, and done with malice.

4.) Defendants Alpough, Hammon and Chambers all knew that the removal of the children was not in compliance with 4th amendment standards. The Defendants did not have consent, a court order or exigent circumstances when they decided to have the children removed. Despite their knowledge, they proceeded to take the children away from the grandmother as a method to carry out their threat that she would never see the kids again. Their anger and dislike of Theresa caused them to initiate removal without a legal basis. Their actions give further credence to the allegations that Defendants' motives were personal, vindictive, unsubstantiated and with malice.

5.) The Defendants give a false indicator for the purpose of the removal. The reason for the removal given by Defendant Hammon and Chambers was "sexual abuse",

20

(*See* TXSD, Doc. 41-10*)*. **The investigation report as of 12/4/2009, clearly indicates that "sexual abuse" had been ruled out (R/O) and the allegations of "neglectful supervision" was undetermined because they could not verify whether the children had been in the mother's possession at the time of her drug use.** *(See* TXSD, Doc. 41-9, p. 19). Based upon the "Allegation Detail" of the investigation report, there was insufficient information to dictate a removal. (*See* TXSD, Doc. 41-6, p. 2). Yet, Chambers and Hammon approve the removal.

    6.)    The Defendants acknowledge that Theresa was an approved TDFPS caregiver for the children in 2007, who was to supervise all contacts by the mother. The Defendants can offer no reason as to why in 2009, a similar arrangement could not have taken place, whereby she would keep the children while her daughter was in rehabilitation. It is part of TDFPS policy to make every effort if possible to keep the children in the home.

Renesha Allen, the mother signed a "Child Caregiver Resource Form" indicating her desire to have the children placed with their grandmother, on the day of removal. A copy of the form is attached as Exhibit "I".

Under Chapter 34 of the Texas Family Code, the parent may enter into an authorization agreement with a relative or other person for the safekeeping of the children. In this case, the Defendants deliberately ignored the fact that Renesha Allen had a right to voluntarily turn her children over to the grandmother, and should have been given the opportunity to do so by executing a "Voluntary Kinship Care Arrangement" while she was in rehabilitation. A copy of an "Authorization Agreement for Nonparent Relative or Voluntary Caregiver" form is attached as Exhibit "J". Despite the wishes of

Renesha, the Defendants deliberately and with malice, denied Theresa the right to take care of the children. The Defendants can offer no viable reason why it was necessary to remove the children from the care of the grandmother, and place the children in foster care.

In fact, their actions show that they did not want Theresa to have the children, and they had no intention of considering her as a "relative caregiver" for the children.

7.) Prior to any home study being performed, Defendants Hammon and Chambers completed a "Preliminary Home Study Assessment". A copy is attached as Exhibit "K". They deliberately eliminate Theresa Allen as a possible relative caregiver. She is not listed on the form. No reason has been given by the Defendants as to why Theresa Allen was not to be considered for placement of the children. This assessment was made prior to an independent home study being performed. Seemingly, they had already made up their mind that Theresa was not getting the children. (*See page 1*). The only person mentioned is Sonya Balenton, a family friend as a possible caregiver. In the report Hammon and Chambers state that they have a "concern of the maternal grandmother possible influence over the placement," with Ms. Balenton because "she is more friends with Ms. Teresa Allen and the agency has on-going concerns with the grandmother's involvement with the children and the mother." To keep Theresa Allen from having any access to the children, the Defendants kept Sonya Balenton's approved home-study from being known. Ms. Balenton, Theresa, nor any of the family was notified of her approval in late December of 2009. Ms. Balenton was hindered from receiving custody of the children, which would have been more beneficial to the children rather than a foster home.

The Defendants were willing to go to any extent to assure that Theresa did not have access to the children. Their actions are in direct violation of Section 261.307(a)(2) of the Texas Family Code, which provides that there is a legal requirement of designating relatives or close family friends to care for the children.

8.) In order to assure placement for the children in foster care, Dr. Greene, the children's therapist was told that the children had no family. Next, they take action to assure that Theresa's home study is not approved. The Court had ordered that a "scout" not associated with TDFPS was to be used for the home study. Instead, the supervisors did just the opposite and retained a S.A.F.E. Project provider used often by TDFPS. The study shows that an unlicensed clinician made the assessment. As a contractor of TDFPS, the preliminary findings are sent to TDFPS for correction and approval. This provider was used to assure Theresa Allen's non- approval. The findings or concerns in the report were never conveyed to Theresa Allen. She didn't receive a copy of the report until October 30, 2012, almost three years after the home study was performed. She was never given the chance to respond to the "concerns" mentioned in the report. It becomes obvious that the Defendants manipulated said report to deliberately keep Theresa from receiving legal custody of the children, and further hindering her from visiting the children. Defendant Alpough, Hammon and Chambers deliberately and purposefully interfered with the social study of Theresa for the sole purpose of thwarting her chances of becoming the "designated relative caretaker" of the children.

9.) On December 17, 2009, Plaintiff Teresa Allen was Ordered to remain in the courtroom for Drug/Alcohol/D.N.A. screening. A copy of the Order

23

is attached as Exhibit "L". The tests were performed that day. The Subcare Transfer Sheet, completed by Defendant Hammon and Alpough acknowledge that the grandmother should have been able to visit the children when they receive her drug results. A copy of the subcare form is attached as Exhibit "M", (See TDFPS, p. 536). The form was completed on the same day of the hearing.

The negative drug test results were received within 24 hours, yet the Defendants Hammon, Chambers, and Homer prohibited Theresa from seeing her grandchildren.

10.) Defendants Alpough, Homer, Hammon and Chambers deliberately do not allow the grandmother as a visitor, knowing that the mother could not visit during her rehabilitation, and the grandmother would likely be the children's only family contact. CPS guidelines allows for family visitation, including parents, grandparents and other relatives. The Defendants can offer no reason as to why Theresa was refused visitation.

11.) Defendants Alpough, Homer, Hammon and Chambers deliberately and purposefully created an implemented a "false court order" of no visitation to hinder and prevent any contact between Theresa and her grandchildren. The Judge acknowledges that "she don't see any notes on her docket sheet" ordering that the grandmother not have visitation. (See TXSD Doc. 22-4, p. 13 and 14 lines 21-25 and 1-6). County Attorney Garland McInnis admits that there was never a written order for the grandmother not to visit with the grandchildren, (See TXSD Doc. 22-4, p.17, line 3).

24

Defendant Homer admits that his only reason not to have the grandmother visit was "because the agency weren't looking to place the children with the grandmother." (See TXSD, Doc. 22-4, p.15 lines 1-5). Even after the court ordered that the grandmother was entitled to visitation, Defendant Homer continued to block her visitation. Theresa did not see the children until she received managing conservatorship of the children in November of 2010.

## COUNT 2 – INTERFERENCE WITH FAMILY RELATIONSHIPS
## FIRST AND FOURTEENTH AMENDMENT CONSTITUTIONAL VIOLATIONS

The Plaintiffs had a right to intimate family association and family integrity pursuant to the First and Fourteenth Amendments to the U.S. Constitution. It is the regulation and procedure of TDFPS to allow visitation to both the benefit of the children and family members, (*See* TXSD, Doc. 41-16, which provides under paragraph 18 that the children are entitled "to visit and have regular contact with my family, including my brothers and sisters (unless a court order or case plan doesn't allow it) and to have my worker explain any restrictions to me and write them in my record.)" There was no court order or case plan that restricted the visitation of Plaintiff Theresa Allen.

In fact, TDFPS state that their initial purpose was to reunite the children with their family. According to the Child Protective Services (CPS) handbook, in cases where family reunification is sought, parental and family visitation should take place at least once a month and may be either supervised or unsupervised, depending on the child's best interests at the time.

Plaintiff Theresa Allen was able to visit her grandchildren 1 time on December 8, 2009, thereafter, Defendant Hammond provided verbal and written information to

Alpough, the investigator, and eventually the subcare workers, Defendant Homer and his supervisor, Whalennial Grant-Billy stating that there was a Court Order prohibiting Theresa Allen from visiting the children, (*See* TXSD, Doc. 41-15, p. 15 lines 20-25). No such order existed. When asked "Did you see the order," Homer replies "No", (*See* TXSD, Doc. 41-15, p. 52 lines 4-5). Even when Plaintiff attempted to inform them that no such order existed, there was no effort made to substantiate the information that was relied upon. The CPS workers continued to enforce the false order without question or confirmation that such an order existed. Defendants Alpough and Homer readily admit that visitation was restricted because Theresa was not going to be designated as the caregiver of the children. Homer had testified in court on October 7, 2010 that it was his desire that Ms. Allen and her grandchildren not see each other again, (*See* TXSD, Document 22-4, p. 8, line 18). Homer further states that he did not want them to have visits because he was not looking to place them permanently with the grandmother, (*See* TXSD, Doc. 41-15, p. 16 lines 6-10 and p. 17 line 20 through p. 18, lines 1-6). Homer states that "I didn't have any personal biases or anything, you know, going towards Ms. Theresa Allen. I just solely went upon what the Agency was telling me to do, (TXSD, Doc. 41-15, p. 19, lines 18-21). It became clear in the Alpough and Homer depositions, that each employee blindly follows the recommendations of the supervisor, even when the instructions given can and did violate the constitutional rights of the Plaintiffs. Both employees claim that they merely follow supervisory directives. Investigator Alpough followed the orders of Hammond blindly. Hammond followed the orders of Chambers blindly. When the case was transferred to the subcare unit Supervisor Whalenniel Grant-

26

Billy, the same instructions of no visitation without an order was enforced by her and Defendant Homer.

The CPS file is to contain a copy of all court orders governing the children and and any restrictions imposed by the Court. There is no viable reason given as to why the CPS employees did not read or review the court file to verify the information before enforcing a non-existent court order of no visitation between Theresa Allen and her grandchildren. Plaintiffs were deprived of their right to the services, consortium, companionship, comfort, and support of their grandchildren/grandparents without due process of law, in violation of their rights under the Fourteenth Amendment to the United States Constitution to live together, and visit as a family.

## COUNT # 3-DUE PROCESS CONSTITUTIONAL AND STATUTORY VIOLATION

It is the Plaintiffs' contention that their constitutional right to due process was violated when no "emergency hearing" was held after the removal of the children. When children are removed from the home without a Court Order, as in this case, an emergency hearing is required under Tex. Fam. Code Ann. § 262.105 which states in part:

> "INITIAL HEARING AFTER TAKING POSSESSION OF CHILD IN EMERGENCY WITHOUT COURT ORDER.
>
> (a) The court in which a suit has been filed after a child has been taken into possession without a court order by a governmental entity shall hold an initial hearing on or before the first working day after the date the child is taken into possession..."

It is undisputed that Theresa Allen, the grandmother, Sonya Balenton, Faye Guillory, and Jim McKinnin, (friends and associates) were present in the courtroom on the morning of December 7, 2009, waiting for the emergency hearing. Alpough specifically

27

acknowledges the presence of Theresa Allen (*See* TXSD, Doc. 41-2, lines 2-3). Despite their presence, an emergency hearing was not held or requested by TDFPS, or its attorney. The State Court's docket sheet confirms that no hearing took place. It only shows a date and no remarks, (*See* TXSD, Doc. 41-3). When questioned about the hearing Alpough states: "Actually, there wasn't an emergency hearing that actually took place. There was a setting for an emergency hearing. When I arrived there, the paperwork was handed to me and I was done. There was an emergency setting. In other words, yes, we show up for but there was not one held." (TXSD, Doc. 41-2, lines 5-16). Attorney Seaquist acknowledges that this is "how the Judge in that court does it." (TXSD, Doc. 41-2, line 21).

Defendant Alpough deliberately and purposefully ignored Plaintiff Theresa Allen and the other witnesses present for the emergency hearing. She at no time informed the court that an emergency hearing was necessary. No emergency hearing was held in compliance with the Texas Family Code. There is no reason given by TDFPS or its Defendants to explain why an emergency hearing did not take place, when clearly they knew that such a hearing is required. They can offer no lawful reason why the emergency hearing did not take place. This is a clear statutory and constitutional violation.

## CONCLUSION

In conclusion, the Defendants failed to adhere to TDFPS policy, state law and constitutional standards. Their purpose was to harm Plaintiff Theresa Allen, and in doing so they caused severe hardship upon the children. The continuous and ongoing destructive behavior by the TDFPS employees was the direct cause of the harm to the

Plaintiffs. Theresa Allen had been the primary caretaker of the children since they were born. The childrens' connection to the grandmother was stronger than with their mother. The grandmother's home was and had always been a safehaven for the children. The children had lived with her, most of their lives.

## PRAYER

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

Wallace & Watson, P.C.

/s/ Sonya Wallace
Sonya O. Wallace
Attorney for Petitioners
TBN: 20776455
2626 S. Loop W., Ste. 400
Houston, Texas 77054
Tele: 713-661-3231
Fax: 713-661-8212
swallace4627@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 29th, 2013, a true and correct copy of Plaintiffs' Response to Defendant's Motion for Summary Judgment was forwarded via CM/ECF with the Court Clerk to Gunnar P. Seaquist, Assistant Attorney General, attorney for the Defendants.

/s/ Sonya Wallace
Sonya Wallace