EXHIBIT A

# ORAL AND VIDEOTAPED DEPOSITION OF THERESA ALLEN

### February 13, 2013



CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**Sunbelt Reporting & Litigation Services**
Houston (713) 667-0763
Austin (512) 465-9100
Bryan/College Station (979) 774-4000
Corpus Christi (361) 882-0763
Dallas/Fort Worth (214) 747-0763
East Texas (903) 593-3213
San Antonio (210) 342-0763

**WITNESS COPY**

Page 237

1  A  Complete.
2  Q  -- investigated in 90 days?
3  A  I think that's what she said.
4  Q  Okay. This case was filed in October -- excuse
5     me, on August 23rd of 2009, correct?
6  A  Uh-huh.
7  Q  What is 90 days from there?
8  A  I don't know when 90 days is, but I'm going to
9     tell you this.
10 Q  Would it be November 23rd, 2009?
11 A  I can't -- I don't think so. I mean -- August,
12    September, October, November. I'm sure.
13 Q  Okay. And in fact, when you allege that she
14    spoke to you, accepting your allegation it's
15    true, it was not even October 23rd yet, correct?
16 A  When she spoke to me, it was November the --
17    November the 12th, I think.
18 Q  Okay. So assuming that there was a 90-day rule,
19    that 90-day rule wouldn't have run for another
20    11 days.
21 A  This is true. That's why she told me she had to
22    come get the children.
23 Q  Ma'am, does it make any sense if she had 11 days
24    to close an investigation, that she would just
25    have to come get the children?

Page 238

1       MR. BRANSON: Objection, speculation.
2  A  Sir, when you ask her -- you know, you have to
3     ask them. I don't work for CPS.
4  Q  (BY MR. SEAQUIST) I know what her testimony is.
5     I'm asking you about yours?
6  A  I gotcha. Well, I'm going to tell you this.
7     And whatever is in between the lines on the back
8     of it, you write it. Yolanda Alpough called me,
9     identified herself, left a voice message. I
10    returned her phone call and she told me on the
11    speaker phone, with Pastor Jim McKinnon sitting
12    right there, that they overlooked my daughter's
13    case. She wasn't in -- she had to -- I don't
14    even -- what she was saying, was just -- it was
15    such a shock. All I heard was, "I'm going to
16    have to come get the kids." Then she started
17    telling me they had 90 days to complete an
18    investigation, she had been a private
19    investigator for five years. Now, if that's a
20    lie, then I'm lying right behind her. Because,
21    I mean, why am I going to throw that in there?
22    I'm trying to throw something in there so that
23    you can investigate that to see if that's a
24    fact. And then you'll know that what she told
25    me is the truth. Okay? Or that what I'm

Page 239

1     telling you is a fact.
2  Q  So if she told you she was an investigator for
3     five years, then she also told you that she was
4     afraid of losing her job and was going to take
5     the kids away?
6  A  I don't know why she was telling me. She just a
7     talkative woman, just whatever. I didn't
8     believe half of what she was telling at all.
9     You know, earlier in the break. But she told me
10    that. She told me that her name was Yolanda
11    Alpough, and that she was an investigator with
12    Children's Protective Services and that she --
13    my daughter's case had gotten overlooked and
14    that she had to close this case -- I mean, she
15    had to complete her investigation in 90 days.
16    Now, if that's a fact, then you go and
17    investigate that and see if that's when they
18    have to conclude it. Because I don't know that.
19    And then, and that's the same thing I sent up to
20    the ombudsman when I filed my report.
21 Q  Okay. What --
22 A  And then after that -- do you want me to finish
23    answering your question?
24 Q  I think you've gone way beyond my question with
25    what you're saying.

Page 240

1  A  Okay. I'm just trying to let you know. Her
2     cell phone number should be on it.
3       MR. BRANSON: Shh.
4       THE WITNESS: Sorry.
5  (Whereupon T. Allen Exhibits 7 to 9 were
6  marked.)
7  Q  (BY MR. SEAQUIST) Well, Exhibit 7 in the phone
8     records that you have provided for November 11th
9     through it looks like December 9th. The phone
10    records identify three calls on that day. Which
11    one was your call going to Alpough?
12 A  Her call to me, you mean? I think I -- wait a
13    minute, who scratched this out? How am I
14    supposed to look at this?
15 Q  I don't know. That's the way your counsel
16    produced them to me, ma'am.
17 A  That probably was highlighted. I don't know but
18    they're good at scratching it out. But I got --
19    I got -- all of these that are scratched out are
20    hers.
21      MR. BRANSON: Can we go off the record
22    for a second?
23      MR. SEAQUIST: Yes.
24      THE VIDEOGRAPHER: It's 4:00 o'clock,
25    off record.

Pages 237 to 240

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

## ORAL AND VIDEOTAPED DEPOSITION OF THERESA ALLEN

### Page 241

1  (Discussion off the record.)
2  THE VIDEOGRAPHER:  4:01, back on
3  record.
4  Q  (BY MR. SEAQUIST) All right. Ms. Allen in
5  discussions off the record I think we've
6  identified that the copies of your phone bill
7  that were produced to us may have been obscured
8  by some highlighting that you have made.
9  Counsel is representing he's going to try to get
10 me a clean copy. My question for you is just so
11 we are clear so that when we evaluate the clean
12 copy of this phone bill, your allegation is that
13 you called Yolanda Alpough on her personal cell
14 phone number; is that right?
15 A  She called me first.
16 Q  She called and left you a message.
17 A  She called me and left me a message in one of
18 these -- this.
19 Q  And it was not in that message -- she did not
20 say in that message anything about being afraid
21 for her job or taking the children, correct?
22 A  No, she didn't say it until I called back.
23 Q  She asked you to give her a call back; is that
24 right?
25 A  Yes, it is.

### Page 242

1  Q  And then you called her back from your cell
2  phone; is that right?
3  A  Yes, I did.
4  Q  And you called her on her personal cell phone
5  number?
6  A  Yes, I did. That's the number I assume it was,
7  because it had her voice mail and it wasn't --
8  just like my cell pone, if you call me now,
9  You'll get my -- you mentioned three calls. I
10 see you have highlighted three calls?
11 Q  Well --
12 A  So I assume that there's 16. There's 2 --
13 Q  Somehow these are just out of order.
14 A  I see a 281.865.6670.
15 Q  Is it your belief that's Yolanda Alpough's
16 number?
17 A  I don't know. I just see it marked out on
18 yours. There's a reason you had to mark them
19 out.
20 Q  I marked the three that looked like they were on
21 November 12th. It looks like there's some more
22 on the third page on November 12th. You don't
23 know which one of these is supposed to have been
24 Yolanda Alpough's number. Is that right?
25 A  No.

### Page 243

1  Q  You did indicate on one of these which is No. 75
2  there, which is on Bates 420. These are not
3  DFPS Bates like the other Bates numbers I've
4  referenced. It's just Bates 420. You had
5  written daughter there. Is it your testimony
6  that that is Renesha Allen's number?
7  A  Yes.
8  Q  Is this her cell phone number?
9  A  Yes. Uh-huh.
10 Q  Is that Renesha Al he knows number?
11 A  Yes.
12 Q  Is that her cell phone number?
13 A  Yes.
14 Q  And if I tell you I can see through the ink that
15 those are a bunch of different numbers. But
16 they're not all calls to one number, correct?
17 A  Nope. Some was to the office and some was to
18 the -- I'm trying to see how you're seeing
19 through.
20 Q  Well --
21 A  Can I see yours? Maybe I can see through.
22 Q  You can try.
23 A  Maybe you can write down a few of the numbers?
24 You see some of these numbers?
25 Q  Uh-huh.

### Page 244

1  A  Maybe I need your glasses then to see. Because
2  I mean, I see 713, something, something,
3  something. I see the last part of these. I
4  mean, can you see them?
5  Q  Well, I'm not going to guess and I'm not going
6  to have you guess at what the numbers are.
7  We'll get the clean copy.
8  MR. BRANSON:  Could we go off the
9  record a second.
10 MR. SEAQUIST:  Yeah.
11 THE VIDEOGRAPHER:  4:05, off the
12 record.
13 (Discussion off the record.)
14 THE VIDEOGRAPHER:  4:07, back on
15 record.
16 Q  (BY MR. SEAQUIST) All right. It's your
17 testimony that you were not living on Tinker
18 Street in the October, November, 2009, time
19 frame; is that right?
20 A  No, I wasn't living there.
21 Q  Okay.
22 A  And it wasn't Tinker. I moved from -- yeah.
23 That's where I moved from.
24 Q  You moved from Tinker to Wood Bayou, I think is
25 what you said.

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

Page 245

| | | |
|---|---|---|
| 1 | A | Yeah. And then I moved from Wood Bayou to -- |
| 2 | Q | Burnham Wood? |
| 3 | A | Yes. |
| 4 | Q | And when was that move? |
| 5 | A | August 20th. |
| 6 | Q | So, in fact, at the time you made the report, |
| 7 | | you would have already been at Burnham Wood? |
| 8 | A | Yep. |
| 9 | Q | But you would have just moved -- how long were |
| 10 | | you at Wood Bayou? |
| 11 | A | About two, three years. |
| 12 | Q | I thought you were at Tinker Street -- tell me |
| 13 | | if I'm wrong. Were you not at Tinker Street |
| 14 | | when Renesha and the children were staying with |
| 15 | | you under the family services plan? |
| 16 | A | I told you I live at each place two years. I |
| 17 | | stayed on Tinker Street two years. I moved |
| 18 | | there before Renesha had the baby. Remember? |
| 19 | | And then when they moved out in 2007, I moved |
| 20 | | out in 2008, if I'm not mistaken. |
| 21 | Q | Okay. And then 2008 you moved to? |
| 22 | A | I moved to -- |
| 23 | Q | Wood Bayou? |
| 24 | A | No, I think I moved from Wood Bayou to the -- |
| 25 | | let me think. I can't remember. |

Page 246

| | | |
|---|---|---|
| 1 | Q | You know, I may have a document later on that |
| 2 | | will help us out with that. Anyway, at the time |
| 3 | | you made the complaint -- |
| 4 | A | I moved from -- yes. I moved from Tinker to |
| 5 | | Wood Bayou, I want to say. Because I moved in |
| 6 | | 2009 to Burnham Wood. |
| 7 | Q | Burnham Wood. |
| 8 | A | Yes. |
| 9 | Q | And that was in August? |
| 10 | A | And I'm still there now. |
| 11 | Q | Okay. So in the year -- in August of 2009 you |
| 12 | | were at Wood Bayou only+ a year and a half. |
| 13 | A | I moved from Wood Bayou to Burnham Wood. |
| 14 | Q | Okay. So not quite two years at Wood Bayou, |
| 15 | | about a year and a half or less? |
| 16 | A | Yes. I found out pretty quick I didn't like it |
| 17 | | over there. |
| 18 | Q | In terms of your last contact with CPS when the |
| 19 | | family service plan was going on, you were over |
| 20 | | at Tinker Street. |
| 21 | A | Yes. |
| 22 | Q | Okay. So it would make sense that that would be |
| 23 | | the address that was in CPS's files. |
| 24 | A | Nope. |
| 25 | Q | Why is that ma'am. |

Page 247

| | | |
|---|---|---|
| 1 | A | Well, because it was my understanding -- oh, |
| 2 | | you're talking about in their file. |
| 3 | Q | Uh-huh? |
| 4 | A | I don't know. She said she went on Wood Bayou, |
| 5 | | if I'm not mistaken, that's what she says in her |
| 6 | | report. She said my last known address. |
| 7 | Q | Well, it says on her report here that she had |
| 8 | | gone by the address given on the referral to |
| 9 | | 15035 Tinker Street. |
| 10 | A | I'll have to go back and check. |
| 11 | Q | Okay. All right. Ms. -- okay. Did you ever |
| 12 | | allege that Renesha sold her food stamps? |
| 13 | A | I never knew it. I mean, I just was told. A |
| 14 | | lot of stuff, like I said, I was told and what |
| 15 | | that girl was doing. I didn't really know what |
| 16 | | she was doing and -- |
| 17 | Q | But that is something you had heard. |
| 18 | A | I had heard, yes, sir. |
| 19 | Q | Okay. And I think you've testified that one |
| 20 | | time Renesha had called you frantically because |
| 21 | | she couldn't find the keys to the van she drove? |
| 22 | A | I don't remember. |
| 23 | Q | Okay. You testified, I think, that she was, you |
| 24 | | know, high and trying to drive the van and she |
| 25 | | got flustered? |

Page 248

| | | |
|---|---|---|
| 1 | A | Are you -- I mean, you're talking about -- |
| 2 | Q | I'm asking you. |
| 3 | A | You're telling me that I testified to that. |
| 4 | Q | I believe that you testified to some extent -- |
| 5 | | I'm not stating your exact words. But I do |
| 6 | | believe you testified earlier when she was |
| 7 | | unable -- that she would call you if she was |
| 8 | | frustrated with the van situation? |
| 9 | A | No. What I told you was that when she wanted me |
| 10 | | to keep the kids -- because, of course, I would |
| 11 | | tell her it's time to see the kids. The kids |
| 12 | | wanted to see her. And she explained she was |
| 13 | | driving the van for the daycare. |
| 14 | Q | Okay. Did she ever call you and tell you that |
| 15 | | she had lost the keys to that van? |
| 16 | A | I don't remember. |
| 17 | Q | Okay. Don't know one way or the other? |
| 18 | A | No. And again, I just don't remember. |
| 19 | Q | Did you tell Ms. Alpough that yours was a family |
| 20 | | and not numbers on a page? |
| 21 | A | Excuse me? |
| 22 | Q | Did you tell her when you spoke to her that you |
| 23 | | wanted her to know that you guys were a family |
| 24 | | and not just numbers? Does that sound like |
| 25 | | something you would say? |

Pages 245 to 248

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio