ORAL AND VIDEOTAPED DEPOSITION OF THERESA ALLEN

## Page 249

1  A  No.
2  Q  You don't think you would have said that?
3  A  That we were a family and not numbers on a page.
4  Q  That's right.
5  A  I may have said that, but not to her.
6  Q  Who do you think you would have said that to?
7  A  I have no idea, but not to her. Because she
8     hasn't spoke to me but that time on the phone
9     when she came and told me I'd never see those
10    kids again.
11 Q  And you're testifying she never spoke to you
12    other than the alleged conversation that you
13    allege?
14 A  When she came in my home, squat down on my sofa,
15    told me because I went over her head and that I
16    would never see them kids again. That's what
17    she said. And I'm never -- I barely recognize
18    her because she look like she kind of thick,
19    gained a little weight.
20 Q  You're saying it's -- that Yolanda Alpough said
21    that?
22 A  I'm sorry?
23 Q  So you're saying that Yolanda Alpough told you
24    you'd be sorry for going over her head?
25 A  Stephanie told me December the --

## Page 250

1  Q  Well, that's not what you just testified to.
2     You said my client, Yolanda Alpough, came to
3     your house and --
4  A  When she came into my home.
5  Q  -- told you that you'd be sorry for going over
6     her head.
7  A  When she came in --
8  Q  She never said that, did she?
9  A  You want me to tell you?
10 Q  I want a "yes" or "no" answer to that question.
11       MR. BRANSON: Well, let her answer
12    your first question.
13 A  Which one you want?
14 Q  (BY MR. SEAQUIST) She never said that. Yolanda
15    Alpough never said to you that you'd be sorry
16    for going over Yolanda Alpough's head?
17 A  You're telling me that or you're asking?
18 Q  I'm asking you that.
19 A  Do you want me to tell you?
20 Q  I want you to answer that question "yes" or
21    "no."
22 A  Yolanda Alpough came inside my home --
23 Q  Ma'am --
24 A  December 4.
25 Q  It is a "yes" or "no" question -- "yes" or "no"?

## Page 251

1  A  "Yes" or "no" what -- yes, she told me that.
2  Q  Your allegation is she told you that --
3  A  Yes.
4  Q  You would be sorry for --
5  A  Yes.
6  Q  -- going over her head.
7       THE WITNESS: Can you get that three
8     times?
9  A  Yes.
10 Q  (BY MR. SEAQUIST) Okay. Because in your
11    petition you allege that comment was made by
12    Stephanie Hammon, not Yolanda Alpough.
13 A  Well, I don't know what happened, but I say on
14    December the 3rd, I received a phone call.
15    While I was on a conference call and I put Ms.
16    Stephanie Hammon on hold. By this time I did
17    not trust them. I asked Ms. Faye Guillory to
18    put her phone on mute and to witness the
19    conversation, because she was mad. She made it
20    obvious that she was upset that I went over her
21    head. I asked her to hold on just a moment and
22    I clicked over. And that's why I will try to
23    get my phone and perhaps they would show that
24    day, December 3rd.
25 Q  Everything you have just said is an allegation

## Page 252

1     that you are making against Stephanie Hammon,
2     not Yolanda Alpough.
3  A  Which one do you want to know --
4  Q  I have asked you --
5  A  -- because they both said it on December 3rd.
6  Q  I have asked you expressly --
7  A  December the --
8  Q  Yolanda Alpough?
9  A  Okay. Yolanda Alpough told me that I would be
10    sorry for going over her head.
11 Q  When did you go over her head, ma'am?
12 A  When I called Ivy Chambers, because they were
13    not returning my phone calls.
14 Q  Who else heard is a witness to this alleged
15    statement by Yolanda Alpough?
16 A  I had my phone on mute -- I mean, when she came
17    to my door.
18 Q  No, ma'am.
19 A  Ms. Faye Guillory was on the phone the whole
20    time.
21 Q  That was, again, your conversation with
22    Stephanie Hammon. I'm asking --
23 A  With Yolanda Alpough.
24 Q  Okay.
25 A  When she knocked on my door and I went to my

Pages 249 to 252

Sunbelt Reporting & Litigation Services
Houston  Austin  Bryan/College Station  Corpus Christi  Dallas/Fort Worth  East Texas  San Antonio

Page 253

```
 1     door and it was freezing and the kids were
 2     trying to see who was at the door. And when I
 3     moved the kids like this, she came in -- her and
 4     whoever she had with her. I put the lady's name
 5     in my notes. She walked in my home. She was
 6     fierce. She was angry and I was intimidated by
 7     her persona. And she came in and she -- you
 8     know. And I remember trying to get my
 9     grandbabies away from that tension.
10          MR. SEAQUIST: Objection,
11     nonresponsive.
12  A  Okay. Well, she came in my home --
13  Q  My question is about this -- first, let me ask
14     you this: When do you allege that Yolanda
15     Alpough ever told you that you would be sorry
16     for going over her head?
17  A  December 4th, when she walked in my house and
18     she walked over to my -- and I asked her, well,
19     who is this. Because I didn't like the way she
20     came in my house. She just -- because my
21     grandbabies were in the way and I didn't like
22     what she --
23          MR. SEAQUIST: Objection,
24     nonresponsive.
25  Q  (BY MR. SEAQUIST) I'm talking about the
```

Page 254

```
 1     statement --
 2  A  December 4th.
 3  Q  December 4th, all right. Who witnessed that
 4     statement?
 5  A  Faye Guillory.
 6  Q  And where was Faye Guillory?
 7  A  On the phone.
 8  Q  Okay.
 9  A  The whole time.
10  Q  Okay. When did you get Faye Guillory on the
11     phone?
12  A  Before she came in.
13  Q  Okay. You had Faye Guillory on the phone before
14     anybody even showed up to your house?
15  A  Yes.
16  Q  All right.
17  A  And I asked Pastor Jim McKinnon to come over as
18     a witness as well. Because of the previous
19     threat made the day before by Stephanie Hammon.
20  Q  Okay. What threat was that, ma'am?
21  A  That I would be sorry -- she said, "You went
22     over my head. You're going to be sorry you went
23     over my head." And I begged her with Faye
24     Guillory on the phone. I said, "Ma'am, I didn't
25     try to go over your head. You guys weren't
```

Page 255

```
 1     returning my phone calls. I'm just trying to
 2     comply -- she said, "uh-huh uh-huh. You're
 3     going to be sorry you went over my head. And
 4     she proceeded to tell me that someone would be
 5     at my house. And she hung up the phone.
 6  Q  Okay. So the only person who heard either of
 7     these statements is Faye Guillory.
 8  A  This is true.
 9  Q  And you say, at least -- you say on the first
10     call, you somehow patched Ms. Guillory into the
11     call.
12  A  I'm saying --
13  Q  No, that was Stephanie Hammon you say you
14     patched Ms. Guillory into the call.
15  A  On December 3rd, Ms. Faye Guillory -- when I
16     received a phone call from Stephanie Hammon, it
17     was so obvious that she was angry by the way she
18     was. She say, you called my supervisor -- my
19     program director. And then I said, ma'am, and I
20     was trying and she was talking over me. And I
21     said, Could you hold on one moment. I said,
22     please, could you hold on one moment? And then
23     I switched over to call Ms. Faye. And I said,
24     Ms. Faye -- and I explained to her the
25     situation. I was trying to find my recorder to
```

Page 256

```
 1     put it on speaker and record. But I was
 2     trembling like this (demonstrating). And then
 3     she say, "Baby, take a deep breath." She said
 4     I'm going to put my phone on mute and I'm going
 5     to listen." She said, maybe you're panicking
 6     for nothing. So I clicked the phone over and
 7     she witnessed to the whole. She said, "Baby,
 8     that's a threat." She say that woman threatened
 9     you. So then that's why I had her on -- she was
10     so --
11  Q  Please stop pointing at my client.
12  A  I'm sorry. Well, I'm sorry. I speak with my
13     hand. But Yolanda Alpough -- can I say her
14     name?
15  Q  You may -- yes, you may.
16  A  Was so indignant when she and abusive in her
17     authority. She didn't even care about m y
18     grandbaby. She just bombarded my home with this
19     attitude feeling. And I tried to be nice, but I
20     was scared. I was scared because she was --
21     looked like her mind was made up to take my
22     grandbabies. And she plopped down on my sofa
23     and she squat down like this and she grabs her
24     phone. She didn't even realize I had the phone
25     in my hand the whole time.
```

Pages 253 to 256

Page 257

1  Q   Okay. So --
2  A   When I sat down.
3  Q   Ms. Guillory, your testimony is Ms. Guillory
4      overheard the interactions in the room on the
5      other end of the phone.
6  A   Yes, she did.
7  Q   Okay. All right.
8  A   And to prove it, she spoke to the other lady
9      that was with her. She didn't tell me -- excuse
10     me. I'm just talking with my hands. I don't
11     mean any harm.
12         She spoke to the other lady that was with
13     Ms. Alpough. When I realized that Ms. Alpough
14     was -- mind was made up, that she was there to
15     take the children, no matter what I did, then I
16     tried to get on my cell phone to call Scott
17     Dixon who I'd spoken to and Ivy Chambers.
18     Because I didn't want -- my grandbabies, they
19     were innocent. They had never been exposed to
20     any of that. She went outside. Yolanda Alpough
21     went outside, Ms. Faye started speaking on the
22     phone to whoever she was with. And if it
23     wouldn't have been for that lady, whoever she
24     was, who appeared to be compassionate, she gave
25     me a form. And the only think Yolanda wanted me

Page 258

1      to sign something for her to pick up the
2      children. I told her, "I'm not -- with all due
3      respect, I'm not trying to upset you, but I'm
4      not signing anything. And I told her my
5      daughter was in rehab. My daughter placed the
6      kids with me. The kids weren't in any harm.
7      And I begged -- I was trying to buy time. Next
8      thing I knew, she went outside and the police
9      came in.
10 Q   Okay. I want to back up. When did Renesha
11     bring the children to you in your -- when is it
12     your testimony that Renesha brought the children
13     to you when she wanted to go to rehab?
14 A   Immediately. I mean, as soon as -- because it's
15     November, remember. It was November when I
16     received that call. The kids were already with
17     me. So she said "Mama, I'm going to make
18     preparation," she said, "and go get some help."
19 Q   Okay. And then you were driving the kids back
20     and forth at that time, correct?
21 A   No. Sometime the children would be with her.
22     Remember I told you she had a split shift for
23     the daycare. And something happened to where
24     the kids couldn't go all day. Because of -- I
25     don't know what it was. So sometime, when she

Page 259

1      would get out, I would have to pick the kids up
2      from her, then to pick the kids up from daycare.
3  Q   And at that point, she was no longer living at
4      the apartment over at 2000 Tidwell; is that
5      right?
6  A   Yeah, wherever we was she was living there.
7      Yes, she was staying.
8  Q   Not the apartment that she was in in August.
9  A   I don't know. I just know that she was working
10     at whatever the name of the thing was and
11     whatever arrangements we had, I dropped the
12     children off and I picked them up and Ms. Faye
13     was always with us because I didn't know the
14     area. I was new to the area. And Ms. Faye, by
15     her being older, she loved being with us. You
16     know, that was like her outing. So she was
17     always with us with everything.
18 Q   Ms. Allen, Ms. Renesha Allen, had been evicted
19     from that other apartment, correct?
20 A   I don't know. When I found out that Renesha was
21     evicted from her apartment, it was just like any
22     other time. I don't even know where she went
23     after that, because I just didn't know. I went
24     over there to help her to try to clean up. But
25     I didn't clean up like I normally do.

Page 260

1  Q   And she testified yesterday that she got a new
2      apartment and she took the kids there; isn't
3      that right?
4  A   Oh, I don't know nothing about that.
5  Q   Okay. And you never went and dropped the kid
6      off at her new apartment or her new house.
7  A   I don't even remember any new house. I've
8      never, ever, ever, ever, ever, been out, after
9      she moved from Tidwell, I don't know where she
10     went. Never.
11 Q   All right. And it's your testimony you did not
12     know that Renesha Allen was asked to take a drug
13     test?
14 A   I didn't know anything about what CPS did. The
15     first time I, again, heard from CPS is when
16     Yolanda Alpough called me and told me what I
17     told you earlier. No one from CPS tried to talk
18     to me about anything.
19 Q   And is it your testimony that on December 3rd,
20     one of the other things you allege Ms. Hammon
21     told you, she told you that Yolanda Alpough was
22     going to be coming out to your house on December
23     the 4th.
24 A   She didn't tell me who. She just said somebody
25     was going to be coming out there and then she

Pages 257 to 260

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

Page 261

1  hung up.
2  Q  Okay.
3  A  I was trying to -- I was begging her and I was
4     asking her, you know, just was begging her, you
5     know. But that's what she was saying. And then
6     Ms. Faye told me, she said, "That woman
7     threatened you. She threatened you. She, you
8     know, she was just telling me that I shouldn't
9     have went over her head and she's going to show
10    what happened to people that go over her head.
11    And I said, "Well, I didn't know what to do." I
12    said, "I called you. What was I supposed to
13    do," you know. And she just kept saying that I
14    went over her head and I was going to be sorry I
15    went over her head.
16 Q  Okay. Ms. Guillory --
17 A  Same thing she said.
18 Q  Ms. Guillory is the only other person who heard
19    that?
20 A  Yep.
21 Q  And nobody else?
22 A  I mean, I can't keep a security guard --
23 Q  Nobody else heard Yolanda Alpough say anything?
24 A  Nope.
25 Q  Do you know that Ms. Alpough also has a

Page 262

1     recording --
2  A  Nope.
3  Q  -- for that time at your house.
4  A  Nope, nope. I sure don't. I sure would like to
5     know what time the recording was -- when did it
6     start? Was it from the very first time she came
7     in the door to when she left? That sure would
8     be nice.
9  Q  In your complaint you cite from Ms. Alpough's
10    report. It says Ms. Theresa Allen was aware
11    that I would be arriving at 10:00 a.m. Is that
12    right?
13 A  Who said that?
14 Q  It's in your complaint.
15 A  Do I have a copy of that, whatever you're
16    looking at? Can I have a copy of that, because
17    I think the last one we got was 7.
18 Q  I don't have a copy to give you.
19 A  Well, could I see yours?
20 Q  I'm not making it an exhibit. It's just the
21    complaint that you filed in this lawsuit, ma'am.
22 A  Well, may I look at it and see?
23 Q  You may. So my question is just specifically
24    you were aware that she would be arriving at
25    10:00 a.m., right?

Page 263

1  A  I was told that someone would be coming to my
2     home.
3  Q  And you were given the time they would be there
4     approximately?
5  A  Yes, sir.
6  Q  So you were expecting them?
7  A  Yes.
8  Q  So you weren't surprised when they knocked on
9     the door?
10 A  No, but I was surprised when she bombard --
11    well, put her foot in my door and I was offended
12    by that. Because I didn't want my grandbabies
13    to be exposed to the wind or the air, the cool
14    air that was up.
15 Q  Demonstrate for me how Yolanda pushed through
16    the door.
17 A  Okay. Do I need to take this off.
18 Q  Yes.
19 A  Well, when -- like she said, the children were
20    in their pajamas, we were excited it was
21    snowing, and I was getting my camera ready for
22    us to take -- go and take pictures and
23    everything. And then we were going to work --
24    we were working on some Christmas stuff for the
25    homeless people. And she stood at the door --

Page 264

1     do I get up and do this?
2  Q  You can.
3  A  She stood at the door and I can't remember. I
4     think she was standing here. And I can't
5     remember if -- I just remember her, and I smiled
6     and I cracked the door and I was pushing the
7     children back and when I looked back at the door
8     like this and she pushed like this. And I'm,
9     like -- and I had the phone in my hand. So she
10    pushed the door -- this is the door.
11 Q  Which side does the door open?
12 A  It opens like this. This is the door. She was
13    standing here. I had about this much cracked
14    because I was holding the phone with this hand.
15    I did like this -- wait, no. Let's see. I told
16    Ms. Faye, I said, "Hold on." I said,
17    "Somebody's knocking at the door and I think
18    it's those people. And Katelynn and Elisha,
19    they're really little. They ran really fast.
20    My foot is here in front of the door. I opened
21    the door like this, about this wide, I look out
22    and I smile. I turn like this to remove
23    Katelynn and Elisha out of the way and she
24    pushes the door. And she came in like this and
25    she moseyed on over to my sofa. And I said to

Pages 261 to 264

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio