IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

THERESA ALLEN,                      :
INDIVIDUALLY, E.T.A. by             :
and through Theresa                 :
Allen, and K.T.A. by and            :
through Theresa Allen               :
                                    :
      Plaintiffs                    :
                                    :
VS.                                 : CIVIL ACTION NO. 4:11-CV-04170
                                    :
TEXAS DEPARTMENT OF                 :
FAMILY AND PROTECTIVE               :
SERVICES, HOWARD                    :
BALDWIN, YOLANDA                    :
ALPOUGH, ADRIAN HOMER,              :
STEPHANIE HAMMON, IVY               :
CHAMBERS, and UNKNOWN               :
COMMISSIONERS,                      :
SUPERVISORS OR DIRECTORS            :
OF YOLANDA ALPOUGH,                 :
ADRIAN HOMER AND                    :
STEPHANIE HAMMON                    :
                                    :
      Defendants                    :

*************************************
ORAL DEPOSITION OF
YOLANDA ALPOUGH
FEBRUARY 21, 2013
VOLUME 1
*************************************

ORAL DEPOSITION OF YOLANDA ALPOUGH, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 21st of February, 2013, from 12:55 p.m. to 4:28 p.m., before Beth L. Sheen, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Children's Advocacy Center, 2500 Bolsover, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Case 4:11-cv-04170   Document 56-5   Filed in TXSD on 07/29/13   Page 2 of 6

Page 67

```
 1      Q.    Okay.  Where did you -- who gave you this
 2   document?
 3      A.    I want to say Ms. Hammon.
 4      Q.    Okay.
 5      A.    There was several documents.  It wasn't just
 6   this.
 7      Q.    Okay.  What were some of the other
 8   documents?
 9      A.    I think it was this, which -- I mean there
10   was -- I don't know.  There was some information, child
11   caregiver resource forms.  There was several things.  I
12   don't remember exactly what all they were.
13      Q.    Okay.  So you were handed this notice of
14   removal of children prior to the meeting by your
15   supervisor already filled out, correct?
16      A.    Apparently.  Because I didn't type it.
17      Q.    All right.  Do you know when it was created?
18      A.    No.
19      Q.    Okay.  So you were given this by your
20   supervisor just in case there was a decision to remove
21   the children?
22      A.    Yes, sir.
23      Q.    Okay.  When were you handed this document?
24      A.    Before we went out to the home.
25      Q.    Okay.  Define when.
```

```
 1    A.    I don't know, sir.  I mean --
 2    Q.    It just mysteriously appeared in your
 3  briefcase?
 4    A.    No.  I was given a folder with some forms in
 5  it.
 6    Q.    Okay.  When were you given the folder with
 7  forms in it?
 8    A.    Prior to leaving to go to the home.
 9    Q.    Prior -- are we talking hours, days?
10    A.    I was out sick the day before.  So it had to
11  be that morning.
12    Q.    Okay.  And they handed you this packet.  Did
13  they say at the time they handed you the packet, this is
14  a removal.  Go pick up the kids?
15    A.    No.
16    Q.    Okay.  So no decision had been made at that
17  time?
18    A.    I don't know what had been made.
19    Q.    Okay.  Is it your supervisor's practice to
20  keep you in the dark about such decisions?
21    A.    I was told we needed to go speak with
22  Ms. Allen.  She had some concerns.  We went out there to
23  speak with her.
24          Like I said, I thought before I went out,
25  that it was a possible removal.  But I wasn't privy to
```

1  whether or not the decision had been made.
2  Q.  Okay.  Is it your supervisor's practice to
3  deceive you about the purpose of a meeting?
4  A.  I don't think she was deceiving me.  I think
5  she wanted us to talk and see what came out of the
6  conversation.  She called me.  Asked me.  We talked about
7  it.  The decision was made to remove.
8  Q.  Okay.  So are you testifying that she made the
9  decision to remove based on her conversation with you
10 that morning while you were at the apartment?
11 A.  I don't know when the decision was made.  It's
12 typed.  I don't know.
13 Q.  Risk of sexual abuse is the only item listed
14 there, correct?
15 A.  Correct.
16 Q.  Risk of a sexual abuse by whom?
17 A.  I'm not sure. The original allegation came
18 from Ms. Theresa Allen that her grandchildren were being
19 sexually abused in the home.  That was in the original
20 referral.
21 Q.  By Theresa Allen?
22 A.  By Theresa Allen.
23 Q.  No.  Theresa Allen stated that Theresa Allen
24 was sexually abusing the kids?
25 A.  No.  That the children were at risk of sexual

```
 1   abuse in the home with their mother.
 2        Q.   But the mother wasn't there?
 3        A.   Correct.
 4        Q.   And the mother's boyfriend wasn't there?
 5        A.   Correct.
 6        Q.   Just the person that had made the allegation
 7   that the children were at risk of sexual abuse?
 8        A.   Correct.
 9        Q.   So you remove the kids based on risk of sexual
10   abuse from the grandmother that had notified you that
11   there was risk of sexual abuse of these kids?
12        A.   The same grandmother who had not allegedly
13   protected her daughter from being sexually abused.
14             MR. BRANSON:  Objection; nonresponsive.
15        Q.   (BY MR. BRANSON)  Let me repeat my question:
16   So you removed these grandchildren based on risk of
17   sexual abuse from the grandmother who had notified you
18   that these children were at risk of being sexually abused
19   by someone else, correct?
20        A.   Correct.
21             MR. BRANSON:  All right.  Very good.
22             (Exhibit No. 7 marked.)
23        Q.   (BY MR. BRANSON)  Let me hand you the
24   investigation report.  Do you recognize this document?
25        A.   I do.
```

A.   After I mentioned to Ms. Allen, Theresa Allen, that we were going to do a removal, she became a little uncomfortable for me. She started getting loud, asked what grounds. I was trying to answer her questions. I told her that -- which is what my supervisor told me -- we are not removing from you. We are removing from the mother. And she said, So are you telling me you're not removing from my home? No. We are removing from the home but we're removing from the mother.

And she asked for my supervisor's name and number. I provided that to her. She proceeded to call and asked for someone else. So I called my supervisor and asked if we needed to get some assistance out there.

Q.   Did you call the police directly yourself?

A.   I did.

Q.   Did you call 911?

A.   I think -- yes. Because they asked ambulance or police and I said police.

Q.   Do you have a recording of that 911 call?

A.   Not of the 911 call. But it is picked up on the -- on the audio file.

Q.   It is?

A.   It is.

Q.   Okay. Has anyone ever told you an emergency situation existed on December 4th, 2009?