UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| THERESA ALLEN, individually, § <br> E.T.A., by and through Theresa Allen, and § <br> K.T.A., by an through Theresa Allen § <br>     Plaintiff, § <br> § <br> v. § <br> § <br> YOLANDA ALPOUGH, § <br> ADRIAN HOMER, STEPHANIE HAMMON, § <br> and IVY CHAMBERS § <br>     Defendants. § | CIVIL ACTION NO. 4:11-CV-04170 |

_____

**SUPPLEMENTAL BRIEFING IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON THE BASIS OF QUALIFIED IMMUNITY**
_____

**GREG ABBOTT**
Attorney General of Texas

**DANIEL T. HODGE**
First Assistant Attorney General

**DAVID C. MATTAX**
Director of Defense Litigation

**JAMES "BEAU" ECCLES**
Chief, General Litigation Division

**GUNNAR P. SEAQUIST**
Texas Bar No: 24043358
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4093
(512) 320-0667 FAX

ATTORNEYS FOR DEFENDANTS

TO THE HONORABLE VANESSA GILMORE, UNITED STATES DISTRICT JUDGE:

In response to the Court's order of August 31, 2013 (Doc. 61), Defendants Yolanda Alpough, Adrian Homer, Stephanie Hammon, and Ivy Chambers hereby file their *Supplemental Brief in Support of their Motion for Summary Judgment on the Basis of Qualified Immunity*, and in support thereof, would show this Court the following:

## I.
## INTRODUCTION AND SUMMARY

In their motion for summary judgment and reply in support, Defendants asserted that they were entitled to qualified immunity as to all of Plaintiffs' claims under 42 U.S.C. 1983.  (Docs. 47 and 57).  The Court has now requested supplemental briefing on: (1) whether there was consent for the child protective services officers to enter; (2) whether exigent circumstances existed to justify the removal of the children; and (3) the scope of a non-custodial grandparent's family integrity rights.  (Doc. 61).  Defendants now offer additional briefing on these points and show the Court that they are entitled to qualified immunity on all three points.

Indeed, the summary judgment evidence establishes that on the morning of the removal of E.T.A. and K.T.A., Defendant Alpough had both affirmative verbal consent, and implied consent through conduct, to enter Theresa Allen's apartment.  Further, although the legal standard for the precise exigency required for removal from an incapacitated parent who has temporarily abdicated a child to a non-custodial third party is not clearly established, Defendants had significant information demonstrating an immediate risk of harm to the children sufficient to create a reasonable belief that the emergency removal did not violate the Fourth Amendment. Finally, Plaintiffs' family integrity claims similarly fail because: 1) there is no clearly established right to family integrity between a non-custodial grandparent and their grandchildren, 2) even in

such a right was clearly established, which it is not, where Plaintiffs have failed to articulate a "conscience shocking" violation sufficient to maintain a substantive due process claim. Accordingly, Defendants are entitled to qualified immunity on Plaintiffs' claims, and this Court should grant summary judgment.

## II.
## SUPPLEMENTAL ARGUMENT AND AUTHORITIES

**A.     Qualified Immunity Standard.**

"Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir.2005)). To determine if qualified immunity applies, the district court must follow a two-step process. First, the court determines whether the plaintiff has asserted a violation of a clearly established constitutional or statutory right. *Id.* (citations omitted). "If no constitutional right would have been violated were the allegations established, the inquiry ends." *Id.* If an official has violated a person's federal civil rights, the second analytical step is to determine whether the official's actions were objectively reasonable. *Id.* at 419.

The issue in the second analytical step is "whether a reasonable person would have believed that his [or her] conduct conformed to the constitutional standard in light of the information available . . . and the clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). The objective reasonableness of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994). "The subjective intent of the public

official is irrelevant, and the official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.'" *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998) (*quoting Harlow*, 457 U.S. at 815–17). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *See Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). To satisfy the second prong, plaintiffs "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity". *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011). "Where no controlling authority specifically prohibits a defendant's conduct[,] . . . the law cannot be said to be clearly established. . . . [G]eneralizations and abstract propositions are not capable of clearly establishing the law". *Id.* at 372. While there need not be a decision directly on point, "existing precedent must have placed the statutory or constitutional question *beyond debate*". *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (emphasis added). "The qualified immunity defense 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*quoting Hunter v. Bryant*, 502 U.S. 224, 226 (1991)).

In short, as to all of Plaintiff's constitutional claims and alleged causes of action related to them, the test is essentially the same: qualified immunity should be afforded to all Defendants unless the Court concludes that their conduct was contrary to the clearly established law at the time and objectively unreasonable. See *Hernandez v. Texas Dep't of Protective and Regulatory Services*, 380 F.3d 872, 879 (as to qualified immunity) (5th Cir. 2004).

B.     **Defendant Alpough had legal consent to enter the apartment of Theresa Allen**

Plaintiff alleges that "Defendants Alpough, Hammon, and Chambers[1] acted unreasonably in entering the home of Theresa Allen without a proper warrant or court order, without consent and without exigent circumstances. Contrary to this assertion, however, Alpough avers, and Cain confirms, that Theresa Allen did, in fact, voluntarily give Alpough verbal, affirmative consent to enter the home on December 4, 2009. (Doc 47, Appx. 4, ¶ 8; Doc 47, Appx. 316, ¶ 3). However, even if the Court accepts Theresa's allegation that she did not give verbal consent to Alpough as true, which it is not, the circumstances still support an objectively reasonable belief that Allen invited Alpough in, and Alpough is entitled to qualified immunity.

Courts determine whether consent was given based on the totality of the circumstances. *United States v. Freeman*, 482 F.3d 829, 831-32 (5th Cir. 2007). "[T]he standard for measuring the scope of . . . consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). As asserted in Defendants' Motion, several federal courts have recognized that body language and conduct *can* form the basis of implied consent to enter. *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (finding implied consent to enter a residence when officers approached a residence and asked for permission to enter to speak with the residents, and although not receiving "any explicit verbal consent" to enter, the defendant backed away from the door, "yielding the right-of-way," implying consent by her body language); *Holmes v. Kucynda*, 321 F.3d 1069, 1078-79 (11th Cir. 2003) (finding consent to enter where, upon officers' request to enter, individual stepped back allowing entry); *Pavao v. Pagay,* 307 F.3d 915, 920 (9th Cir. 2002).

---

[1] Plaintiff Allen does not appear to allege a Fourth Amendment search violation against Defendant Homer who had no role in the investigation and removal of E.T.A. and K.T.A. (Doc. 22, ¶ 62).

Key to the analysis in these cases are the facts, both present here, that the resident was aware of the law enforcement official at the door, and gave the impression of yielding the right of way, thus signaling invitation into the home. *Id.* (opening the door and stepping back indicated that her actions constituted an implied invitation to enter the home); *see also United States v. Griffin*, 530 F.2d 739, 743 (7th Cir. 1976) (holding that despite the defendant's silence in response to police questions about a possible burglary at his residence, his conduct in stepping back and leaving the door open constituted consent to enter the home); *Robbins v. MacKenzie*, 364 F.2d 45, 48 (1st Cir. 1966) (holding that "a policeman who identifies himself and his purpose from the other side of a closed door has every reason to assume that the act of unlocking and opening the door, without more, is a consent to talk, and that the walking back into the room is an implied invitation to conduct the talking inside"). Thus, Defendant Alpough is entitled to summary judgment on the grounds of qualified immunity unless no reasonable individual could have interpreted the totality of the circumstances to imply consent to enter. *Babb*, 33 F.3d at 477. (Plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper).

Here, the totality of the circumstances contained in the summary judgment record support a finding that a reasonable official would have interpreted Theresa Allen's actions as an implied invitation to enter. First, it is undisputed that Allen was expecting DFPS to come out for a visit at 10:00 am on the morning of December 4, 2009. (Doc 47, Appx 320, Theresa Allen Depo, 263:1-7). Indeed, both Alpough and Cain were aware that Theresa was expecting them. (Doc 47, Appx. 193, Doc 47, Appx. 316, ¶3). Further upon Alpough's arrival, Theresa Allen testified that she was holding the phone when she answered the door and looked out and smiled at Cain and Alpough. (Doc 47, Appx. 324, Theresa Allen Depo, 264:3-19). Theresa next testified that

after she opened the door and smiled at Alpough, she turned inward to remove E.T.A. and K.T.A. from the doorway. (Id. 264:12-24). It was only at that point that Theresa recalls Alpough entering the room. (Id.). Finally, it must be considered that it was unseasonably cold outside and even starting to snow. (Doc 47, Appx. 193; Doc 47, Appx. 10, ¶ 8(2)). Thus, a reasonable person would not only expect to be invited in out of the cold, but would also attempt to enter more quickly in order to prevent the occupants of the home from exposure to the weather.

Therefore, based on the totality of the undisputed facts, the objective picture to Alpough and Cain when they arrived for their pre-scheduled visit was a waiting recipient, presently occupied with a phone call, who opened the door and smiled at them before promptly turning to clear the children from the doorway opening a path into the apartment and out of the cold. Importantly, that Theresa did not believe she was gesturing the two in is of no moment—the issue is what a reasonable officer would have perceived. *See Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998) (*quoting Harlow*, 457 U.S. at 815–17). Taking the undisputed facts as true, then, Plaintiff cannot establish that no reasonable official would have perceived her actions as an implied consent to enter, and Defendant Alpough is entitled to qualified immunity on Plaintiff's Fourth Amendment entry claim.[2]

C. **Although Defendants were not guided by a clearly established standard of exigency and are entitled to qualified immunity on that basis alone, the removal of E.T.A and K.T.A. was nevertheless supported by sufficient exigency to render the removal reasonable and therefore in conformity with the Fourth Amendment.**

In order to adequately brief the issue of whether exigent circumstances existed, it must first be established that the test for exigency in the circumstances at issue was clearly established

---

2 Defendants reiterate that Allen has also wholly failed to raise a genuine issue of material fact to sustain a Fourth Amendment entry claim against Defendants Homer, Hammon, and Chambers. *See* Defendants Motion for Summary Judgment, Doc. 47, ppl

at the time of the removal of E.T.A. and K.T.A. It was not. Neither the Fifth Circuit, nor the Supreme Court, have specified the exigency necessary for the removal of children left by a drug impaired parent in the possession of a non-custodial third party. Accordingly, the law facing Defendants at the time of the removal was not clearly established and qualified immunity is appropriate. In evaluating qualified immunity, the objective reasonableness of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See Blackwell*, 34 F.3d at 301. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *See Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). For the law to be clearly established, plaintiffs "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity". *Morgan,* 659 F.3d at 371-72. While there need not be a decision directly on point, "existing precedent must have placed the statutory or constitutional question *beyond debate*."

Here, Plaintiffs incorrectly allege that Defendants violated their right to be free from unreasonable seizure, as articulated in the Fifth Circuit's opinion in *Gates*. (Doc. 22, ¶ 68, citing *Gates*, 537 F.3d at 427). *Gates*, however, addressed only the standard of exigency needed to remove from a custodial parent in the family homestead or from their school. *Gates*, 537 F.3d at 429. In its analysis, the Gates Court explained that assessing the reasonableness of a seizure the court weighs the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests that justify the intrusion. *Id.* at 432. To that end, a particular standard of exigency must account for the "nature and quality" of the intrusion, and must be "flexible enough to account for the unique interests involved in child

abuse investigations." *Id*. Thus, applying this balancing test, the *Gates* Court concluded that the seizure of a child from a public school is a lesser intrusion than seizing a child from her parents' home, and, therefore, dictates a lower standard of exigency. *Id.* Under Fifth Circuit precedent, then, the applicable standard of exigency necessary to justify a removal varies depending on the underlying facts and circumstances leading to the removal.

Nevertheless, based on the summary judgment evidence, sufficient exigency existed to render DFPS's removal of E.T.A. and K.T.A. reasonable. Balancing DFPS's interest in protecting E.T.A. and K.T.A. from exposure to a parent in the depths of crack addiction, against a child's interest in being left in the possession of a non-custodial third party (even a grandmother) where there is a history of that third-party returning the children to the impaired parent without notifying the authorities, weighs decisively in favor of protection, not intrusion. Indeed, the record available to DFPS affirmatively suggested that Renesha Allen would briefly leave the children with Theresa when she got in trouble with DFPS—either because Theresa had called in an unsubstantiated report of neglect or abuse against her, or because Renesha had actually failed a drug test.. (Doc 47, Appx. 39-66; Doc 47, Appx. 3, ¶ 5). Thereafter, Renesha would quickly reclaim the children and would soon be the subject of further allegations of abuse, neglect, and drug use. Moreover, the DFPS record suggested to Hammon and Chambers, who made the decision to remove, and Alpough, who was instructed to carry out the removal, that Renesha Allen had taken affirmative steps to evade DFPS in its efforts to secure E.T.A. and K.T.A.'s well-being. (Doc 47, Appx. 3-4, 190-192). The record suggested Theresa enabled this attempt by failing to advise she had the children and then returning the children to Renesha at a time when she was suspected of using drugs. (Id.). Incredibly, Theresa acknowledged that Renesha had called her when high and had even "popped [E.T.A.] in the mouth" and gave him a

"busted lip," but that she nevertheless returned the children to Renesha without contacting DFPS. (Id.).

Thus, when Hammon finally learned of the children's location on December 3, 2009, and staffed the matter with Chambers, the investigation revealed clear danger to E.T.A. and K.T.A. Specifically, 1) Renesha's positive drug test and the information provided by Theresa Allen showed that Renesha was using crack cocaine with the children in her custody; 2) Renesha's propensity to hide with the children so that DFPS could not intervene to protect them; 3) Theresa stated that, while hiding the children from DFPS, Renesha had admitted physically striking the children; and 4) Theresa Allen's complicity in returning the children to Renesha and not contacting DFPS, even though she was aware of these dangers and that DFPS was actively trying to find the children.

Further, there was ample cause for concern of a risk of danger to the children in the possession of Theresa. In fact, the record is replete with references to Theresa Allen's having an untreated mental disorder. (*See e.g.,* Doc. 47, Doc 47, Appx. 54-57, 82-83, 186, 189). The record relied upon by Hammon, Chambers, and Alpough, showed that these allegations were made not just by Renesha, but by other family members as well. Moreover, far from a conspiracy contrived by Alpough, those allegations were repeated to, and documented by, various caseworkers, over at least three investigations, in as many years. (Id.). In addition to the allegations of untreated mental illness, the record available to DFPS and its officials included allegations of unaddressed and overlooked sexual, physical, and emotional abuse against Renesha Allen, while in the care of her mother Theresa, including the statement that Theresa "brutally beat" her as a child. (Doc. 47, Doc 47, Appx. 186). Thus, weighing the risks versus the intrusion in this case, a reasonable caseworker could, as Defendants did here, conclude that

the emergency removal of E.T.A. and K.T.A. from Theresa's possession was appropriate.

**D.    There is no clearly established right to family integrity between a non-custodial grandparent and grandchild and, even if there were, Plaintiff has not stated a substantive due process violation.**

Once again, neither the Fifth Circuit nor the United States Supreme Court have recognized a clearly established right to family integrity between a non-custodial grandparent and their grandchildren. However, the Ninth Circuit has expressly held that non-custodial grandparents, solely by virtue of a genetic link, do not have constitutionally protected interests in visiting or adopting their grandchildren. See *Miller v. California*, 355 F.3d 1172) (9th Cir. 2004) (holding grandparents had no constitutionally protected interest in visiting grandchildren who had been removed from parents' custody); *Mullins v. Oregon*, 57 F.3d 789, 794, 797 (9th Cir. 1995) ("We have found no other authority supporting the proposition that a grandparent, by virtue of genetic link alone, enjoys a fundamental liberty interest in the adoption of her grandchildren.").

Similarly, other circuits have severely questioned whether non-custodial grandparents have family integrity rights under the constitution. See *Brown v. Ives*, 129 F.3d 209, 211 (1st Cir. 1997) (recognizing only the possibility of limited rights for "grandparents who were residing with the grandchildren" and noting that "[p]rotection of nonresident grandparents … has an even slimmer pedigree in the case law."); *Shirley v. Drake*, 176 F.3d 475 (Table), 1999 WL 202671, at *4 n.3 (4th Cir. 1997) (noting that grandparent who had lived with both parents and grandchild "has not convinced us that she suffered the deprivation of a constitutionally protected liberty interest" related to her grandchild); *Harpole v. Ark. Dept. of Human Serv.*, 820 F.2d 923, 928 (8th Cir. 1987) ("We do not believe that the drafters of the Fourteenth Amendment intended to protect from government interference every conceivable family relationship, no matter how far

removed."); *Ellis v. Hamilton*, 699 F.2d 510, 513 (7th Cir. 1982) (questioning whether non-custodial grandparents have constitutionally protected interest in custody and adoption of grandparents). Thus, Plaintiffs cannot, "point to controlling authority—or a robust consensus of persuasive authority—that clearly establishes the right to family integrity between Theresa Allen and E.T.A. and K.T.A. *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011).

In fact, as it relates to social workers' investigations of child abuse and neglect, the Fifth Circuit has recognized that the formulation of the right to family integrity, even between children and parents, can be vague and overly generalized. *Kiser v. Garrett*, 67 F.3d 1166, 1172 (5th Cir. 1995) (*quoting Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988). As a result, "reasonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited." *Id.* Thus, the Fifth Circuit has noted that the right to family integrity has a "nebulous nature," particularly in the context of social-workers seeking to protect children. *Doe v. State of Louisiana*, 2 F.3d 1412, 1417 (5th Cir. 1993). In *Kiser*, for example, the court stated that the contours of a substantive due process right to family integrity "are not well-defined, and continue to be nebulous, especially in the context of a state's taking temporary custody of a child during an investigation of possible parental abuse." 67 F.3d at 1173.

Therefore, the Fifth Circuit has affirmed district court decisions recognizing qualified immunity for state actors whose reports or investigations of complaints of child abuse or neglect result in the temporary removal of a child from her parents' custody. In these cases, the Fifth Circuit recognized that social workers investigating suspected child abuse or neglect are entitled to qualified immunity, even in the face of evidence – not present here – that the social workers unnecessarily prolonged an investigation, threatened parents with removal of their children, and

even misled families about the danger facing their children. *Hodorowski*, 844 F.2d at 1217-18; *Kiser*, 67 F.3d at 1173. In fact, Defendants are unaware of any Fifth Circuit authority in which a child social worker participating in an investigation of child abuse and neglect was held to have unreasonably violated a clearly established standard of law such that they were not entitled to qualified immunity.

Finally, even if Plaintiffs' right to family integrity was clearly established in this case, and it is not, Plaintiffs are still unable to state a conscience shocking violation of that right, as necessary to assert a substantive due process claim. *Hernandez v. Tex. Dep't of Protective and Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004). Indeed, it is undisputed in this case that on December 7, 2009, the next business day after the removal, the Harris County District Court entered an ex part order approving the removal and continuing temporary managing conservatorship of E.T.A. and K.T.A. in DFPS. (Doc 47, Appx. 222-228). Further, a full adversary hearing was held ten days later in which the Court again approved the removal and continued temporary custody in DFPS. (Doc 47, Appx. 232-241).

As the federal courts have recognized, brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Southerland v. City of New York*, 667 F.3d 87, 113-14 (2nd Cir. 2011). Further, once such "court confirmation of the basis for removal" is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child. *Id*; *see also Pittman v. Cuyahoga Cty. Dep't of Child. and Prot. Servs.*, 640 F.3d 71, 729 (6th Cir. 2011) (Social worker cannot be liable for violating plaintiff's substantive due process rights because, to the extent that plaintiff suffered a

deprivation of his fundamental right to family integrity, that deprivation was perpetrated by the juvenile court, not by the social worker. Indeed, the Second Circuit has articulated the "brief removal" doctrine by which the removal of children from their parent for the purpose of keeping the children safe does not violate the parent's substantive due process rights if a post-removal judicial proceeding is promptly held to confirm that there exists a reasonable basis for the removal. *Southerland*, 667 F.3d at 113-14. According to that court, the period of time in which the child and parent are separated solely at the instance of the defendant (i.e., prior to the state court's order) is not sufficient to amount to a substantive due process violation by the defendant caseworker. *Id.* Accordingly, as a matter of law, Plaintiff may not maintain a substantive due process right to family integrity claim based on an alleged one day interference between the removal and the state court's order approving the removal and granting custody to DFPS.

## V.
## CONCLUSION

**For these reasons**, and those asserted in Defendants Motion for Summary Judgment and Reply in Support, DFPS. employees Yolanda Alpough, Stephanie Hammon, Ivy Chambers, and Adrian Homer respectfully request that the Court grant their summary judgment as to all of Plaintiffs' claims and for such other and further relief to which she may be entitled. .

        Respectfully submitted,

        **GREG ABBOTT**
        Attorney General of Texas

        **DANIEL T. HODGE**
        First Assistant Attorney General

        **DAVID C. MATTAX**
        Director of Defense Litigation

        **JAMES "BEAU" ECCLES**

Chief, General Litigation Division

/s/ Gunnar P. Seaquist
GUNNAR SEAQUIST
Texas Bar No: 24043358
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 475-4083
(512) 320-0667 FAX

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on September 20, 2013, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) with the Clerk of the Court of the U.S. District Court for the Southern District of Texas, and that counsel identified below would be advised of and given access to a copy of the filing.

Ms. Sonya Wallace
2626 South Loop West, Ste. 400
Houston, TX 77054
*Attorney for Plaintiff Theresa Allen,*
*Individually and as next friend to E.T.A. and K.T.A.*

 /s/ Gunnar P. Seaquist
Gunnar P. Seaquist
Assistant Attorney General