IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| THERESA ALLEN, INDIVIDUALLY, AND AS NEXT FRIEND TO ELISHA TYRELL ALLEN AND KATELYNN TYREAL ALLEN<br>PLAINTIFFS,<br><br>V.<br><br>TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, HOWARD BALDWIN YOLANDA ALPOUGH, ADRIAN HOMER, STEPHANIE HAMMON, IVY CHAMBERS, AND UNKNOWN COMMISSIONERS, SUPERVISORS OR DIRECTORS OF YOLANDA ALPOUGH, ADRIAN HOMERAND STEPHANIE HAMMON<br>DEFENDANTS. | §§§§§§§§§§§§§§§§§§§§§§<br><br>CIVIL ACTION NO.4:11 CV-04170 |

PLAINTIFFS' SUPPLEMENTAL BRIEF
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiffs, Theresa Allen, Individually, and as next friend to Elisha Tyrell Allen and Katelynn Tyreal Allen, and files this Plaintiffs' Supplemental Brief to Defendants' Motion for Summary Judgment, and will show the Court the following:

### IMMUNITY

Qualified immunity shields government officials from liability when they are acting in **good faith** within their discretionary authority and their conduct does not violate clearly established **statutory** or **constitutional law** of which a **reasonable person** would have known. Tex. Fam. Code Ann., § 261.106. In performing the qualified

1

immunity analysis, the first question we must ask is whether, taken in the light most favorable to the Plaintiffs, the facts alleged show that the Defendant's conduct violated a statutory or constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d 272 (2001). If no statute or constitutional right would have been violated were the allegations established, the inquiry ends. *Saucier*, 533 U.S. at 201. If, however, the plaintiffs allege the violation of a statutory or constitutional right, the court must then determine whether the right was clearly established at the time of the incident at issue. *Id.* A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). Finally, if the law was clearly established, the court must decide whether the defendants' conduct was objectively reasonable. *Aucoin v. Haney,* 306 F.3d 268, 272 (5th Cir. 2002); see also *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court in Gates considered an official's conduct to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the conduct violated the Constitution. *Gates v. Texas Dep't of Protective & Regulatory Services,* 537 F.3d 404, 421 (5TH Cir. Tex. 2008).

In the summary judgment context, a government official need only plead qualified immunity, which then shifts the burden to the plaintiff. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The Plaintiffs must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct. *Id.*

## WARRANTLESS ENTRY

**ISSUE - WHETHER THERE WAS CONSENT FOR THE CHILD PROTECTIVE SERVICES OFFICERS TO ENTER?**

The courts have strongly supported the right to family privacy and integrity when child protective service workers without a warrant or court order have attempted to enter the family home in their investigation efforts. In the recent Fifth Circuit case, where social workers accompanied by police insisted on entering the Gates' home to interview their children as part of a child abuse investigation, the Court held that "physical entry of the home is the chief evil against which the Fourth Amendment is directed… Pursuant to our Fourth amendment law, "warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *Gates at 421.*

Turning to the facts of this case, we argue that the Defendants entered the grandmother's home without her consent. The Defendants' apparent assertion that the grandmother, provided implied consent for this otherwise illegal search and seizure is without merit. When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained, the government must demonstrate by a preponderance of the evidence that consent to search was in fact voluntarily given, and not the result of duress or coercion, express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).

The Defendants assert that their entry into the Allen's home was permissible because (1) Theresa Allen, the grandmother gave implied consent to their entry through her actions, and (2) they were compelled by exigent circumstances.

3

The standard for measuring the scope of consent under the Fourth amendment is that of "objective" reasonableness—what would the typical reasonable person have understood the exchange between the social worker and the suspect? ((Gates quoting Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed. 2d 297 (1991)).

The individual defendants argue that their entry into the Allens' home was constitutional because Theresa Allen's body language and conduct formed a basis of implied consent. The Defendants then provide a variety of cases where implied consent was found, but the facts and scenarios are not similar to the case at hand. The cases reference situations where the officers **ask** for permission to enter, and the party "**backs away**" or "**steps back**" from the door yielding the right away signaling invitation into the home.

At the first stage of the inquiry, the court must assume the accuracy of Mrs. Allen's version of the facts. *Branton v. City of Dallas,* 272 F.3d 730, 744 (5th Cir. 2001). In this case, the grandmother, Theresa Allen, who answered the door stated in her deposition that she did not consent to the search, verbally or otherwise. (Document 56-3.) The defendants did not ask for permission to enter. As she turned to keep the children from opening the door, Defendant Alpough stuck her foot in the door and pushed her way into the home. (Document 56-3). There is no evidence that Theresa Allen stepped back from the door. In fact, Ms. Allen's actions were just the opposite. Due to the threats by Alpough and Hammond, Theresa was apprehensive and fearful that Alpough was coming to pick the children up and place them in foster care. Hammond had failed to state the exact nature of the visit. Theresa intentionally did not allow Alpough into the home when she arrived at the door. She held them at the door while speaking through the

crack. The door was not open fully giving easy access to the home. Her body blocked the door way and Alpough had to use force by sticking her foot in the door to open it further and enter on her own volition. Both parties admit that she had opened the door slightly to talk, but she did not invite them into the home. It is clear, that Ms. Allen's initial intent was to merely speak with them. She never affirmatively consented to let them into the house. If it was her intent to let them in, her immediate response upon opening the door would have been to immediately invite them into her home. That did not occur.

Since Alpough never asked to enter, Theresa's silence cannot form the basis for consent to enter. *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 200 F. 3d 395, 401 (5th Cuir. 2002). There is a fact issue as to whether or not the Defendants can meet their burden to establish by a preponderance of the evidence that consent was in fact given.

On August 28, 2008 Commissioner Carey Cockerell and Assistant Commissioner of CPS, Joyce James through General Counsel, Jerry Williams, issued an "Urgent Legal Advisory for Investigations:" to "All CPS Personnel", (hereinafter referred to as "CPS Legal Advisory"). *See Document No.56-6,7and 8)* In its section "Entering and Remaining in a Home" the CPS Legal Advisory states, "As with removals, in order to gain entry into a home for the purpose of a CPS Investigation, we must have one of the following: 1) exigent circumstances, 2) consent, or 3) a court order, but the Gates ruling provided additional explanation concerning exigent circumstances and consent that will affect our practices." The Advisory contrasts current practice with new practice following Gates. Under current practice the Advisory states, "CPS enters a family's home only if we have exigent circumstances, consent, or a court order. CPS does not always ensure

5

consent is specific to our investigators. A court order in aid of investigation is rarely utilized." Under new practice, "As with removals, exigent circumstances are present only when there is immediate danger to a child in the home, i.e., life or limb is in immediate jeopardy. Consent must be clear, unequivocal, voluntary and given specifically to CPS, as opposed to law enforcement. We will likely increase the use of court orders in aid of investigation." (TXSD, Doc.56-8, p. 10). In its section on "Consent", the Advisory further adds, "The Gates case serves as an important reminder about the need for consent to enter a home for the purposes of conducting a CPS investigation. Key points are:

**Consent must be affirmative.** It is not enough that a person does not say no. Consent for CPS to enter a home must be voluntarily given and unequivocal (clear). You should identify yourself as a CPS investigator and **explicitly request** and receive permission to enter the home. The best practice is to ensure that the person state you may enter (rather than simply getting a nod or other non-verbal gesture). In any case you must document the basis for consent in your narrative." (TXSD, Doc. 56-8, p. 11).

The Defendants allege that Alpough received "verbal, affirmative consent to enter the home." (TXSD, Doc. 47). The facts provided are less than clear. Alpough failed to explicitly request and receive permission to enter as she had been instructed during her training. Furthermore, implied consent which is the basis of their argument stemming from non-verbal gestures, does not constitute "verbal" affirmative consent which is required by CPS.

The Defendants acknowledge receipt of this Advisory and training concerning the new implications of the Gates case. As a result, it can be said that a reasonable official

6

would understand that he was violating the rights of the Plaintiffs. Their conduct was contrary to the clearly established law and CPS policy at the time and objectively unreasonable.

The Defendants' implied consent theory does not apply to the search and seizure of the children. It is clear that the Defendants did not have the parent(s) consent to seize the children. Therefore, a Fourth Amendment violation occurred upon the continuation of the warrantless search, interrogation and the ultimate seizure.

## WARRANTLESS SEARCH AND SEIZURE

### ISSUE – WHETHER EXIGENT CIRCUMSTANCES EXISTED TO JUSTIFY THE REMOVAL OF THE CHILDREN WITHOUT A COURT ORDER

**Count #1 – Unlawful Search and Seizure Without Probable Cause by CPS Agents**

The Fourth Amendment of the U.S. Constitution and Section 9 of the Texas Constitution protects individuals from unreasonable searches or seizures of their person or property. The law is clear, the social worker cannot enter a person's home without consent or a warrant unless probable cause, combined with exigent circumstances, justify warrantless entry. *Payton v. New York,* 445 U.S. 573, 586 (U.S. 1980). The government may not seize a child absent a court order, parental consent, or exigent circumstances. Exigent circumstances are, generally, limited to situations in which there is imminent threat to a person inside the home or, as the 5th Circuit holds, "that based upon the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in the home." *Gates v. TDPRS,* at 422. The Court states that it is a flexible inquiry that considers all the facts and circumstances with no one factor being dispositive. The following analysis is provided to determine

whether the Allen children were in imminent danger of physical or sexual abuse if they had remained in the home. This analysis is based upon the given factors coupled with the information known by the Defendants who made the decision to remove the Allen children. The following factors were relevant and considered in the Gates inquiry:

1. **Whether there was time to obtain a court order;**

The seizure took place on December 4, 2009, at approximately 10:00 a.m. in the morning. The Harris County court system was open. The Defendants should have sought a court order prior to seizure in accordance with the law and their own policy and regulations. The CPS Legal advisory devotes over five pages on the topic of "Removal of a Child". Under current practice it states, "in the majority of cases, DFPS removes based on immediate danger to the physical health or safety of the child or prior sexual abuse of the child, and then goes to court the next business day to file for an ex parte order for the removal of the child." Under new practice it makes it very clear, "We obtain consent or file for a court order prior to removal of the child unless life or limb is in immediate jeopardy or sexual abuse is about to occur." (TXSD Doc. 56-6, p.2).

The Defendants never retrieved the parent's consent to remove the children, therefore, a court order was required. The fact that Alpough went to the home without a court order in an effort to remove the children was a continuum of doing things the old way, and a deliberate neglect to implement and follow the new policies laid out by CPS. At the time of the removal, the Defendants can not provide sufficient evidence to show that the children were in immediate jeopardy of physical or sexual abuse. The Defendants have offered no explanation as to why a court order was not sought prior to the removal of the children.

8

2.  **The nature of the abuse (its severity, duration, and frequency);**

According to CPS records, three complaints had been filed involving the children. One in March of 2006, which resulted in both neglect and sexual abuse being ruled out. The second incident, was on August 7, 2007, which involved allegations of drug abuse by the mother, Renesha Allen, and neglect concerning the children. The case was closed after Renesha lived with the grandmother under a voluntary safety plan arrangement, where the grandmother could not allow the mother to see the children without supervision. Renesha completed her rehabilitation program with CPS, and were restored with her children in 2008. The third case, filed on August 23, 2009, is the basis for this lawsuit. Again, neglect and sexual abuse was ruled out by CPS. Although the mother had a positive drug test, CPS could not confirm whether or not she had taken drugs while the children were in her possession.

The mere use of a controlled substance by the mother is not sufficient evidence to remove a child. The use of said drugs must constitute an immediate danger to the physical health or safety of the child. Tex. Fam. Code Ann., § 262.104(a)(5). CPS had not made that determination at the time the children were removed. The mother was not in the presence of the children at the time of the removal and an immediate danger to the children was not apparent.

The Defendant's allegation that the Fifth Circuit, nor the Supreme Court, have specified the exigency necessary for the removal of children left by a drug impaired parent in the possession of a non-custodial third party, is without merit. The "exigency" requirement is not limited to parents or non-parents. The Tex. Fam. Code Ann.,

§ 262.107(a)(1) recognizes that someone other than the parent maybe entitled to possession of the child, such as a "caretaker, or custodian". Under § 51.02(3), a "custodian" is defined as the adult with whom the child resides. Section 264.901(1), defines a "caregiver" as an individual, other than a child's parent, conservator, or legal guardian, who is related to the child or has a long-standing and significant relationship with the child or the child's family. The grandmother, Theresa Allen was and continues to be a caretaker and custodian of the children. In considering whether the children were in danger, the Defendants were to analyze the situation of the household were the children were located. The Court makes a similar determination at the emergency hearing. Section 262.107(b) states, "in determining whether there is a continuing danger to the physical health or safety of a child, the court may consider **whether the household to which the child would be returned** includes a person who has: abused or neglected another child… or sexually abused another child." Entry into the grandmother's house by Alpough must satisfy Fourth Amendment standards. The Court must consider whether exigent circumstances existed that permitted the individual defendants to make a warrantless entry into the grandmother's home.

    The Fifth Circuit in Gates, held that there was no exigent circumstances present at the time of the defendants' initial entry into the Gates' house that would have permitted the warrantless intrusion. First, Gary, the alleged abuser, was not at home. Second, no one treated the interviews as emergencies. Third, the defendants did not witness any exigent circumstances or emergency situation at the Gates' home. Therefore, at the time the individual defendants approached the house, the only evidence of danger to the Gates children was a one-time incident involving Travis and the questionable discipline

10

methods. The Court states "these facts do not give rise to an "immediate danger" supporting a warrantless entry into the Gateses' house. ... the stated purpose of entering the house was ...., not to guard them against some sort of immediate danger." Therefore, it was concluded that the individual defendants' entry was not justified by exigent circumstances.

In this case, Renesha Allen, the mother and alleged abuser was not at the home. The length of the investigation (over 100 days) and the slow response of the defendants do not support the theory that there was an emergency on December 4, 2009. Alpough admitted in her deposition that she did not witness any exigent circumstances or emergency situation at the grandmother's home. It was clear, no exigent circumstances existed, and a reasonable person, would have seen no reason to remove the children from the grandmother's home.

3. **The strength of the evidence supporting the allegations of abuse;**

Prior to the removal, CPS had insufficient evidence to confirm that any physical or sexual abuse occurred. More relevant, was the fact that the children were not in any danger of such abuse in the home of the grandmother. The children were safe.

4. **The risk that the parent will flee with the child.**

The State claimed that there was a risk that the mother would flee with the children, or at the very least leave the rehabilitation facility and retrieve the children from the grandmother. The mother was in a CPS rehabilitation facility at the time of the children's removal. There was no immediate risk that the mother would leave the facility and flee with the children. Renesha Allen had purposefully and voluntarily left the

11

children with the grandmother prior to entering rehabilitation. According to the CPS Legal Advisory, the parent could at anytime "voluntarily" enter into a safety plan with a family member or relative in an effort to protect the children and ensure their safety. (TXSD Doc. 56-6) The risk of the mother taking the children at some future date, is insufficient to constitute "imminent danger" to life or limb. The danger was not present at the time of the removal. The facts are clear, the alleged abuser was not in the home at the time of the removal therefore such risk did not exist.

Furthermore, the Defendants were under a statutory duty to take "reasonable efforts, consistent with the circumstances and providing for the safety of the child, to prevent or eliminate the need for removal of the child". Tex. Fam. Code Ann. § 262.102(a)(3). The Defendants had the ability to have a protective order issued on behalf of the children instead of or in addition to obtaining a temporary restraining order if they were concerned that the mother would return at anytime to remove the children from the grandmother's possession. Tex. Fam. Code Ann., §§ 262.1015 and 262.104.

**5. The possibility of less extreme solutions to the problem.**

CPS is encouraged to use alternative response mechanism and family preservation programs. Among the family preservation practices are the use of "safety plans" and "safety resources." A safety plan is a voluntary agreement by the parent to take specific steps to keep the child safe or refrain from doing something that is endangering the child. The plan can include an agreement to protect the children by ensuring that all visitation between a child and parent is supervised by an agency approved adult. A "safety resource" plan may require that the parent agrees to place the child with a friend, neighbor, or relative until a CPS investigation is complete or until the problems that

12

resulted in CPS involvement are resolved. Sometimes the child remains in the home with an approved parent or relative while the parent accused of neglect or abuse moves out.

In 2007, CPS utilized such a plan involving the Plaintiffs and the mother of the children, Renesha Allen. The investigatory report states "A safety plan was completed with mother agreeing to leave the children with grandmother (Plaintiff Theresa Allen), until recommended, otherwise, by a therapist." This report indicates that the mother acknowledged that she used drugs, and the "family has agreed that there will be no unsupervised contact between mother and the children." An excerpt of the Investigation Report is attached as Exhibit "A".

When the report was filed by the grandmother in 2009, the mother found herself in a similar predicament with CPS. On this occasion, Renesha voluntarily gave the children to her mother, Theresa Allen, while she committed herself to a rehabilitation center. The mother and grandmother requested that CPS permit the children to stay with the grandmother during the mother's rehabilitation. CPS failed to initiate a safety plan that would protect the children. Such a plan would have secured the children with the grandmother; prohibit the mother from retrieving the children; and grant the grandmother with the authority to be the relative caretaker for the children.

CPS can offer no viable reason for the removal of the children from the grandmother. When the children were placed in the care of the grandmother, all risks to the children of physical and sexual abuse was eliminated. Further, the Defendants could not determine that abuse occurred. The social workers lacked objectively reasonable grounds to believe the children had been sexually or physically abused or was in imminent danger of such on the day of removal. "Mere allegations by a person may

13

justify investigation but will not provide reasonable grounds for removal absent independent, articulable criteria of reliability." *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d at 1127. There are no facts of imminent danger which would justify a warrantless entry, search and seizure.

6.  ***Any harm to the child that might result from the removal.***

The children were only two and four years of age at the time of the removal. Placement in foster care with no contact from their mother or grandmother for over 10 months caused the children severe anxiety leading to depression, nightmares, and behavior requiring psychotropic drugs. At minimum, the research suggests that every time a child is moved to a different home, some developmental or emotional harm occurs. Avoiding this type of destabilization will often be in a child's best interests. *See Nicholson v. Scoppetta*, 344 F.3d 154 (2d Cir. 2003); Joseph Goldstein, Anna Freund, & Albert Solnit, *Beyond the Best Interests of the Child* 31-39 (1976). Studies conclude that "a child's adjustment can be facilitated by continued contact with the family, which may provide a tie to the biological parent or a greater sense of belonging." Karoline S. Homer, *Program Abuse in Foster Care: A Search for Solutions*, 1 Va. J. Soc. Pol'y & L. 177, 228 (1993).

In conclusion, the warrantless search was per se unreasonable, and therefore unconstitutional, because the circumstances cannot support that an emergency or exigent circumstances existed at the time of the removal. *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995).