# FAMILY INTEGRITY CLAIM

## ISSUE – WHETHER A NON-CUSTODIAL GRANDPARENT IS ENTITLED TO FAMILY INTEGRITY RIGHTS?

## COUNT #2- INTERFERENCE WITH FAMILY RELATIONSHIPS

The first step in determining whether the Plaintiff, Theresa Allen as grandmother of the children, is entitled to family integrity rights is to establish whether or not the Plaintiffs meet the criteria of a "family" that would invoke the constitutional right to family integrity.

The law is clear and settled that there is a fundamental right to family integrity and privacy. *See Griswold v. Connecticut,* 381 U.S. 479, 485 (1965); *Pierce v. Society of Sisters,* 268 U. S. 510, 535-36 (1926); *Meyer v. Nebraska,* 262 U.S. 390, 399-400 (1923). There is a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944). There is also no doubt that this fundamental freedom protects families from unwarranted intrusion by government child protective service agencies. As the Supreme Court held in *Troxel v. Granville,* 530 U.S. 57, 68-69 (U.S. 2000):

> "So long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."

Failure to observe that "zone of privacy" exposes the state to a claim that it has violated the family's Fourth, Fifth, and Fourteenth Amendment rights under the Constitution. Troxel makes it clear that the state cannot forcibly separate parent and child for any significant period of time without a court hearing, clear and convincing evidence of parental unfitness, and provision of counsel to the parent. None of these

protections prohibits the state from pursuing its responsibility to protect children from abuse and neglect, and "the right to familial integrity… does not include a right to remain free from child abuse investigations." *Croft v. Westmoreland County,* 103 F3d 1123, 1125 (3rd Cir. 1997).

When analyzing a familial relations claim a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse. In weighing these competing interests, the same reasonableness test used to evaluate Fourth Amendment claims should be used and the following considerations made:

(1) the nature of the privacy interest upon which the action taken by the State intrudes;

(2) the character of the intrusion that is complained of;

(3) the nature and immediacy of the governmental concern at issue; and

(4) the efficacy of the means employed by the government for meeting this concern.

This analytical framework allows courts to determine whether the governmental action taken was justified at its inception, and reasonably related in scope to the circumstances which allegedly justified the interference in the first place. *Doe v. Heck,* 327 F.3d at 520.

Three cases in particular, *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), *Santosky v. Kramer*, 455 U.S. 745 (1982), and *Troxel v. Granville*, 530 U.S. 57 (2000) can be interpreted as recognizing a due process right to family integrity under the Constitution.

### A. *Moore v. City of East Cleveland*

Appellant lives in her East Cleveland, Ohio, home with her son and two grandsons (who are first cousins). An East Cleveland housing ordinance limits occupancy of a dwelling unit to members of a single family, but defines "family" in such a way that appellant's household does not qualify. Appellant was convicted of a criminal violation of the ordinance. Her conviction was upheld on appeal over her claim that the ordinance is unconstitutional.

The U.S. Supreme Court reversed the decision, concluding that the ordinance deprived appellant of her liberty in violation of the Due Process Clause of the Fourteenth Amendment. *Moore v. City of East Cleveland*, 431 U.S. 494 (1977).

The ordinance here expressly selects certain categories of relatives who may live together and declares that others may not, in this instance making it a crime for a grandmother to live with her grandson. Id., pp. 498-499. When the government intrudes on choices concerning family living arrangements, the usual deference to the legislature is inappropriate; and the Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation. Id. at 499. The ordinance at best has but a tenuous relationship to the objectives cited by the city: avoiding overcrowding, traffic congestion, and an undue financial burden on the school system. Id., pp. 499-500. The strong constitutional protection of the sanctity of the family established in numerous decisions of this Court extends to the **family choice involved in this case and is not confined within an arbitrary boundary drawn at the limits of the nuclear family (essentially a couple [431 U.S. 494, 495] and their dependent children).** Appropriate limits on substantive

17

due process come not from drawing arbitrary lines but from careful "respect for the teachings of history [and] solid recognition of the basic values that underlie our society." *Griswold v. Connecticut*, 381 U.S. 479, 501 (Harlan, J., concurring). The history and tradition of this Nation compel a larger conception of the family. Moore, pp. 500-506.

### B. *Santosky v. Kramer*

Under New York law, the State may terminate, over parental objection, the rights of parents to their natural child upon a finding that the child is "permanently neglected." The New York Family Court Act (§ 622) required that only a "fair preponderance of the evidence" support that finding. Neglect proceedings were brought in Family Court to terminate petitioners' rights as natural parents to their three children. Rejecting petitioners' challenge to the constitutionality of § 622's "fair preponderance of the evidence" standard, the Family Court weighed the evidence under that standard and found permanent neglect. After a subsequent dispositional hearing, the Family Court ruled that the best interests of the children required permanent termination of petitioners' custody. The Appellate Division of the New York Supreme Court affirmed, and the New York Court of Appeals dismissed petitioners' appeal to that court. The U.S. Supreme Court vacated and remanded. *Santosky v. Kramer* - 455 U.S. 745 (1982)

The U. S. Supreme Court held that the fundamental liberty interest of natural parents in the care custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. A parental rights termination proceeding interferes with that fundamental liberty interest. When the State moves to

destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. Id., pp. 752-754. The nature of the process due in parental rights termination proceedings turns on a balancing of three factors: the private interests affected by the proceedings; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Mathews v. Eldridge,* 424 U. S. 319, 424 U. S. 335. In any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the public and private interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants. The minimum standard is a question of federal law which this Court may resolve.

The "fair preponderance of the evidence" standard prescribed by § 622 violates the Due Process Clause of the Fourteenth Amendment. *Santosky v. Kramer, pp.* 758-768. The balance of private interests affected weighs heavily against use of such a standard in parental rights termination proceedings, since the private interest affected is commanding, and the threatened loss is permanent. Once affirmed on appeal, a New York decision terminating parental rights is *final* and irrevocable. Id., pp. 758-761. A standard of proof more strict than preponderance of the evidence is consistent with the two state interests at stake in parental rights termination proceedings -- a *parens patriae* interest in preserving and promoting the child's welfare and a fiscal and administrative interest in reducing the cost and burden of such proceedings. Id., pp. 766-768.

Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence. A "clear and convincing evidence" standard adequately

conveys to the fact finder the level of subjective certainty about his factual conclusions necessary to satisfy due process. Determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts. Id., pp. 768-770.

### C. *Troxel v. Granville*

In 2000, the Supreme Court considered a constitutional challenge to Washington state's "third-party" or "non-parental" visitation statute. *Troxel*, 530 U.S. at 57. At issue in the case was whether a state could order visits with a non-parent against the wishes of a parent if the state determined that such visits were in the child's best interests. At the time the case was heard, all fifty states had enacted some form of third-party visitation statute, many of them singling out grandparents, others granting standing more broadly. Id. at 73. Several advocacy organizations for grandparents and children filed amicus briefs emphasizing the changing look of American families and the importance of children's maintaining relationships with those nontraditional caregivers to whom they had formed attachments. *See Brief of Amicus Curiae National Association of Counsel for Children, Troxel v. Granville,* 530 U.S. 57 (2000) (No. 99-138) (supporting state's authority to order visits with third parties who had served in a parental role because of the importance of these relationships to the child); *Brief of Amicus Curiae of Grandparents United for Children's Rights, Inc. (*arguing that children have a constitutional right to maintain their relationships with their grandparents*)*. These sorts of arguments appear to have strongly impressed the Court, inspiring a majority of the justices to offer only constrained support for parental rights.

20

**Texas Law**

The Tex. Fam. Code Ann., Chapter 261.001 entitled "Investigation of Report of Child Abuse or Neglect" defines and recognizes the following "persons" as having a notable relationship with a child in investigations of child abuse. Subparagraph 5 provides:

> (5) "Person responsible for a **child's care, custody, or welfare**" means a person who traditionally is responsible for a child's care, custody, or welfare, including:
>
> (A) a parent, guardian, managing or possessory conservator, or foster parent of the child;
>
> (B) **a member of the child's family or household as defined by Chapter 71;**
>
> (C) a person with whom the child's parent cohabits;
>
> (D) school personnel or a volunteer at the child's school; or
>
> (E) personnel or a volunteer at a public or private child-care facility that provides services for the child or at a public or private residential institution or facility where the child resides.

The Tex. Fam. Code Ann., Chapter 71, specifically provides under § 71.003 that "Family" includes individuals related by consanguinity or affinity, such as grandparents. (*See* §§ 573.022 and 573.024 of the Texas Government Code).

There is evidence that the parent, Renesha Allen voluntarily abdicated her parental duties and responsibilities to the grandparent, Theresa Allen. Based upon the above code provisions, it is clear that Theresa Allen, as a grandparent, is considered "family" and a "person" who is responsible for her grandchildren's care, custody, or welfare.

21

It was clearly known by the Defendants that Renesha Allen had consented and entrusted the children to the care of the grandmother. The grandmother's acts, words, and course of conduct would have led a reasonable person to conclude that she had accepted the responsibility for protection, food, shelter, and medical care for the children. The grandmother was in fact acting *in loco parentis* of the children.

*In loco parentis* means "in the place of the parent" and refers to a person who assumes the duties of a parent. *Schrimpf v. Settegast*, 36 Tex. 296, 302-03 (1871-1872); *Coons-Andersen v. Andersen*, 104 S.W.3d 630, 634-35 (Tex. App.-Dallas 2003). A person *in loco parentis* to a child has the same rights, duties, and liabilities as the child's parents without going through the formalities of a legal adoption. *Id.* at 635. These rights, duties, and liabilities include, among other things, physical possession of the child, moral and religious training, choice of the residence of the child, protection and reasonable discipline, support of the child, the right to make decisions concerning the child's education, and "any other right or duty existing between a parent and child by virtue of law." Tex. Fam. Code Ann. § 151.001(a). As can be seen from the Family Code's definition of the rights and duties of parents, a person *in loco parentis* has great responsibility and broad authority. It is obvious that being *in loco parentis* not only includes "accepting responsibility for protection, food, shelter, and medical care for a child," but greatly exceeds it. Thus, one who stands *in loco parentis* has, by its very definition, "care, custody, or control" of the child under § 261.001(5) of the Texas Family Code.

The doctrine of *in loco parentis* has had a strong influence that has caused a broader definition of "parent". In *Bennett v. Bennett*, 390 S.E.2d 276 (1990)

(grandparents stood in loco parentis to grandchild while child was in their custody, and could therefore take advantage of family immunity doctrine in tort action).  The U.S. Department of Education regulations implementing the IDEA define "parent" to include relative caregivers. The definition of "parent" is found in Title 34 of the Code of Federal Regulations (CFR) at section 300.30(a):

> The term parent means -- … (4) An individual acting in the place of a biological or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare;

Under the Texas Penal Code § 9.61

> (b) For purposes of this section, "in loco parentis" includes grandparent and guardian, any person acting by, through, or under the direction of a court with jurisdiction over the child, and anyone who has express or implied consent of the parent or parents.

Based upon the above noted leading cases and Texas law, it is the Plaintiffs' contention that Theresa Allen and her grandchildren are "family".  Theresa had the rights of a parent and a grandparent.  The sanctity of her family was violated by the Defendants when 1) the children were removed from the grandmother's possession, 2) the grandmother was denied due process when an emergency hearing was not held, 3) Defendants refused to perform statutorily required home study on the grandmother prior to the adversarial hearing, and 4) the grandmother was denied visitation with her grandchildren.

23

## COUNT #4 – SECTION 1983 VIOLATION OF ZONE OF PRIVACY PROTECTED BY THE UNITED STATES CONSTITUTION COMMITTED BY GOVERNMENTAL AGENT

The Texas Constitution protects personal privacy from unreasonable intrusion, and this right to privacy should yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental objective that can be achieved by no less intrusive, more reasonable means. *Texas State Employees Union v. Texas Dept. of Mental Health and Mental Retardation.* 746 S.W.2d 203, 205 (Tex. 1987).

In this case, the fundamental right to the family unit heavily outweighs the state's interest in protecting the children from abuse, when it is clear from the facts that the children were not in danger of physical or sexual abuse while in the possession of the grandmother. The Defendants cannot justify the removal of the children under the circumstances of this case.

Tex. Fam. Code Ann., § 262.107(1) recognizes that a parent, caretaker, or custodian, could be entitled to possession of the child . Subparagraph (b) looks directly to the household where the children would be returned and whether or not the person to be in possession has abused, neglected or sexually abused another child. If no abuse is found, the children are to be returned to the household. It is clear that the analysis performed by CPS prior to the removal, and the analysis performed by the Court after the removal should have involved the grandmother and her home, since the children resided with her and she had custody and control of them. Id.

There is/was no substantiated or official complaints against the grandmother concerning abuse of any kind. The Defendants cannot show that the grandmother was

24

"unfit" as a parent, or as a grandmother. The removal was illegal and a violation of the Plaintiffs' fundamental right to family integrity and privacy. *Griswold v. Connecticut*, 381 U.S. at 485.

**COUNT #3-Removing Children from Family Custody Without Hearing**

Under Tex. Fam. Code Ann., §§ 262.105 and 262.106, the Defendants were obligated to request an emergency hearing on December 7, 2009, when they initially filed their petition affecting the parent-child relationship. The Defendants were under a legal obligation to inform the court that Theresa, not the mother had physical custody of the children at the time of the removal. The last paragraph on the first page of Defendant Alpough's Affidavit attached to the original petition (state action) deliberately misinforms the Court by stating that CPS does not know "of any person not a party to the proceedings who has physical custody of the children." A copy of the first page of the Affidavit is attached as Exhibit "B". The Defendants failure to notice Theresa and their subsequent failure to have an emergency hearing was a violation of the grandmother's due process rights since she had possession of the children prior to their removal, and she was also present in the court on the day such a hearing was to be held.

**HOMESTUDY REQUIRED BY STATUTE**

CPS was obligated under Tex. Fam. Code Ann., § 262.114 to evaluate the grandmother to determine whether she could be an appropriate substitute caregiver for the children. A homestudy should have been performed prior to the adversarial hearing on December 17, 2009. Id. Theresa was the only person listed on the child placement

25

resource form provided under Tex Fam.Code Ann., § 261.307 completed by the mother. The resource form was never filed with the court as required by law. Id. The Defendants did not file a statement with the court that explained why the children were not placed with a relative or other designated caregiver as required by Tex. Fam. Code Ann., § 262.114(a-2). The Defendants deliberately and with malice refused to allow the grandmother to have possession of the children. When the court finally ordered a home study on Theresa, the Defendants manipulated the report and eventually denied her as a possible relative placement.

**VISITATION AND FAMILY ASSOCIATION**

The Defendants denied visitation to Theresa in excess of 10 months with no valid reason given. The CPS records did not contain a "court order" restricting the grandmother's visitation as alleged by the individual defendants. The only limitation imputed by the Court was for Theresa to take a drug test before visiting. The negative test results were submitted to the Court within 24 hours. According to CPS policy, visitation may be restricted if it is in the best interest of the child. The Defendants have used this policy inappropriately to restrict visitation of relatives when they are not to be designated as a "relative caretaker", or if CPS has decided without court order approval to permanently place the children for adoption. These unwritten policies were enforced by the individual defendants to the detriment of the children and the grandmother.

The Defendants' failure to provide visits between the grandmother and the children violates their right to freedom of association and family integrity under the First and Fourteenth Amendment. *Aristotle P. v. Johnson,* 721 F. Supp. 1002, 1005 (N.D. Ill. 1989).

26

Theresa argues that her relationship and visitation with the children was important because their relationship with their biological parents were tenuous. It was likely, that if she did not visit with the children, their mother would not likely visit (while in rehabilitation), leaving the children feeling abandoned. The Court determined that "the Fourteenth Amendment embraces a right to associate with one's relatives." Id., at 1007 The Court agreed that failing to provide visits among family on "a reasonable basis violates their right to freedom of association under the First Amendment…" Id. at 1005.

In *Aristotle P.*, the court concluded that the defendants' policies had seriously damaged, if not severed the relationship between the plaintiffs… The plaintiffs have sufficiently alleged the existence of a policy which deprives their liberty interests in their relationships. Id., at 1008. Significantly, the court noted, "The fact that the plaintiffs' injuries are psychological rather than physical is of no moment. … 'The protections of the Due Process Clause against arbitrary intrusions on personal security include both physical and emotional well-being.' " *Id.*, citing *White v. Rochford*, 593 S.2d 381, 385 (7th Cir. 1979).

The grandmother's in loco parentis rights afford her the same rights as a parent. As such, the children were not to be separated from her for any significant length of time without a court finding, by clear and convincing evidence, that she, as the parent was unfit and that her lack of fitness is harmful to the child. These statutory and judicially created rights ensure the child and the family are afforded appropriate substantive and procedural due process when the state's child protective service agency intervenes in their lives. *Troxel v. Granville* at 68-69.

Tex. Fam. Code Ann. § 102.004(b) provides further that the court may grant "a grandparent or other person" deemed to have had substantial past contact with the child leave to intervene in a pending suit "if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." Plaintiff, Theresa Allen did intervene in the lower court's pending suit, and eventually received managing conservatorship of the children, and the mother filed an unrevoked affidavit of relinquishment under Chapter 161 of the Texas Family Code, giving Theresa Allen the proper standing pursuant to §§ 102.003 (10) and 102.004 to pursue matters affecting her and the children.

## COUNT #5 – ABUSE OF CIVIL PROCESS

Abuse of process is the malicious misuse or misapplication of legal process in order to accomplish an ulterior purpose. *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 378 (Tex.App.- Texarkana 1989, no writ).

The elements of a claim for the tort of abuse of process are

    (1) There was an illegal, improper, or perverted use of the legal process, neither warranted nor authorized by the legal process,

    (2) There was an ulterior motive or purpose in exercising such use, and

    (3) There was damage as a result of the illegal act.

*Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 756 (Tex.App.-Houston [14th Dist.] 2000, pet denied).

Abuse of process exists where the original process is used to accomplish an end other than that which the writ was designed to accomplish. *Bossin v. Towber*, 894 S.W.2d

28

25, 33 (Tex.App.- Houston [14th Dist.] 1994, writ denied).

In this case, it has become evident from the facts that the Defendants utilized the legal system to remove the children from the possession of Theresa Allen, not for the purpose of protecting the children from physical or sexual abuse, but merely to punish Theresa for reporting their misconduct. Alpough was in fear of her job because she had failed to investigate the case timely. Hammond was upset because Theresa reported their lack of diligence and her concerns to their supervisor, defendant Chambers. When Chambers would not take corrective action, Theresa contacted the Program Director, Scott Dixon. Hammond was furious, and readily told Theresa that she would be sorry for going over her head. Both Alpough and Hammond threaten to remove the children, and made it clear that Theresa would never see them again. On December 4, 2009, the defendants made good on their threat. The children were taken without probable cause, and illegally removed from the possession of Theresa. The defendants were not concerned about the alleged "drug addicted mother", nor the "boyfriend", because the children were not in their custody. The Advisory indicated that an "emergency" was required under pre-Gates and post-Gates. The defendants' anger motivated them to remove the children without probable cause, not some known emergency. The Defendants misused the legal system to vindictively destroy the relationship between Theresa and her grandchildren. The facts show that the defendants' intentionally abused and manipulated the civil process by 1) initiating a civil lawsuit under a false pretense, 2) filing an erroneous document stating that they were unaware that Theresa had possession of the children, 3) deliberately avoiding the required statutory emergency hearing, and 4) manipulating the record to indicate a false "no visitation order" against Theresa to

enforce their illegal intent to permanently sever any connection between Theresa and her grandchildren. The defendants used the legal system to punish Theresa for "going over their heads" and contacting their supervisors. Supposedly, the Defendants were reprimanded internally for not following proper procedure when removing the children, but no corrective action was taken to rectify the situation. The state lawsuit continued to be pursued, causing Theresa to intervene, and litigate for over eleven months before the children were returned to her possession.

## PRAYER

For the reasons stated above, Plaintiffs request that the Court deny Defendants' Motion for Summary Judgment based upon immunity.

Respectfully submitted,

Wallace & Watson, P.C.

/s/ Sonya Wallace
Sonya O. Wallace
Attorney for Petitioners
TBN: 20776455
2626 S. Loop W., Ste. 400
Houston, Texas 77054
Tele: 713-661-3231
Fax: 713-661-8212
swallace4627@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2013, a true and correct copy of Plaintiffs' Supplemental Brief was forwarded via CM/ECF with the Court Clerk to Gunnar P. Seaquist, Assistant Attorney General, attorney for the Defendants.

/s/ Sonya Wallace
Sonya Wallace

30