UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THERESA ALLEN, individually, | § | |
| E.T.A., by and through Theresa Allen, and | § | |
| K.T.A., by an through Theresa Allen | § | |
|     Plaintiff, | § | CIVIL ACTION NO. 4:11-CV-04170 |
| | § | |
| v. | § | |
| | § | |
| YOLANDA ALPOUGH, | § | |
| ADRIAN HOMER, STEPHANIE HAMMON, | § | |
| and IVY CHAMBERS | § | |
|     Defendants. | § | |

---

**DEFENDANTS' REPLY TO PLAINTIFFS' SUPPLEMENTAL RESPONSE BRIEF**

---

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

JAMES "BEAU" ECCLES
Chief, General Litigation Division

*/s/ Gunnar P. Seaquist*
Gunnar P. Seaquist
*Assistant Attorney General*
Texas Bar No. 24043358
Southern District ID No. 1140733
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Phone: (512) 475-4083
Fax: (512) 320-0667
ATTORNEYS FOR DEFENDANT

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ii

I.   Summary of Reply ...................................................................................................1

II.  Reply .......................................................................................................................2

   A.  Fourth Amendment Search ...............................................................................2

      i.   Homer, Hammon, and Chambers.................................................................2

      ii.  Alpough...........................................................................................................2

   B.  Fourth Amendment Seizure ..............................................................................5

      i.   Homer ...........................................................................................................5

      ii.  Alpough, Hammon & Chambers ...................................................................5

         a.   No Clearly Established Standard .............................................................5

         b.   Objectively Reasonable Conduct ...........................................................7

            1.   Whether there was time to obtain a court order...............................7

            2.   Severity, Frequency, and Duration of the Abuse..............................8

            3.   Strength of the evidence supporting allegations of abuse.................9

            4.   Risk that the parent will flee with the child .....................................9

            5.   The possibility of less extreme solutions .........................................9

            6.   Any harm to the child that might result from the removal ...............10

   C.  Right to Family Integrity .................................................................................10

   D.  Removing Children Without a Hearing ...........................................................14

   E.  Abuse of Process.............................................................................................14

III. Prayer ....................................................................................................................16

Certificate of Filing and Service ..........................................................................17

# TABLE OF AUTHORITIES

## Cases

*Babb v. Dorman,* 33 F.3d 472 (5th Cir. 1994).................................................................2

*Baubles & Beads v. Louis Vuittan, S.A.*,
    766 S.W.2d 377 (Tex.App.—Texarkana 1989, no writ) ..................................15

*Bennett v. Bennett*, 390 S.E.2d 276 (Ga. 1990) ...........................................................13

*Bossin v. Towber*, 894 S.W.2d 25 (Tex.App.—Houston [14th Dist.] 1994, writ denied)........15

*Brown, Brown v. Callahan,* 623 F.3d 249 (5th Cir. 2010) ...........................................6

*Cantrell v. City of Austin*, 666 F.3d 911 (5th Cir. 2012) .............................................6

*Coons v. Coons-Anderson*, 104 S.W.3d 630 (Tex.App.—Dallas 2003, no pet.).....................14

*Foster v. City of Lake Jackson*, 28 F.3d 425 (5th Cir. 1994)........................................4

*Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404 (5th Cir. 2008) ..........6, 7

*Gibson v. Rich*, 44 F.3d 274 (5th Cir. 1995).................................................................4

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ..................................................................4

*Hunt v. Baldwin*, 68 S.W.3d 117 (Tex.App.—Houston [14th Dist.] 2001, no pet.)...............15

*Hunter v. Bryant*, 502 U.S. 224 (1991)........................................................................4

*Martin v. Tex. Dep't of Protective & Regulatory Servs.*,
    405 F. Supp. 2d (S.D. Tex. 2005) ....................................................................15

*Mesa v. Prejean*, 543 F.3d 264 (5th Cir. 2008) .......................................................5, 12

*Miller v. California*, 355 F.3d 1172 (9th Cir. 2004) ....................................................12

*Moore v. City of East Cleveland,* 431 U.S. 494 (1977) ...............................................11

*Mullins v. Oregon*, 57 F.3d 789 (9th Cir. 1995) .........................................................12

*Pittman v. Cuyahoga County Dep't of Family & Protective Servs.*,
    640 F.3d 716 (6th Cir. 2011) ..........................................................................15

*Pool v. Gray*, 275 F.3d 1115 (D.C. Cir. 2002) ...........................................................15

*Price v. Roark,* 256 F.3d (5th Cir. 2001) ..............................................................5, 6, 11

*Rakas v. Illinois*, 439 U.S. 128 (1978)..........................................................................5

*Salyer v. Patrick*, 874 F.2d 374 (6th Cir. 1989)..........................................................15

*Sama v. Hanningan,* 669 F.3d 585 (5th Cir. 2012)......................................................5

*Sanchez v. Swynden*, 139 F.3d 464 (5th Cir. 1998) .....................................................4

*Santosky v. Kramer*, 455 U.S. 745 (1982) ...............................................................12

*Tolan v. Cotton*, 713 F.3d 299 (5th Cir. 2013) .......................................................................7

*Troxel v. Granville*, 530 U.S. 57 (2000) .............................................................................12

*United States v. Pack*, 612 F.3d 341 (5th Cir. 2010) .................................................5

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013)..............................................................5, 11

**Statutes**

Tex. Fam. Code Ann. § 71.003.............................................................................................13

Tex. Fam. Code Ann. § 102.003...........................................................................................14

Tex. Fam. Code Ann. § 261.001...........................................................................................13

Tex. Fam. Code Ann. § 262.105...........................................................................................14

Tex. Fam. Code Ann. § 262.106...........................................................................................14

Tex. Fam. Code Ann. § 262.106(b).......................................................................................14

Tex. Fam. Code Ann. § 262.115...........................................................................................13

TO THE HONORABLE VANESSA GILMORE, UNITED STATES DISTRICT JUDGE:

Defendants Yolanda Alpough, Stephanie Hammon, Ivy Chambers, and Adrian Homer file their Reply to *Plaintiffs' Supplemental Brief* (Doc. 64) and would show as follows:

### I.      Summary of Reply

In their Supplemental Brief, Plaintiffs' wholly ignore this Court's directive to identify the summary judgment evidence on which they rely, and continue to resort to self-serving statements and unsupported allegations, but present not a scintilla of evidence to challenge the record upon which Defendants Alpough, Hammon, and Chambers based the decisions at issue in this case. (*See* Doc. 61, *but see* Doc. 64).   Accordingly, the record shows that these Defendants actions were not objectively unreasonable, nor in violation of a clearly established legal standard, and Defendants are therefore entitled qualified immunity as to the removal of E.T.A. and K.T.A prior to obtaining a court order.

Moreover, although given another opportunity to brief their family integrity claims, Plaintiffs fail to identify even a single case recognizing a right to family integrity or visitation in a non-custodial grandparent in their grandchildren, let alone a "robust consensus of authority" at an adequate level of specificity, as is required to overcome Plaintiffs' qualified immunity. Defendants are entitled to qualified immunity on Plaintiffs' family integrity and associational claims because Plaintiffs' have once again wholly failed to offer any legal authority evincing a clearly established right or any evidence that Defendants violated that right under the "conscience shocking analysis."

Plaintiffs' claim for removal without a hearing also fails because there is no dispute in the evidence that TDFPS complied with state law by filing a SAPCR petition on the first business

day after the removal—the Texas Family Code places the burden of holding a hearing thereon on the Court, not DFPS, and expressly allows an ex parte hearing as occurred in this case.

Finally, Plaintiffs are legally precluded from bringing an abuse of process claim under § 1983, and have identified no evidence on which to overcome qualified immunity on such a claim.

## II.     Reply
### A.  Fourth Amendment Search[1]

#### i.  *Homer, Hammon, and Chambers*

Similar to their earlier briefing, Plaintiffs' Supplemental response fails to identify any evidence sufficient to sustain a Fourth Amendment entry claim against Defendants Homer, Hammon, and Chambers.

#### ii.  *Alpough*

In their motion for summary judgment, Defendants produced evidence to show both that Theresa Allen gave affirmative verbal consent for Alpough and Cain to enter her apartment (Doc. 47, Appx. 4, ¶ 8; Appx. 316, ¶ 3), and that the totality of the circumstances would also support a reasonable belief of implied consent.   (Doc. 47, pp. 7-8).   Allen admits that to overcome Alpough's qualified immunity defense and survive summary judgment, Allen was required to produce summary judgment evidence to show that, under the totality of the circumstances, no reasonable caseworker could have believed that Theresa's actions signaled her intent to invite Alpough and Cain in when she opened the door, smiled, and cleared the children out of the way.  (*See* Doc. 64, p. 2; *See also* Doc. 47, pp. 7-8); *Babb v. Dorman*, 33 F.3d 472,

---

[1] As in their first round of briefing, Plaintiffs frequently conflate Theresa Allen's Fourth Amendment allegation of unlawful entry into her apartment, with E.T.A. and K.T.A.'s allegations of unlawful seizure during the removal.  In fact, the two are distinct claims and must be analyzed as such.

477 (5th Cir. 1994) (Plaintiff must rebut the qualified immunity defense by establishing and that no reasonable officer could have believed his actions were proper.)

In her Response Briefing, Theresa suggests that she was apprehensive and fearful that Alpough was coming to pick up the children and therefore "intentionally did not allow Alpough into the home when she arrived at the door."  (Doc. 64, pp. 4-5).  Theresa's testimony plainly refutes any notion of fear, however, as she testified that immediately prior to Alpough's arrival "we were excited it was snowing and I was getting my camera ready for us to take…to go and take pictures and everything."  (Doc. 56-4, p. 263: 19-23).  Theresa further recalls that she was "working on some Christmas stuff for the homeless people."  (Doc. 56-4, p. 263:23-25).  It was against this backdrop that Allen, with full knowledge that DFPS workers were coming out to visit her that morning, opened the door, smiled at Alpough, and turned inward to remove E.T.A. and K.T.A. from the doorway.  (*Id.* 264:12-24).

Even accepting as true Theresa's argument that she did not expressly invite Alpough in, which is false, it was only after Theresa says she turned inside and cleared the doorway that Alpough allegedly entered.  (*Id.*).  Thus, although Theresa alleges in her Response Brief that her body was purportedly "blocking the doorway," that is contradicted by her testimony that she turned to remove the children.  (Doc. 64, p. 5).  Similarly, although Theresa alleges in her response that "she held them at the doorway while speaking through the crack" (Doc. 64, p. 5), her testimony shows that she did not seek to speak to Alpough and Caine from behind the door as she was on the telephone when she came to the door.  (Doc. 47, Appx. 324, Theresa Allen Depo., 264:3-19).  To the contrary, Theresa opened the door, smiled, and then quickly turned away to move the children, because, as Allen testified, "they ran really fast."  *Id.*  To a reasonable social worker then, Allen's actions, taken in quick succession, would have appeared

3

as nothing more than Theresa smiling and backing away from the doorway to allow Alpough and Caine in out of the blustery weather.  Under such circumstances, it simply cannot be said that no reasonable caseworker could have believed Allen's conduct to be an implied invitation to enter.

Indeed, Allen's own arguments appear to focus more on the fact that she did not intend to invite Alpough and Caine in.  (Doc. 64, p. 5, ["Ms. Allen's initial intent was to merely speak with them"… "If it was her intent to let them in her immediate response upon opening the door would have been . . ."]).  However, in the qualified immunity analysis, relevant inquiry is not what Theresa intended, but rather how Theresa's actions, viewed objectively, would appear to a reasonable caseworker.  *See Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998 (*quoting Harlow*, 457 U.S. at 815–17.  Even if Alpough and Caine were mistaken about Allen's consent for them to enter, "the qualified immunity defense 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'"  *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995 (*quoting Hunter v. Bryant*, 502 U.S. 224, 226 (1991).  Thus, while this case may present a close call, courts err in favor of preserving qualified immunity.  *See e.g., Foster v. City of Lake Jackson*, 28 F.3d 425, 428 (5th Cir. 1994) (In balancing these interests, it is inevitable that some improper actions are shielded, however, "[a]brogation of qualified immunity is properly the exception, not the rule) (internal citations omitted).  Here, Plaintiff has failed to raise a genuine issue of material fact that no reasonable social worker could have believed Allen's actions to constitute implied consent[2] to enter and Alpough is therefore entitled to qualified immunity.

---

[2] Allen correctly points out that a DFPS internal legal advisory states that it is a "best practice" to obtain verbal consent rather than simply getting a nod or other non-verbal gesture.  (Doc. 64, p. 6).  However, that verbal consent is promoted by DFPS's General Counsel as a best practice does not make it a constitutional requirement.  As stated, verbal consent was given by Allen in this case.  Even if it were not, however, DFPS's internal legal memorandum does not preclude Alpough's reliance on the doctrine of implied consent through conduct, as recognized by the authorities cited in Defendants Motion for Summary Judgment.  (Doc. 47, pp. 6-7).

### B.  Fourth Amendment Seizure[3]

#### i.  Homer

As in their prior briefing, Plaintiffs' supplemental brief offers no evidence or allegation to show that Homer had any involvement in the removal of E.T.A. and K.T.A, and Homer is entitled to summary judgment on this claim.  (Doc. 47, Appx. p. 21, ¶ 2).

#### ii.  Alpough, Hammon, & Chambers

##### a.  No Clearly Established Standard

The Fifth Circuit has held that a right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*."  *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (emphasis added).  "Pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances."  *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012) (brackets omitted).  Thus, "immunity is not denied unless existing precedent places the constitutional question beyond debate."  *Wyatt*, 718 F.3d at 503.

The inquiry as to "whether the right was clearly established . . . 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008).  Although "it is not necessary [for] the defendant's exact act" to have been previously identified as a constitutional violation, nevertheless the "unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations."

---

[3]  Although unclear from Plaintiffs' Response, to the extent Theresa Allen argues she has a claim for wrongful removal/seizure under the Fourth Amendment, Defendants are entitled to summary judgment on that claim.  Fourth Amendment rights are personal rights, which may be enforced only by the person whose rights were infringed."  *United States v. Pack*, 612 F.3d 341, 341 (5th Cir. 2010) (citation omitted); *see also Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.").  Here, Theresa Allen was not "seized" and therefore cannot assert a wrongful seizure claim under the Fourth Amendment.

*Brown*, *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).. "An official does not lose qualified immunity merely because a certain right is clearly established in the abstract," but instead, the defendant "should receive the protection of qualified immunity unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful." *Cantrell v. City of Murphy*, 666 F.3d 911, 920 (5th Cir. 2012).

Allen's Fourth Amendment seizure argument in this case is predicated on the "imminent danger" standard announced in the *Gates* case, but that case did not address the situation facing Defendants Alpough, Chambers, and Hammon on December 4, 2009. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 427-28 (5th Cir 2008); *but see Price*, 256 F.3d at 369. *Gates* instead addressed the removal from the child's home and from parents who were otherwise present and able to care for the children. *Id.* As articulated in Defendants' Motion for Summary Judgment and subsequent briefing, there is no clearly established authority setting forth the level of exigency applicable to the removal of a child temporarily left with a non-custodial third-party by a parent who is unable to care for the child due to active drug abuse. (Doc. 47, pp. 9-12). In her latest round of briefing, Allen again fails to join issue on the applicability of *Gates*, and simply dismisses the stark contrast between the circumstances at issue in that case and those pertinent here as being "without merit." (Doc 64, p. 9). However, Allen's attempt to construe *Gates* as clearly establishing the law as it relates to this case fundamentally misapplies the Fifth Circuit's precedent on clearly established authorities in the context of qualified immunity. In fact, no clearly established precedent specifically, rather than abstractly, controls the facts facing Defendants in this case, and immunity cannot be properly denied as to this claim. *Cantrell*, 666 F.3d at 920.

### b.  Objectively Reasonable Conduct

Moreover, Plaintiffs' Supplemental Response Brief misapplies the non-dispositive *Gates* factors as, even under *Gates*, Defendants actions were reasonable in light of the information known to Defendants at the time of the removal of E.T.A. and K.T.A.   Defendants reply as follows:

### 1.  Whether there was time to obtain a court order.

Plaintiffs assert that "the seizure took place on December 4, 2009, at approximately 10:00 a.m., in the morning…The Harris County court system was open."  (Doc. 64, p. 8).  Notably, after defendant properly invokes qualified immunity, plaintiff bears the burden to rebut its applicability."  *Tolan v. Cotton*, 713 F.3d 299, 304 (5th Cir. 2013). "The plaintiff must rebut the defense by establishing that genuine issues of material fact exist regarding the reasonableness of the official's conduct."   *Gates*, 537 F.3d at 418-19.   Here, although Plaintiffs make the conclusory assertion that the Harris County Courts were open, they present no evidence to show that was actually the case.  To the contrary, it is undisputed that there was inclement weather in Houston on December 4, 2009, including freezing temperatures and precipitation creating ice/snow.  (Doc. 47, Appx. 193; Doc. 47. Appx. 4, ¶ 8; Doc. 56-4, p. 263: 19-23).  Indeed, the government offices of DFPS were closing, and it is not clear that other government offices such as the Harris County Courts, were, in fact, open.  (Doc. 47, Appx. 193; Doc. 47, Appx. 4, ¶ 8).

Furthermore, even if the courthouse doors were technically open, Plaintiffs still cannot establish that a reasonable caseworker in Alpough's shoes would have believed there was sufficient opportunity to obtain a Court order in time to remove the children before the weather deteriorated further.  As Alpough relates in her investigation report, "[i]t was snowing outside and our offices were closing," and "Hammon told me to remove the children and return to our

office so we could get the children placed before the weather got too bad." (Doc. 47, Appx. 193, Appx. 4, ¶ 8, Appx. 10, ¶ 8). Here, Defendants concerns for getting the children placed before it became too dangerous to be out on the roads were reasonable and appropriate.

## 2. Severity, Frequency, and Duration of the Abuse.

The danger of abuse and neglect to E.T.A. and K.T.A. has been extensively briefed in this matter. (Doc. 47, Doc. 57, Doc. 62). In addition to a long CPS history of abuse and neglect allegations, Renesha Allen had tested positive for crack cocaine during a time when she had possession of the children. (Doc. 47. Appx. 190) (Theresa admits that Renesha briefly brought Theresa the children when she was trying to avoid taking a drug test and that she was going to take something to clear the drugs out of her system; she positive for cocaine). Similarly, Theresa knew Renesha was using drugs because she stated that Renesha had called her when she was high. (Appx. 190). Moreover, Theresa stated that she had seen the children unclean, with bruises and busted lip, and that Renesha had admitted to popping E.T.A. in the mouth. (*Id.*). Theresa further stated that Renesha kept the children in a "rat hole" while she was hiding from DFPS. (*Id.*). Despite knowledge of this ongoing danger and abuse, Theresa neglectfully endangered the children by returning them to Renesha without calling DFPS, because she believed DFPS would not allow the children to remain with her. (Appx. 191). Moreover, there were extensive references in investigative record to Theresa Allen's suffering from a mental disorder (bi-polar) for which she refused to take medication. (*See e.g.,* Appx. 56-57, 82, 186, 189). Thus, upon finding the children at Theresa's it was reasonable for Defendants to believe that the children were in immediate danger of continued abuse and neglect if they were not removed. Indeed, at both the ex parte emergency hearing and the subsequent full adversary hearing the Court found that there was a continuing risk of danger if returned. (Appx. 222-241).

### 3.   Strength of the evidence supporting allegations of abuse.

It is no small irony that Theresa would seek to challenge the strength of evidence that was comprised largely of Theresa's own statements to DFPS.  Additionally, Theresa's allegations of Renesha's drug use were also supported by a positive drug test and Renesha's own admission that she was using drugs.  (Appx. 4, ¶ 7).

### 4.   Risk that the parent will flee with the child.

The evidence before DFPS was that Alpough was unable to find E.T.A. and K.T.A. for a significant period of time when she knew them to be in the possession of a drug-using Renesha. Indeed, there was evidence of active concealment of the children by Renesha coupled with either neglect or outright complicity by Theresa.  (Appx. 187-189).  Thus, it was entirely reasonable for DFPS and its officials to believe that removal was a reasonable step to protect against once again losing the children to a dangerous and abusive environment.  DFPS had no independent confirmation that Renesha was actually in rehab, nor that she would stay there.  As such, the risk that Renesha would reclaim the children and go back into hiding was real, and Defendants actions were reasonable in light of that risk.

### 5.   The possibility of less extreme solutions.

Theresa has not identified any "less extreme" solution that DFPS did not investigate or consider, beyond Theresa's own belief that the children should have been placed in her custody. However, Theresa's conduct in returning the children to Renesha without calling for help and allegations by several of Theresa's relatives that she suffered from untreated mental disorders made Theresa unfeasible as a short term placement.  (*See e.g.,* Appx. 56-57, 82, 186, 189). Then, shortly after the removal, Renesha indicated that she did not want Theresa to have possession of her children.  (Appx. 14-15).  Under these circumstances, Theresa cannot show

that no reasonable caseworker could have concurred with Defendants that Theresa was not a viable option for placement of the children

### 6.  Any harm to the child that might result from the removal.

In her supplemental brief, Theresa mistakenly argues that harms supposedly suffered by the children during their subsequent time in foster care were attributable to the removal.[4]  As a threshold matter, Theresa has neither produced nor identified any summary judgment evidence that supports these purported harms, as indeed there is none.  Further, Theresa's argument misunderstands the scope of the alleged deprivation due to a removal without a court order.  In fact, even if the December 4, 2009 removal was improper, which it was not, the family court approved the removal on December 7, 2009, and ordered placement with DFPS.  (Appx. 222-228).  Thus, the correct analysis at issue here is what harm might have resulted at the time of the initial removal without a Court order—before the subsequent court approval.  Here, Theresa produces neither allegation nor evidence of any such harm, and, therefore, this factor does not weigh against the reasonableness of the removal on December 4, 2009.  To the contrary, even if *Gates* was clearly established as controlling the circumstances facing Defendants in this case, and it was not, a proper application of the foregoing *Gates* factors shows that Defendants' actions were reasonable and that Defendants are entitled to qualified immunity.

### C.  Right to Family Integrity

In their supplemental Response Brief, Plaintiffs again wholly neglect to address any of Defendants cited authorities, which clearly held that the right to family integrity is not only generally nebulous in the context of CPS investigations such that qualified immunity is properly afforded, but also that there is no clearly established right to family integrity between a non-

---

[4]In fact, Theresa blatantly misstates the evidence.  It is undisputed in the record that Renesha Allen did visit the children during their time in foster care.  Doc. 47, Appx. 33, Renesha Depo. transcript, 214:16-214:8).

custodial grandparent and their grandchildren.  (*See* Doc. 62, pp. 10-13, *but see* Doc. 64, pp. 15-23).  Instead, Theresa cites inapposite federal case law, unrelated statutes and regulations, and the common-law doctrine of *in loco parentis* in an attempt to cobble together an argument that the right to family integrity should extend to her even though she did not have custody of E.T.A. and K.T.A.  However, the test for qualified immunity is not whether a plaintiff can formulate a novel, albeit unsound, legal theory, but rather whether "existing precedent places the constitutional question beyond debate."  *Wyatt*, 718 F.3d at 503.  Plaintiffs have failed to identify a single authority clearly establishing the non-custodial grandparent's right to family integrity in the situation confronted by Defendants and Defendants are, therefore, entitled to qualified immunity.  *See Price*, 256 F.3d at 369.

Indeed, a review of Plaintiffs' cited federal authority demonstrates that those cases did not address the issue of a non-custodial grandparent's right to have children placed with her or to visit the children, particularly when the children's mother has expressly that the children not be so placed.  For example, *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), addressed only the narrow question of whether a city housing ordinance that, based on land-use concerns, "intrude[d] on choices concerning family living arrangements."  *Id.* at 499.  The Supreme Court struck down the ordinance that restricted occupancy in a dwelling to single families and defined "family" in a manner that prevented a grandmother from choosing to allow her grandson to live with her in her home.  *Id*. at 504–06, 97 (footnotes and internal citation omitted).  *Moore* did not address matters of child welfare and did not hold that non-custodial grandparents had a right to custody or visitation of children removed from their parents due to abuse and neglect.  Indeed, since the holding in *Moore*, the Ninth Circuit has recognized that no such right exists.  *See*

*Miller v. California*, 355 F.3d 1172 (9th Cir. 2004); *Mullins v. Oregon*, 57 F.3d 789, 794, 797 (9th Cir. 1995).

Plaintiffs' reliance on *Santosky v. Kramer*, 455 U.S. 745 (1982), and *Troxel v. Granville*, 530 U.S. 57 (2000) is similarly misplaced.   *Santosky*, in fact, did not discuss the rights of grandparents at all, but instead addressed only the proper evidentiary standard for termination of the rights of parents in their biological children.   *Santosky*, 455 U.S. at 753-54.   Therefore, while that decision might recognize the right to family integrity in another, more generalized context, it does not define the right with sufficient specificity to deny qualified immunity on the facts of this case.   *Mesa*, 543 F.3d at 269 (The inquiry as to "whether the right was clearly established . . . 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'").   Likewise, *Troxel* did not recognize a right to family integrity by grandparents, and indeed struck down a court order mandating that grandparents have visitation with their grandchildren on the basis that it infringed upon the parents' right to determine the best interest of their child.   *Troxel*, 530 U.S. at 68-70.   Here, the children's biological mother, Renesha, expressly requested that her mother not have custody of the children and requested visitations only for herself.   (Appx. 14-15).   Thus, *Troxel* actually supports DFPS's actions as reasonable as the agency was attempting to balance the biological parent's wishes with protecting the safety of the children.   As such, Plaintiffs have offered no precedent showing that a grandparent has a clearly established family integrity right with regard to children in the managing conservatorship of DFPS.

Likewise, Plaintiffs' arguments under Texas law also fail to demonstrate that a non-custodial grandparent has a clearly established family integrity right under the Fourteenth Amendment to the U.S. Constitution, as asserted in this case.   Plaintiffs' citation to the Texas

Family Code show only that grandparents are included within in an illustrative list of individuals traditionally responsible for a child's care, custody, or welfare (Tex. Fam. Code § 261.001) and the definition of a "family" as it relates to obtaining a protective order on the basis of family violence (Tex. Fam. Code § 71.003).  (Doc. 64, p. 21).  Neither of these provisions articulate a right of grandparents to visitation or custody of children in DFPS's conservatorship.  To the contrary, Tex. Fam. Code § 262.115, which addresses visitation of children in foster care, references only the right to visitation by a parent, and even then, only in certain circumstances. Tex. Fam. Code. § 262.115.  Although Theresa seeks to avoid the point: she was not the parent or legal conservator of E.T.A. and K.T.A. at the time of the events at issue in this suit, and therefore did not have a clearly established family integrity right to the children.

Neither may Plaintiff sustain her clearly established right to family integrity by invoking the common law doctrine of *in loco parentis*.  Plaintiff has not produced, and cannot produce, any authority in support of their argument that a grandparent who temporarily assumes possession of her grandchildren for a brief period is somehow vested with all the rights of a biological parent.  (Doc. 64, p. 23).  To the contrary, all of Plaintiffs' cited authorities show that the *in loco parentis* doctrine requires more than the mere brief possession of a child.  For example, *Bennett v. Bennett,* a remote case from Georgia that is over twenty-years old, the court found grandparents to be acting *in loco parentis* based on the fact that the grandparents were the legally appointed guardian of their grandchildren.  *Bennett v. Bennett* 390 S.E.2d 276, 277 (Ga. 1990).  Further *Coons v. Coons-Anderson* addressed a provision in the Texas Family Code that allowed non-custodial persons with possession of children standing to sue on their behalf only after that individual had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition.  104 S.W.3d 630

13

(Tex.App.—Dallas 2003, no pet.)(citing Tex. Fam. Code § 102.003).  Further, *Coons-Anderson* recognizes that an *in loco parentis* relationship ceases once there is no longer actual care, control, and possession of the child.  *Coons-Anderson*, 105 S.W. 3d at 635-36.  Thus, even if Theresa was acting *in loco parentis* at the time of removal, she ceased doing so when the children were placed in the conservatorship of DFPS and Renesha was actively visiting the children while attempting to achieve reunification.  Ultimately, however, Theresa cannot point to any authority applying the common law doctrine of *in loco parentis* to vest a non-custodial grandparent with a clearly established right to visitation or custody of a grandchild in foster care. As such, Defendants are entitled to qualified immunity on Plaintiffs' family integrity claims.

### D.  Removing Children Without a Hearing

Contrary to Plaintiffs' assertions, the Texas Family Code expressly allows for the initial hearing after the emergency removal of a child to be ex parte and proof may be by sworn petition or affidavit if a full adversary hearing is not practicable.  Tex. Fam. Code § 262.106(b).  Under the family code, it is the court that holds the hearing, and it is therefore the determination of the court as to whether the hearing will be ex parte or a full adversary matter in open court.  Tex. Fam. Code §§ 262.105, 262.106.  Alpough's affidavit to the Court expressly referenced Theresa Allen and explained why DFPS did not place the children with Theresa. (Doc. 47, Appx. 220). Thus, the Court had a full record before it and made its determination in accordance with the statute.   Plaintiffs have failed to articulate a due process violation, and Defendants are entitled to qualified immunity.

### E.  Abuse of Process

As stated in Defendants' summary judgment, Defendants are entitled to summary judgment on this claim because there is no free-standing federal abuse of civil process claim

under Section 1983, as alleged by Plaintiffs.  *See e.g., Martin v*, 405 F. Supp. 2d at 798.  Even if such a claim was cognizable, which it is not, the federal courts have recognized that Social Workers have absolute immune from liability for initiating SAPCR claims.  *See e.g., Pittman v. Cuyahoga County Dep't of Family & Protective Services*, 640 F.3d 716, 724 (6th Cir. 2011); *Salyer v. Patrick,* 874 F.2d 374, 378 (6th Cir. 1989); *Pool v. Gray*, 275 F.3d 1115, 1117 (D.C. Cir. 2002).

Finally, even if construed as a state law claim, which Plaintiffs have not plead, Plaintiffs have nevertheless failed to produce evidence establishing an abuse of process claim under Texas law.  Specifically, Plaintiffs have not established an illegal, improper or perverted use of the legal process.  To constitute an abuse of process under Texas Law, the process must have been used to accomplish an end which is beyond the purview of the process and which compels a party to do a collateral thing which he could not be compelled to do. *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 379 (Tex. App.--Texarkana 1989, no writ). The critical aspect of this tort is the improper use of the process after it has been issued. *Bossin v. Towber,* 894 S.W.2d 25, 33 (Tex. App.--Houston [14th Dist.] 1994, writ denied). Stated another way, the original issuance of process is justified, but the process itself is later used for a purpose for which it was not intended. *Hunt v. Baldwin,* 68 S.W.3d 117, 130 (Tex. App.--Hous. [14th Dist.] 2001, no pet.).  When the process is used for the purpose for which it was intended, even though accomplished by an ulterior motive, no abuse of process has occurred. *See id.*  Here, Defendants used the process afforded in the Texas Family Code for the purpose it was intended: to remove the children to ensure their protection.  Plaintiffs offer nothing more than rank speculation and unsupported allegations to the contrary.  As such, Defendants are entitled to summary judgment on the basis of qualified immunity on these claims.

**III.    Prayer**

Based on the foregoing, Defendants pray that the Court grant their summary judgment and dismiss Plaintiffs' claims in their entirety.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

JAMES "BEAU" ECCLES
Chief, General Litigation Division

 */s/ Gunnar P. Seaquist*
Gunnar P. Seaquist
*Assistant Attorney General*
Texas Bar No. 24043358
Southern District ID No. 1140733
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Phone: (512) 475-4093
Fax: (512) 320-0667
*Attorneys for Defendant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on October 15, 2013, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) with the Clerk of the Court of the U.S. District Court for the Southern District of Texas, and that counsel identified below would be advised of and given access to a copy of the filing.

Ms. Sonya Wallace
2626 South Loop West, Ste. 400
Houston, Texas 77054
*Attorney for Plaintiff Theresa Allen,*
*Individually and as next friend to E.T.A. and K.T.A.*


*/s/ Gunnar P. Seaquist*
Gunnar P. Seaquist
Assistant Attorney General